LATHAM & WATKINS LLP
  Daniel Scott Schecter (Bar No. 171472)
    *daniel.schecter@lw.com*
355 South Grand Avenue
Los Angeles, California  90071-1560
Telephone:   (213) 485-1234
Facsimile:   (213) 891-8763

LATHAM & WATKINS LLP
  David F. Kowalski (Bar No. 265527)
    *david.kowalski@lw.com*
12670 High Bluff Drive
San Diego, CA 92130
Telephone:   (858) 523-5400
Facsimile:   (858) 523-5450

LATHAM & WATKINS LLP
  Blair Connelly (Bar No. 174460)_
    *blair.connelly@lw.com*
  William O. Reckler (not admitted to the California Bar)
    *william.reckler@lw.com*
885 Third Avenue
New York, New York 10022-4834
Telephone:   (212) 906-1658
Facsimile:   (212) 751-4864

Attorneys for Plaintiff CrossFit, Inc.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CROSSFIT, INC., a Delaware corporation,<br><br>              Plaintiff,<br><br>       v.<br><br>NATIONAL STRENGTH AND CONDITIONING ASSOCIATION, a Colorado corporation,<br><br>              Defendant. | CASE NO.   **'14CV1191 JLS  KSC**<br><br>**COMPLAINT FOR:**<br><br>**(1)   FALSE ADVERTISING (Lanham Act - 15 U.S.C. § 1125(a));**<br><br>**(2)   FALSE ADVERTISING (Cal. Bus.  Prof. Code § 17500);**<br><br>**(3)   UNFAIR COMPETITION (Cal. Bus. & Prof. Code § 17200); and**<br><br>**(4)   DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

**PRELIMINARY STATEMENT**

1.     This case is about a supposedly "scientific" study that Defendant National Strength and Conditioning Association (the "NSCA") published to attack one of its competitors, CrossFit, Inc. ("CrossFit").  The study is based on data that is objectively false.  Specifically, it reports that 9 of the 54 participants in the study dropped out of the CrossFit program being evaluated due to "injury or overuse."  That simply is not true.  The NSCA nonetheless published the study and used the falsified rate of injury to attack its competitor, CrossFit, in the marketplace.  CrossFit has made the NSCA well aware of the fact that the study's data was falsified, but the NSCA has nonetheless refused to take any corrective action.  This case seeks to remedy the harm caused by the NSCA's unlawful, unfair, and unethical conduct.

2.     The NSCA and CrossFit are competitors in the fitness industry. In the past half-century, little has changed in most American gyms.  The staples of today's gyms – things like weight machines, treadmills, and exercise bicycles – are basically the same types of equipment that were used decades ago.  The NSCA and its long-time peer, the American College of Sports Medicine (the "ACSM"), are two pillars of this traditional fitness establishment.  For decades, the NSCA and ACSM have taught the same stagnant brand of fitness and have built a lucrative apparatus around it.  They are among the largest certifiers of personal trainers and strength and conditioning professionals (collectively, "trainers") in the country, and they also offer seminars, study guides, and tests that are used throughout the industry.  They also publish supposedly scholarly journals that perpetuate their fitness model.  In short, the NSCA and ACSM are largely responsible for maintaining the status quo in the massive fitness industry, and they have a vested interest in doing so:  they obtain significant revenues charging for the certifications and training services based on it.

3.      Plaintiff CrossFit is a relatively new player in the fitness space. CrossFit has experienced a meteoric rise from a single affiliate gym in 2000 to approximately 10,000 affiliate gyms today, with 80,000 certified CrossFit trainers teaching CrossFit to more than a million participants.  The CrossFit regimen is a radically different approach to the brand of fitness training fostered by NSCA and ACSM.  CrossFit involves constantly varied functional movements performed at a relatively high intensity, with an emphasis on aerobic exercises, gymnastic movements, and Olympic weight lifting.  Whereas the NSCA's and ACSM's decades-long stranglehold on fitness has resulted in a country that is generally considered to be out of shape – if not downright obese – CrossFit has gained a massive following in recent years precisely because it achieves better and faster results than traditional forms of fitness training.  In short, it succeeds where the traditional fitness establishment has failed.

4.      Like the NSCA and ACSM, CrossFit makes a significant portion of its revenue through the certification of CrossFit trainers.  CrossFit, Inc. offers its initial Level I Trainer's course, as well as both advanced and specialty courses. CrossFit's ascendance therefore threatens the revenue stream of the traditional fitness providers.  The NSCA and ACSM could use this competition as an opportunity to rise to the occasion, and either (a) prove that their fitness model yields better results than CrossFit (which it does not), or (b) revise their model to make it better.  They have done neither, and instead have opted for the well-worn strategy that "the best defense is a good offense."  Through its supposedly "peer reviewed" journal – the Journal of Strength and Conditioning Research ("JSCR") – the NSCA has published falsified data suggesting that CrossFit causes injuries at a high rate.  It has done so in an effort to portray CrossFit as "dangerous," and therefore a fitness program that should be avoided.

5.      There has not been a single study based on scientifically valid principles demonstrating that CrossFit poses a greater injury risk than any other

form of rigorous exercise.  In November 2013, the JSCR published a study by Steven T. Devor (an ACSM "fellow"), Michael M. Smith, Allan J. Sommer, and Brooke E. Starkoff, entitled "Crossfit-based [sic] high intensity power training improves maximal aerobic fitness and body composition" (the "Devor Study"). The Devor Study purported to track a ten-week CrossFit program.  While the Devor Study correctly found that CrossFit improved the athletes' fitness levels, it also reported that nine of fifty-four participants (16% of the sample population) dropped out of the program due to "overuse or injury."  That assertion was based on false data.

6.      The report of a 16% "overuse or injury" rate is at best the result of sloppy and scientifically unreliable work, and at worst a complete fabrication.  It simply is not true that nine participants sustained injuries that prevented them from completing the study.  In fact, CrossFit has spoken to a majority of those who did not complete the study; those participants denied reporting that they failed to finish because of injuries.  Indeed, those participants asserted that they had not been in contact with Mr. Devor and his team at all regarding their reasons for not completing the study, or regarding injuries in general.

7.      The purported "overuse or injury" data published in the JSCR was contrived to dissuade people from pursuing CrossFit as a form of exercise, and relatedly to dissuade trainers from seeking CrossFit certification instead of NSCA and ACSM certifications.  CrossFit discussed the unreliability of the data with the Devor Study's authors, and made it known to the NSCA, but the NSCA chose not to correct the publication.  Instead, the NSCA continues to disseminate inaccurate information about CrossFit throughout the fitness industry.

8.      CrossFit is eager to compete with the NSCA, ACSM, and other traditional fitness providers in the market.  It is confident that the merits of the CrossFit model will prevail.  CrossFit only demands that there be a level playing field based on the merits of the fitness program, not false data and junk "science"

1    intended to scare participants away from CrossFit.  The Devor Study is just one

2    egregious example of the NSCA's campaign of using false advertising and unfair

3    competition to attack CrossFit's business model.  CrossFit brings this action to put

4    a stop to the NSCA's unlawful conduct.

5                                          **PARTIES**

6           9.    Plaintiff CrossFit is a Delaware corporation, with its principal place of

7    business at  444 S. Cedros Avenue, Solana Beach, California.

8           10.   The NSCA is a Colorado corporation, with its principal place of

9    business at 1885 Bob Johnson Dr., Colorado Springs, Colorado.

10                          **JURISDICTION AND VENUE**

11          11.   This is a civil action for false advertising under the Lanham Act (15

12   U.S.C. § 1125(a)); false advertising under California Business and Professions

13   Code Section 17500; unfair competition under California Business and Professions

14   Code Section 17200; and declaratory judgment.

15          12.   This Court has subject matter jurisdiction over CrossFit's claims for

16   violation of the Lanham Act pursuant to 15 U.S.C. § 1125; and 28 U.S.C. §§ 1331

17   and 1338(a).  This Court has original and/or supplemental jurisdiction over

18   CrossFit's state law claims pursuant to 28 U.S.C. §§ 1338(b) and 1367(a), because

19   the state law claims for false advertising and unfair competition are joined with

20   substantial and related claims under the federal false advertising and unfair

21   competition law.  This Court also has diversity jurisdiction over this action,

22   pursuant to 28 U.S.C. § 1332(a)(2), because the matter in controversy exceeds the

23   sum or value of $75,000 exclusive of interest or costs, and is between citizens of

24   different states.

25          13.   Personal jurisdiction over the NSCA is proper because it advertises

26   and sells products and services to customers and prospective customers in

27   California and in this District.

28

1    14.    Venue is proper in this District and before this Court pursuant to 28

2    U.S.C. § 1391(b).

3    **GENERAL ALLEGATIONS**

4    **A.    The NSCA's Lucrative Personal Training Certification Business**

5    15.    The NSCA is a fitness organization that was founded in 1978.  It

6    promulgates standards for physical training.  For the past several decades, the

7    NSCA, ACSM, and American Council on Exercise have been the three leading

8    players in the physical training industry.  Their physical training standards are

9    widely used throughout the fitness industry.

10   16.    Today the NSCA consists of nearly 30,000 members and touts itself

11   as the "leader in research and education of strength and conditioning

12   professionals."  According to the NSCA's website, its members consist of

13   "thousands" of NSCA-certified trainers.  It is one of the largest certifiers of trainers

14   in the country.

15   17.    On information and belief, a large portion of the NSCA's revenue is

16   attributable to the certification of trainers, and accompanying renewal and

17   continuing education requirements for its trainers.

18   18.    The NSCA offers exams for four types of trainer certifications:

19   Certified Strength and Conditioning Specialist, Certified Special Population

20   Specialist, NSCA-Certified Personal Trainer, and Tactical Strength and

21   Conditioning Facilitator.  The fees for such exams range from $250 to $450.  The

22   NSCA also sells a variety of examination preparation materials.

23   19.    Once certified, NSCA-certified trainers are required to pay to renew

24   their certifications every two years.  The NSCA also has continuing education

25   requirements, which vary based on a trainer's level of certification.  These

26   continuing education requirements can be met through NSCA-approved continuing

27   education programs, such as seminars and videos.  The NSCA receives revenue in

28   the form of fees paid by trainers for continuing education programs.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

6

20.     According to the ACSM's website, it has "more than 45,000 members and certified professionals worldwide."  Like the NSCA, it provides trainer certifications.  On information and belief, a large portion of the ACSM's revenue is attributable to the certification of trainers, and accompanying renewal and continuing education requirements for its trainers

21.     Although the NSCA and ACSM are technically competitors in the trainer certification industry, they promote similar fitness products and have similar business models.  Their certifications are viewed as nearly interchangeable in the fitness industry.  Like the NSCA, the ACSM derives revenue from trainer certification programs, exam preparation materials, and continuing education requirements.  The NSCA and ACSM work closely together and, in fact, the ACSM even allows its members to use NSCA courses to fulfill ACSM continuing education requirements.

22.     In addition to its trainer certification business, the NSCA also publishes supposedly scholarly work regarding health and fitness in support of the NSCA's traditional fitness model.  The NSCA publishes at least six journals.  According to the NSCA's website, the JSCR is "the official research journal of the National Strength and Conditioning Association."  It purports to publish "monthly issues containing peer-reviewed, evidenced based findings intended to increase your professional knowledge . . . ."

23.     The NSCA's website indicates that the "goal" of its journals, including the JSCR, is to "provide you with a valuable balance of the newest findings in strength and conditioning research and its practical application."  It advertises its allegedly peer-reviewed journals, of which the JSCR is its most notable, as "some of the most sought after in the industry" and as " top resources for your continuing education and professional development."

24.     Upon information and belief, the NSCA coordinates the supposed peer-review process for articles published in the JSCR.

25.     The JSCR is published in print format, online format, and as applications for tablets and mobile devices.  Issues of the JSCR are available to NSCA members and for purchase.

26.     The JSCR has a large readership and the articles published therein are frequently cited by fitness professionals, authors, commentators, and members of the media.  The NSCA uses the JSCR to further the NSCA's brand of fitness and recognition in the fitness industry.

**B.     CrossFit's Competing Trainer Certification Business**

27.     CrossFit, Inc. is a fitness company whose training methodology differs from that of the NSCA and ACSM.  Its trainer certification program also competes with that of the NSCA and ACSM.

28.     CrossFit aims to improve muscular strength, endurance, flexibility, and the other generally recognized components of fitness through a perpetually changing, rigorous mix of functional movements that include gymnastics and bodyweight based movements, Olympic weight lifting, and single-modality aerobic activities (such as running, rowing, or even swimming).  CrossFit mixes these exercises together in workouts that may be for time, for load, or in rounds.

29.     Due to its (a) high-intensity exercise style, (b) focus on practical physical training, and (c) constantly varying mix of exercises, CrossFit is highly effective and has quickly earned a massive following (particularly among current and former members of the military).

30.     CrossFit's novel approach to fitness is a threat to the NSCA's and ACSM's business models.  In just over a decade, CrossFit has grown to include nearly 10,000 licensed affiliate gyms (referred to as "boxes"), including approximately 300 military and law-enforcement affiliate boxes.  CrossFit continues to expand rapidly, presently with approximately 80,000 certified trainers, and a million or more participants around the world.

31.     CrossFit's profitability is due to two core revenue streams: (i) the certification of trainers through its seminar program, which provides American National Standards Institute (ANSI) accredited certificate courses; and (ii) licensing the CrossFit name to affiliate boxes, which are run by licensed Level I trainers in good standing, many of whom also employ additional Level I trainers.

32.     A large portion of CrossFit's popularity is due to the low costs of operating affiliate boxes.  CrossFit licenses the CrossFit name to its affiliate boxes for an annual, renewable fee of no more than $3,000.  Unlike most fitness organizations, CrossFit's boxes require few expensive pieces of gym equipment. CrossFit's low licensing fees contribute to its impressive growth.

33.     All CrossFit affiliate boxes are operated by individuals that have completed at least the CrossFit Level 1 Trainer Course.  This course is offered by CrossFit to first-time trainers for a fee of approximately $1,000.  This certification is valid for five years, at which time the trainer must recomplete and pass the Level 1 Trainer Course and accompanying written test.

**C.     The NSCA, Through the JSCR, Publishes False CrossFit Injury Data**

34.     The JSCR's website identifies JSCR as "The Official Research Journal of the National Strength and Conditioning Association."

35.     The JSCR's Editor-in-Chief is Dr. William J. Kraemer.  Dr. Kraemer is also a fellow with the ACSM.

36.     In its November 2013 issue, the JSCR published the Devor Study, which was co-authored by another ACSM fellow, Dr. Devor.

37.     The NSCA purports to hold the copyright in the Devor Study.

38.     In the Devor Study, Dr. Devor and his fellow researchers purport to examine the effects of "Crossfit-based high-intensity power training" (which the article refers to by the acronym "HIPT") on aerobic fitness and body composition.

39.     The study states that it tracked fifty-four individuals during ten weeks of CrossFit training at a CrossFit affiliate in Columbus, Ohio.  According to the

study, all training performed during the study was done "under the supervision of a fellow of the American College of Sports Medicine (ACSM) and an ACSM certified registered clinical exercise physiologist."

40.     No ACSM fellow was present at any point during the training program.  Instead, an existing CrossFit affiliate, running an annual "challenge" for its members agreed to allow the members to be tested before the challenge and tested again at the end of the 10-week challenge.

41.     The Devor Study notes that following ten weeks of CrossFit, participants' "body fat percentage dropped by 3.7% across all individuals, in absolute terms."  This data supports what the one million or more CrossFit participants already know:  CrossFit works.  The Devor Study unsurprisingly concludes that "a 10-week crossfit-based [sic] HIPT program significantly improves the maximal aerobic capacity and body composition in individuals of all fitness levels and genders."

42.     But the Devor Study does not stop there.  It instead goes on to address a topic that is found nowhere in the abstract and that is different from the supposed focus of the study.  The Devor Study finds a 16% "overuse or injury" rate among participants, which the study says "may call into question the risk-benefit ratio for such extreme training."  The Devor Study, on that basis, opines that CrossFit "may not be worth the risk of injury and lost training time."

43.     In support of the 16% "overuse or injury" rate, the Devor Study represents that eleven subjects "dropped out of the training program" and that nine of them cited "overuse or injury for failing to complete the program and finish follow up testing."  The Devor Study declines to define what "overuse" means or to specify what injuries those individuals supposedly suffered.

44.     The allegation that nine subjects cited "overuse or injury" was unfounded and plainly intended to discredit CrossFit by painting it as unsafe due to injury risk.

45.     The "overuse or injury" statistics in the Devor Study were fabricated. No member who tested in at the beginning of the ten week challenge ever cited "overuse or injury for failing to complete the program and finish follow up testing."  The authors of the Devor Study knew this because neither they nor anyone else involved in running the study ever spoke to those nine participants that the study reports dropped out due to "overuse or injury" about why they failed to test out at the end of the program.

46.     The Devor Study's authors did not – and could not –ask the participants why they failed to return because the Devor Study was a blind study in which the subjects were identified only by a number.  The researchers did not know the true identities of the participants, and the 11 participants simply failed to return without providing notice.  Therefore, when the participants did not return, the testers could not have contacted them.  There is no basis for the "overuse or injury" statistic.

47.     As detailed in Section D below, CrossFit has identified the individuals who dropped out of the study and confirmed that they did not do so because of "overuse or injury."

48.     Moreover, the Devor Study states that "there are emerging reports of increased rates of musculoskeletal and metabolic injury" in CrossFit and other rigorous workout regimens.  In support of that claim, it purports to rely on a 2011 article co-authored by Dr. Kraemer (ACSM Fellow and JSCR Editor-in-Chief) and co-published by the ACSM: "Consortium for Health and Military Performance and American College of Sports Medicine Consensus Paper on Extreme Conditioning Programs in Military Personnel" (the "CHAMP/ACSM Paper").  The CHAMP/ACSM Paper purported to examine several rigorous exercise programs, including CrossFit, speculating that they "could arguably lead to undue overload, poor body control, and loss of safe exercise performance, which, alone or in combination, might notably exacerbate and augment musculoskeletal injury risk."

1   The CHAMP/ACSM Paper, however, did not involve any data gathering or

2   scientific testing to support this hypothesis, which is why its findings were only

3   phrased as what types of injuries "could arguably" be attributed to exercise

4   programs such as CrossFit.  Therefore, the Devor Study's claim that "there are

5   emerging reports of increased rates of musculoskeletal and metabolic injury" in

6   CrossFit is unsupported and false.

7   **D.   CrossFit Has Confirmed the Falsity of the Devor Study's Data, but its**
8        **Authors Refuse to Correct Their Data or Even Explain It**

9        49.    Suspicious of the surprisingly high "overuse or injury" rate, both

10  CrossFit and the Columbus, Ohio affiliate attempted to verify why the 9

11  participants actually dropped out of the Devor Study.  The owner of the CrossFit

12  affiliate where the study was conducted knew the identity of the participants in the

13  study and reported to CrossFit that he verified that they did not drop out because of

14  "overuse or injury."  A CrossFit representative contacted a sample of those who

15  dropped out to confirm that they dropped out because of a lack of time and/or

16  interest in completing the study, not injury.  Each denied even speaking to the

17  authors of the Devor Study about his/her reasons for not returning to complete the

18  study.  They categorically denied having sustained injuries, or having informed the

19  researchers that they suffered injuries due to CrossFit.  Moreover, the study

20  coordinator, who knew the identity of the study participants – including those who

21  dropped out – also confirmed that the dropouts were not because of overuse or

22  injury.

23       50.    Dr. Devor was made aware of the discrepancy between the "overuse

24  or injury" findings in the Devor Study and the responses of the participants to

25  inquiries by the CrossFit affiliate owner and CrossFit's own representative.  In an

26  April 23, 2013 telephone conversation with Russell Berger of CrossFit, Dr. Devor

27  admitted that his team conducted a "blind study" and, therefore, did not know the

28  identity of the nine participants who did not return.  In fact, Dr. Devor stated that

1   he did not collect any of the data at all.  He said the data was collected by Dr.

2   Smith.  Confronted on the April 23, 2013 call with the obvious conflict between

3   the Devor Study's findings and the lack of available data, Dr. Devor agreed to

4   contact Dr. Smith and that then one or both of them would contact Mr. Berger to

5   further discuss the Devor Study's data collection and findings.

6          51.    Rather than explain or retract their findings, on April 25, 2013, Dr.

7   Devor sent an email to Mr. Berger, indicating that Dr. Devor had spoken with Dr.

8   Smith, and that the two of them would not provide any further comment or

9   explanation regarding the Devor Study.

10         52.    CrossFit has attempted to refute the false data in the Devor Study.  It

11  has published an article challenging the data in the Devor Study, including a

12  transcript of Mr. Berger's call with Dr. Devor, and otherwise tried to address the

13  study and the bad press that has surrounded its publication.  Nonetheless, the

14  NSCA has failed to retract the false Devor Study.

15  **E.     The NSCA Continues to Attack CrossFit's Alleged Injury Risk Despite**
    **the Absence of Any Scientific Support**
16

17         53.    The NSCA has used the JSCR's wide distribution among fitness

18  professionals and credibility in the fitness industry to disseminate the Devor Study,

19  which contains false and fraudulent injury data about CrossFit.  It has done so for

20  the benefit of the NSCA, which competes with CrossFit in the fitness and training

21  certification industries.

22         54.    The NSCA lacks actual data demonstrating that CrossFit is riskier

23  than other similar forms of exercise.  However, the NSCA, through the JSCR, has

24  only further increased its efforts to discredit CrossFit by continuing to characterize

25  CrossFit as carrying a heightened risk of injury.

26         55.    For example, on November 22, 2013, the JSCR, the NSCA's official

27  journal, posted in the "Published-Ahead-of-Print" section of its website yet another

28  study portraying CrossFit as dangerous, entitled "The nature and prevalence of

injury during CrossFit training," authored by Paul Taro Hak, Emil Hodzovic, and Ben Hickey (the "Hak Study").  According to the JSCR's website, "Articles appearing in this Published Ahead-of-Print section have been peer-reviewed and accepted for publication in this journal and posted online before print publication."

56.   The Hak Study attempted to quantify the injury rate for CrossFit participants through data collection methods that do not adhere to scientifically valid principles, especially for a supposedly peer-reviewed journal.  The Hak Study relies solely on an a *self-selected* population of people from ten CrossFit *online forums* who filled out *anonymous online questionnaires* in which they *self-reported* injuries that they supposedly suffered over a *multi-year period*, without *any verification* by the authors as to (a) the causes of those injuries, (b) whether those injuries were even suffered, or (c) whether those participants had in fact done CrossFit at all.  The study featured an eye-popping allegation that 73.5% of CrossFit participants suffered injury, only to subsequently concede that this translated to only 3.1 alleged injuries per 1,000 hours trained, which is similar to the injury rates for "general gym/fitness club training; and long, middle and sprint distance running."

57.   On information and belief, the Hak Study was published by the NSCA to further paint CrossFit as dangerous.

**F.    The False Data Published by the NSCA has Caused Harm to CrossFit**

58.   The NSCA has, through use of the JSCR, intentionally painted CrossFit as dangerous based on these false and unscientific studies.  That has caused substantial harm to CrossFit.

59.   The false and fraudulent data published in the Devor Study has been re-published and cited many times over, including in reputable fitness publications.

60.   For example, on November 4, 2013, Outside Magazine published an article entitled, *Is CrossFit Killing Us?: The CrossFit backlash is in full swing – led by a long list of injured participants*.  The article features the Devor Study,

explaining that it "revealed a troubling statistic: 16 percent of the 54 participants had quit the program due to 'overuse or injury.'" That, of course, was based on the demonstrably false and unsupported statements described above.

61. By way of further example, on November 4, 2013, four publications – the Air Force Times, Army Times, Marine Corps Times, and Navy Times – published an article entitled "Reality check: Fitness fads." The article explains that the Devor Study "fueled criticism of CrossFit by reporting that nine subjects - or 16 percent of those who started - dropped out of the study because of injuries or overuse issues."

62. By way of further example, on December 5, 2013, WorldLifestyle published an article entitled *CrossFit: Dysfunctional Fitness* that, relying on the Devor Study, writes "CrossFit promotes functional fitness, but its high-intensity workouts leave some people unable to function at all."

63. The dissemination by the NSCA of the false and fraudulent injury data in the Devor Study has caused substantial reputational and economic damage to CrossFit.

## FIRST CLAIM FOR RELIEF
## FALSE ADVERTISING
### (Lanham Act 15 U.S.C. § 1125(a))

64. CrossFit realleges and incorporates by reference the allegations in paragraphs 1 through 63, as if set forth fully herein.

65. CrossFit is in the businesses of licensing its name to affiliates and certifying the trainers of such affiliates. Because CrossFit provides its licenses and certifications in interstate commerce, and because the false advertising at issue has been disseminated throughout interstate commerce (e.g., via the internet). CrossFit is entitled to protection under the Lanham Act.

66. Defendant NSCA is a company that certifies trainers, throughout the United States and globally.

67.    The NSCA, operating through its journal, the JSCR, published and distributed the Devor Study to numerous customers, trainers, and potential customers and trainers of CrossFit.

68.    The Devor Study contained numerous false, misleading, and/or deceptive statements regarding CrossFit's injury rates.

69.    The Devor Study contains statements that are literally false and misleading, and/or false and misleading by implication, and also deceived, and/or has a tendency to deceive, a substantial segment of the JSCR's target audience: customers, trainers, and other fitness professionals.  Those statements include the following statements:

- "nine subjects (16% of total recruited subjects) cit[ed] overuse or injury for failing to complete the [CrossFit] program and finish follow up testing"; and

- "there are emerging reports of increased rates of musculoskeletal and metabolic injury in these programs [including CrossFit]."

70.    The NSCA intended the publication of false injury data and other false, misleading, and/or deceptive statements to influence the purchasing decisions of CrossFit's customers, trainers, and/or potential customers and trainers.

71.    By distributing and making available the Devor Study and its false injury data, and by making other statements, the NSCA has caused numerous false, misleading, and/or deceptive statements of fact to enter interstate commerce.

72.    The Devor Study and its faulty injury data and any other false, misleading, and/or deceptive statements by the NSCA already have diverted, and/or are likely to divert, potential certification sales from CrossFit.  Moreover, the NSCA's false, misleading, and/or deceptive statements of fact regarding CrossFit's injury rate have lessened, and/or are likely to lessen, the goodwill previously associated with CrossFit in general.  Therefore, CrossFit has suffered,

1    and will continue to suffer, injury and irreparable harm as a result of the NSCA's

2    conduct.

3         73.    CrossFit is entitled to recover damages along with the NSCA's profits

4    and reasonable royalties, each of which may be trebled pursuant to Section 35(a) of

5    the Lanham Act, 15 U.S.C. § 1117(a).

6         74.    The NSCA's willful conduct renders this case an exceptional case

7    pursuant to 15 U.S.C. § 1117(a) such that CrossFit is entitled to reasonable

8    attorneys' fees.

9         75.    The NSCA's acts of false advertising and misrepresentation have

10   caused and, if not preliminarily and permanently enjoined, will continue to cause,

11   CrossFit to suffer irreparable harm.

12                     **SECOND CLAIM FOR RELIEF**

13                        **FALSE ADVERTISING**

14                   **(Cal. Bus. & Prof. Code § 17500)**

15        76.    CrossFit realleges and incorporates by reference the allegations in

16   paragraphs 1 through 75, as if set forth fully herein.

17        77.    The NSCA, through its journal, the JSCR, published and distributed

18   the Devor Study and made other false, misleading, and deceptive statements to

19   numerous consumers and potential consumers of CrossFit, in order to dissuade

20   customers and trainers from using CrossFit's services instead of the NSCA's

21   competing services.

22        78.    The NSCA has made false, misleading, and/or deceptive statements,

23   assertions, and conclusions about CrossFit's injury rates.  The NSCA's statements

24   are literally false and misleading and/or false and misleading by implication, and

25   also have deceived, and/or have a tendency to deceive, a substantial segment of its

26   target audience – fitness customers, trainers, and other fitness professionals.  Those

27   statements include:

28          • "nine subjects (16% of total recruited subjects) cit[ed] overuse

or injury for failing to complete the [CrossFit] program and finish follow up testing"; and

- "there are emerging reports of increased rates of musculoskeletal and metabolic injury in these programs [including CrossFit]."

79.     The NSCA knew, or through the exercise of reasonable care should have known, that its statements were false, misleading, and/or deceptive.

80.     The Devor Study and its faulty injury data, and any other false, misleading, and/or deceptive statements by the NSCA, already have diverted, and/or are likely to divert, potential certification sales from CrossFit.  Moreover, the NSCA's false, misleading, and/or deceptive statements of fact regarding CrossFit's injury rate has lessened, and/or is likely to lessen, the goodwill previously associated with CrossFit in general.  Therefore, CrossFit has suffered, and will continue to suffer, injury and irreparable harm as a result of the NSCA's conduct.

81.     The NSCA's acts of false advertising and misrepresentation have caused and, if not preliminarily and permanently enjoined, will continue to cause, CrossFit to suffer irreparable harm.

## THIRD CLAIM FOR RELIEF
## UNFAIR COMPETITION
### (Cal. Bus. & Prof. Code § 17200)

82.     CrossFit realleges and incorporates by reference the allegations in paragraphs 1 through 81, as if set forth fully herein.

83.     The NSCA, through its journal the JSCR, published and distributed the Devor Study and made other false, misleading, and deceptive statements to numerous consumers and potential consumers of CrossFit in order to dissuade customers from using CrossFit's services instead of the NSCA's competing services.  Those statements include:

- "nine subjects (16% of total recruited subjects) cit[ed] overuse or injury for failing to complete the [CrossFit] program and finish follow up testing"; and
- "there are emerging reports of increased rates of musculoskeletal and metabolic injury in these programs [including CrossFit]."

84.   The NSCA's publication and distribution of the Devor Study and other false, misleading and deceptive statements, assertions and conclusions, have impaired, and will continue to impair, CrossFit's goodwill.  Those acts have also adversely affected, and will continue to affect, CrossFit's business and reputation. The NSCA's conduct also violates federal and state statutory law, as if set forth fully herein.  As such, the NSCA's acts constitute an unlawful, unfair and/or fraudulent business practice within the meaning of California Business and Professions Code Section 17200.

85.   Absent injunctive relief, CrossFit has no means by which to control the publication and distribution of the Devor Study and other false, misleading and deceptive statements or assertions by the NSCA.  CrossFit is thus entitled to injunctive relief prohibiting the NSCA from continuing such acts of unfair competition.  CrossFit also is entitled to disgorgement of the NSCA's profits.

## FOURTH CLAIM FOR RELIEF

## DECLARATORY RELIEF

### (Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201 and 2202)

86.   CrossFit realleges and incorporates by reference the allegations in paragraphs 1 through 85, as if set forth fully herein.

87.   Pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202, this Court may declare the rights or legal relations of any party in any case involving an actual controversy.

1       88.    An actual controversy has arisen and now exists between CrossFit and

the NSCA, in that CrossFit contends that the Devor Study published by the NSCA

makes false, misleading and deceptive statements, assertions and conclusions

regarding CrossFit's injury rates.  CrossFit is informed and believes, and on that

basis alleges, that the NSCA disputes CrossFit's position.

       89.    CrossFit therefore requests and is entitled to a judicial determination

that the Devor Study contains false, misleading and/or deceptive statements,

assertions and conclusions regarding CrossFit and/or its injury risk, and such a

judicial determination of these rights and obligations is necessary and appropriate

at this time.

**WHEREFORE**, CrossFit prays for the following relief:

1.    That the Court enter a judgment in favor of CrossFit and against the

NSCA on all claims alleged herein.

2.    That the Court enter a judgment that the NSCA has:

       a.    Falsely advertised CrossFit's injury risk;

       b.    Committed unfair business practices in connection with

publishing false, misleading and deceptive statements, assertions and

conclusions regarding CrossFit's injury risk; and

       c.    Interfered with CrossFit's goodwill, reputation, and prospective

economic advantage.

3.    That the Court issue a preliminary and, thereafter, permanent

injunction against the NSCA and its journals, officers, agents, employees,

representatives, and all others in active concert or participation with each of them

with notice hereof, enjoining and restraining them from the following:

       a.    Further publishing and distributing any version of the Devor

Study, in whole or in part, or reference thereto, to any person or entity;

       b.    Publishing any other advertising, marketing and/or promotional

materials that contain false, misleading and/or deceptive statements,

1   assertions and conclusions regarding CrossFit's injury risk, including false,

2   misleading and/or deceptive statements, assertions and conclusions which

3   are consistent with or similar to those made in the Devor Study;

4       c.      Making any false and/or disparaging statements or any

5   statements that contain false, misleading and/or deceptive assertions and

6   conclusions regarding any of CrossFit's services, including, in particular,

7   publishing or communicating such statements to consumers or potential

8   consumers of CrossFit's services; and

9       d.      Assisting, aiding or abetting any other person or entity in

10   engaging in or performing any of the activities referred to in subparagraphs

11   (a) through (c) above.

12       4.      That the Court order the recall of all copies of any version of the

13   Devor Study and any excerpt or portion thereof, including disabling copies

14   available via the Internet over which the NSCA has control; that the NSCA be

15   required to turn over for impound, during the pendency of this action, all

16   advertising, communications, marketing and/or promotional materials in its

17   custody and control that contain false, misleading and/or deceptive statements,

18   assertions and conclusions regarding CrossFit's injury risk, including all copies of

19   the Devor Study; and that the NSCA turn over all matters used to make the above-

20   referenced materials.

21       5.      That the Court issue a declaratory judgment that the Devor Study

22   contains false, misleading and/or deceptive statements, assertions and conclusions

23   regarding CrossFit and/or its injury risk.

24       6.      That the Court issue a declaratory judgment that the NSCA is not

25   authorized to publish or distribute advertising, marketing and/or promotional

26   materials, nor engage in verbal communications, which contain false, misleading

27   and/or deceptive statements, assertions and conclusions regarding CrossFit and/or

28   its injury risk.

7.     For an award of award of damages, including general, punitive and exemplary damages, against the NSCA.

8.     That the Court order the NSCA to pay to CrossFit both the costs of this action and reasonable attorneys' fees incurred by CrossFit in prosecuting this action.

9.     That the Court order the NSCA to pay and provide for appropriate corrective advertisements.

10.    For interest at the legal rate.

11.    For such other and further relief as the Court may deem just and proper.

Dated:  May 12, 2014                         Respectfully submitted,

                                             LATHAM & WATKINS LLP


                                             By /s Daniel Schecter
                                                Daniel Scott Schecter
                                             Attorneys for Plaintiff CrossFit, Inc.


OF COUNSEL:

LATHAM & WATKINS LLP
Blair Connelly
William O. Reckler

1

## **DEMAND FOR JURY TRIAL**

2      Plaintiff CrossFit demands trial by jury on each of its claims for relief

3   triable before a jury.

4   Dated:  May 12, 2014                    Respectfully submitted,

5                                           LATHAM & WATKINS LLP
                                            Daniel Scott Schecter
6

7

8                                           By /s Daniel Schecter
                                            Daniel Scott Schecter
9                                           Attorneys for Plaintiff CrossFit, Inc.

10
    OF COUNSEL:
11
    LATHAM & WATKINS LLP
12  Blair Connelly
    William O. Reckler
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28