1  LATHAM & WATKINS LLP
   Daniel Scott Schecter (Bar No. 171472)
2  *daniel.schecter@lw.com*
   355 South Grand Avenue
3  Los Angeles, CA 90071-1560
   Telephone: (213) 485-1234; Fax: (213) 891-8763

4

5  LATHAM & WATKINS LLP
   David F. Kowalski (Bar No. 265527)
   *david.kowalski@lw.com*
6  12670 High Bluff Drive
   San Diego, CA 92130
7  Telephone: (858) 523-5400 ; Fax:  (858) 523-5450

8  LATHAM & WATKINS LLP
   Blair Connelly (Bar No. 174460)
9  *blair.connelly@lw.com*
   William O. Reckler (admitted *pro hac vice*)
10 *william.reckler@lw.com*
   Paul A. Serritella (admitted *pro hac vice*)
11 *paul.serritella@lw.com*
   885 Third Avenue
12 New York, NY 10022-4834
   Telephone: (212) 906-1239; Fax: (212) 751-4864

13

   Micha "Mitch" Danzig (SBN 177923)
14 *mdanzig@mintz.com*
   Justin Nahama (SBN 281087)
15 *jsnahama@mintz.com*
   MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO PC
16 3580 Carmel Mountain Road, Suite 300
   San Diego, CA 92130
17 Telephone: (858) 314-1500; Fax: (858) 314-1501

18 *Attorneys for Plaintiff*
   *CROSSFIT, INC.*
19

   MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
20 Kenneth S. Kawabata (Bar No. 149391)
   *ksk@manningllp.com*
21 550 West C Street, Suite 1900
   San Diego, CA 92101
22 Telephone: (619) 515-0269; Fax: (619) 515-0268

23 MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
   Anthony J. Ellrod (Bar No. 136574)
24 *aje@manningllp.com*
   801 S. Figueroa St., 15th Floor
25 Los Angeles, CA 90017
   Telephone: (213) 624-6900; Fax: (213) 624-6999

26

   *Attorneys for Defendant*
27 *NATIONAL STRENGTH AND CONDITIONING ASSOCIATION*

28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CROSSFIT, INC., a Delaware corporation,<br><br>  Plaintiff,<br><br>  v.<br><br>NATIONAL STRENGTH AND CONDITIONING ASSOCIATION, a Nebraska corporation,<br><br>  Defendant. | Case No. 3:14-cv-01191-JLS-KSC<br><br>**JOINT MOTION FOR DETERMINATION OF DISCOVERY DISPUTE [PEER REVIEWER IDENTITIES]**<br><br>Judge:<br><br>  The Honorable Janis L. Sammartino<br>  The Honorable Karen S. Crawford<br><br>Courtroom: 4A |

# **TABLE OF CONTENTS**

## PLAINTIFF'S CONTENTIONS

I.   PROCEDURAL HISTORY ....................................................................4

    A.   The Court Denied CrossFit, Inc.'s First Motion to Compel Without Prejudice, Based on the then-Current State of Evidence ...........4

II.   LEGAL STANDARD ........................................................................5

III.   ARGUMENT ..................................................................................6

    A.   The JSCR Purports to Be a Scientific Journal ..........................6

    B.   Scientific Journals Routinely Publicly Identify the Names of Contributing Peer Reviewers and Any Confidentiality Concerns Can Be Adequately Addressed Through the Parties Protective Order .......................................................................................7

    C.   CrossFit, Inc. Has Illustrated—and the NSCA's Erratum Confirms—Scientific Misconduct During the NSCA's Peer Review Process Justifying Disclosure of the Peer-Reviewer Identities ..................................................................................8

    D.   The Peer Reviewers' Identities are Relevant to CrossFit, Inc.'s Claims and Proportional to the Needs of the Case ..................11

        1.   The Peer Reviewers' Identities are Critically Relevant to CrossFit, Inc.'s Claims ............................................12

    E.   Disclosing the Peer Reviewers' Identities is Proportional to the Needs of the Case .........................................................13

        1.   The Eastern District of New York's Holding in Solarex Corp. v. Arco Solar, Inc. Affords the NSCA No Protection from the Disclosure of the Peer Reviewers' Identities ...........................................................15

    F.   The Editor in Chief and Hand Selected Senior Editor of the Devor Study Have Been Intimately Involved with the NSCA's Efforts to Unfairly Compete with CrossFit, Inc. ....................16

        1.   The NSCA Begins a Smear Campaign Led by the Same Individuals Who Manipulated the Devor Study Peer Review .............................................................17

        2.   Defendant First Openly Targets CrossFit Training through the CHAMP Paper ...........................................18

        3.   NSCA/JSCR Successfully Influence the Opinions of the CHAMP Paper .........................................................19

        4.   The CHAMP Paper Authors Admit The Paper Is Purely "Anecdotal" .........................................................20

i

5.    The NSCA Manipulates the Devor Study to Publish False Injury Data and Further Its Anti-CrossFit Agenda ...................... 21

G.   The Original Manuscript of the Devor Study Contained No Injury Data ............................................................................ 21

H.   The Devor Study Relied on Anecdotal Evidence and Falsified Data ................................................................................ 23

1.    The NSCA Was On Notice of the Fraudulent Data Since May 2013 But Refused to Acknowledge Falsity Until September 2015 ....................................................... 24

2.    The NSCA/JSCR's Erratum Confirms the Injury Data Was Fabricated ............................................................ 25

IV.   CONCLUSION ............................................................................ 25

DEFENDANT'S RESPONSE

I.    INTRODUCTION ........................................................................ 27

II.   CROSSFIT HAS NO EVIDENCE TO SHOW LEGAL RELEVANCE OF THE PEER REVIEWERS' IDENTITIES TO ITS CLAIMS ...................................................................................... 31

A.   CrossFit fails to show that the peer review process was fraudulent or improper ................................................... 31

B.   CrossFit fails to show that the peer review process is relevant to tis claims for false advertising and/or unfair competition ..................... 33

1.    CrossFit's legal authority is threadbare and inapposite ............... 33

2.    CrossFit has failed to distinguish Solarex from the instant case .................................................................. 35

3.    The burden to Defendant outweighs the benefits of disclosure .......................................................... 36

4.    CrossFit's motion poses grave First Amendment concerns .......... 38

III.  CROSSFIT MISCHARACTERIZES THE SCIENTIFIC CONTEXT OF THE CHAMP ARTICLE TO FALSELY PORTRAY THE NSCA AS THE ARCHITECT OF A CONSPIRACY AGAINST CROSSFIT .......... 38

A.   Scientists properly applying the scientific method generate hypotheses from anecdotal reports of injury ........................... 39

B.   CrossFit acknowledges case reports of life-threatening injuries resulting from its workout program ........................ 40

C.   Based on CrossFit's own theory for what could be causing the injuries, research scientists propose a hypothesis through the CHAMP paper and call for testing of that hypothesis ............................. 41

IV.   CROSSFIT PROVIDES CHERRY-PICKED EVIDENCE TO
FALSELY ARGUE THAT THE ACADEMIC COMMUNITY
ROUTINELY "UNMASKS" ANONYMOUS PEER REVIEWERS ............. 44

    A.   Scientific journals do not universally identify peer reviewers ............... 44

    B.   Peer reviewers and scientific journals are not expected to
discover dubious data as a matter of course ........................................... 45

V.   CONCLUSION ............................................................................................. 46

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Accreditation Ass'n for Ambulatory Health Care, Inc. v. U.S.*,
2004 WL 783106 (N.D. Ill. Jan. 8, 2004) ............................................................6

*In re Admin. Subpoena Blue Cross Blue Shield of Massachusetts, Inc.*,
400 F.Supp.2d 386 (D. Mass. 2005) ....................................................................6

*In re Baptist Mem'l Hosp.*,
2004 WL 2905391 (W.D. Tenn. June 22, 2004) ..................................................6

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
249 F.R.D. 8 (D. Mass. 2008) ............................................................................37

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
627 F.Supp.2d 384 (D.N.J. 2009) ......................................................................38

*Chapman v. P&G Distrib., LLC*,
766 F.3d 1296 (11th Cir. 2014) .........................................................................40

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993) ...........................................................................................39

*Dow Chem. Co. v. Allen*,
672 F.2d 1262 (7th Cir. 1982) ...........................................................................36

*Henderson v. Holiday CVS, L.L.C.*,
269 F.R.D. 682 (S.D. Cal. 2010) .........................................................................5

*People v. Forest E. Olson, Inc.*,
137 Cal. App. 3d 137 (1982) ..............................................................................12

*Richards of Rockford, Inc. v. Pacific Gas & Electric Co.*,
71 F.R.D. 388 (N.D. Cal. 1976) ...................................................................36, 38

*Solarex Corp. v. Arco Solar, Inc.*,
121 F.R.D. 163 (E.D.N.Y. 1988)..................................................................*passim*

*Soldo v. Sandoz Pharms. Corp.*,
244 F. Supp. 2d 434 (W.D. Pa. 2003) ................................................................39

iv

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
  793 F.2d 1034 (9th Cir. 1986) ......................................................... 12, 13

**Statutes**

Cal. Bus. & Prof. Code § 17500 ............................................................... 12

Lanham Act ......................................................................... 12, 13, 34

**Other Authorities**

Fed. R. Civ. P. 26 ......................................................................... *passim*

Pursuant to the Chamber Rules and Civil Pretrial Procedures of the Honorable Karen S. Crawford (the "Chamber Rules"), Plaintiff CrossFit, Inc. ("CrossFit, Inc." or "Plaintiff") hereby re-petitions the Court for resolution of a discovery dispute arising out of Defendant National Strength and Conditioning Association's ("NSCA" or "Defendant") assertion of a so-called "peer review" privilege as to the identities of the individuals who acted as peer reviewers for the study in question. CrossFit, Inc. previously attempted to compel the NSCA to identify the peer-reviewers by filing a Joint Motion for Determination of Discovery Dispute [Doc. No. 25 ("First Motion").] The Court denied the First Motion without prejudice, primarily because the Court concluded the challenges to the integrity of the peer review process were "wholly speculative *at this time*." [Doc. No. 57 ("the Order") at 14 (emphasis added).] The Court invited CrossFit, Inc. to "present evidence and additional argument that would tip the balance in favor of disclosure of the identities of the peer reviewers."[1]

After the Order, CrossFit, Inc. propounded additional written discovery and took various party and third-party depositions. CrossFit, Inc. contends the post-Order discovery responses, document productions, and deposition testimony provide irrefutable evidence of scientific misconduct and fraud during the subject peer review process. Further, in September 2015, the NSCA issued an Erratum publically stating that the injury data (at issue in this action) was no longer to be considered part of the study at issue. The NSCA maintains that it is still not required to disclose the identity of the peer reviewers.

## PLAINTIFF'S CONTENTIONS

This lawsuit centers on a supposedly scientific study published in the Defendant's premier journal[2] concluding, in part, that an alarming number of test subjects were injured completing CrossFit workouts (the "Devor Study" or "the

---

[1] *See* Order Re Joint Motion for Determination of Discovery Dispute (Peer Review and Compensation Discovery), Dkt. No. 57, at p. 16.

[2] The Devor Study was published in the NSCA's premier journal, the Journal of Strength and Conditioning Research ("JSCR").

Study"). From the moment the Study was first published ahead of print in 2013, early indicators suggested the injury data was fabricated. Plaintiff CrossFit, Inc. immediately questioned the integrity of the NSCA's self-proclaimed "rigorous" and "double blind" peer -review process as the Study spread like wildfire through the fitness community. CrossFit, Inc.'s concerns—and mounting reputational harm— were compounded by the NSCA's refusal to investigate reliable evidence of scientific misconduct presented to the NSCA both before and after the Study was published. Discovery has revealed that the NSCA's decision to ignore the then-suspected (and now known) fraudulent injury data was based solely on its biased Editor in Chief's guidance (Dr. William Kraemer), the same individual at the helm of the Study's deeply flawed peer-review process. Discovery has also confirmed that even before the peer-reviewers were selected, Dr. Kraemer hand-selected a senior editor with whom he worked in the past to disparage CrossFit training and directed her to find "good reviewers" to focus on injuries:

> Travis ... I thought you would be able to be the editor on this one as it is in an area that you were involved with in a review etc. so we put it in your good hands to get it ok, *so a lot of context is needed for this, fit but at what cost etc*. So see what you think and get some good reviewers to take a close look at this as catabolism will break you down but while fit are you in a catabolic state etc, so here you go, see you next month.. talk to you before that time too... as ever, Bill. (emphasis added.)

CrossFit, Inc. learned during discovery that the NSCA improperly influenced and manipulated the peer-review process in order to cause the authors to incorporate fictitious "injury or overuse" data in the Devor Study. Internal correspondence and manuscript revisions illustrated that the NSCA exerted editorial and peer-review pressure on the authors to create false injury data if they wanted the NSCA to publish the Study. After the mountain of evidence confirming that the injury data was fraudulent became insurmountable, the NSCA finally issued an Erratum in September 2015—nearly a year and half after the complaint was filed—conceding the injury data should not be considered. The peer-reviewers, at best, intentionally looked away

1  from overwhelming evidence of scientific misconduct and, at worst, directly

2  contributed to the fraud.

3      The NSCA, understandably, does not want the full scope of its malfeasance

4  and manipulation of the peer-review process to see the light of day.  In addition to

5  refusing to produce any information detailing the royalty payments the NSCA

6  received for the record-breaking distribution of the Devor Study,[3] it refused to

7  identify the peer reviewers by name.    After the Order and before the NSCA's

8  Erratum was issued, CrossFit, Inc. took numerous party and third-party depositions

9  and propounded written discovery.  The post-Order depositions and discovery

10  confirmed CrossFit, Inc.'s suspicions that the NSCA used its peer-review process as a

11  vehicle to unfairly compete with CrossFit, Inc. by requiring the Study's authors to

12  concoct "scientific" data supporting the NSCA's long-standing campaign to label

13  CrossFit training as dangerous.

14      As explained in more detail below, the names of peer-reviewers are not per se

15  treated as confidential in scientific journals.  Rather, the industry merely maintains

16  confidentiality—absent fraud allegations—with respect to the particular articles

17  contributed to by a peer-reviewer.  Indeed, the majority of scientific journals publicly

18  thank their peer-reviews by name.  Additionally, it is well settled in the scientific

19  journal industry that the identity of peer reviewers can and should be revealed when

20  fraud or dishonesty is *alleged*.  Here, the NSCA's Erratum and the discovery obtained

21  after the Order confirm that fraud or dishonesty *occurred*.   Finally, any

22  confidentiality or "chilling effect" concerns can be addressed by designating the

23  documents and potential testimony at issue as CONFIDENTIAL or

24  CONFIDENTIAL-FOR COUNEL ONLY under the parties' Protective Order.

---

[3] The NSCA withheld its Publishing Agreement detailing its royalty arrangement with its publisher for JSCR sales.  The publisher, Lippincott Williams & Wilkins ("LWW"), produced the Publishing Agreement in response to a subpoena and the NSCA improperly instructed the LWW to not produce any royalty-related information. The parties have filed a joint discovery motion with the Court [Dkt. No. 70] to address the propriety of the NSCA's instruction to LWW.

Based on these new considerations and the other evidence discussed below, CrossFit, Inc. respectfully accepts the Court's invitation to "present evidence and additional argument that would tip the balance in favor of disclosure of the identities of the peer reviewers."[4]  Specifically, CrossFit, Inc. asks the Court for an Order (1) requiring the NSCA and its agents to identify the peer reviewers by name; (2) permitting CrossFit, Inc. to depose the peer-reviewers; (3) requiring the NSCA to supplement its discovery responses and document productions with un-redacted versions of the documents containing the peer-reviewers' names; (4) requiring the NSCA to confirm under penalty of perjury that it has provided complete responses and document productions to CrossFit, Inc.'s previous discovery requests concerning the peer-reviewers and (5) requiring the NCSA to instruct its publisher to produce un-redacted versions of the previously-produced documents.

I.      **PROCEDURAL HISTORY**

   A.      **The Court Denied CrossFit, Inc.'s First Motion to Compel Without Prejudice, Based on the then-Current State of Evidence**

The Court denied CrossFit, Inc.'s First Motion to Compel without prejudice primarily because the Court concluded CrossFit, Inc.'s challenges to the integrity of the peer review process were "wholly speculative *at this time*."  (Dkt. No. 57 at 14 (emphasis added).)  Specifically, the Court found that the identity of the peer reviewers was not relevant based on the current state of the evidence, that any bias would be revealed by the communications between the peer reviewers and the authors, and that the NSCA's need for confidentiality outweighs the demand for disclosure.  (*Id.*)

The Devor Study morphed from a study that sought to (and did) measure the benefits of CrossFit training to an agenda-driven hit piece through the NSCA's

---

[4] *See* Order Re Joint Motion for Determination of Discovery Dispute (Peer Review and Compensation Discovery), Dkt. No. 57, at p. 16.

grossly-manipulated peer-review process. Fact discovery has now closed and the NSCA finally conceded that the injury data was fabricated by issuing an Erratum in September 2015. Additionally, CrossFit, Inc.'s ethics expert has issued a detailed report describing the extensive bias and improprieties during the peer-review process. CrossFit, Inc. has also learned that the leading ethics authorities in scientific journals recommend that the identities of peer reviewers can be disclosed with *allegations* of fraud or scientific misconduct.

Based on the new evidence at hand, the peer-review comments alone do not provide sufficient evidence of bias because, for example, they do not detail any pre-existing relationships the peer-reviewers had with Dr. Kraemer, Dr. Triplett, the CHAMP initiative, or other anti-CrossFit initiatives. That evidence is directly relevant to CrossFit, Inc.'s claims. Given the record discussed below, the NSCA can no longer be allowed to withhold the identities of the peer reviewers in the name of "academic integrity" that it did not practice.

## II. LEGAL STANDARD

The scope of discovery under Fed. R. Civ. P. 26(b) is broad: "Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." The party resisting discovery generally bears the burden to show that the discovery requested is irrelevant to the issues in the case or is overly broad, unduly burdensome, unreasonable, or oppressive. *Henderson v. Holiday CVS, L.L.C.*, 269 F.R.D. 682, 686 (S.D. Cal. 2010). Additionally, one of the leading authorities on ethics in publishing—especially in scientific journals— concludes that confidentiality relating to peer reviewers can be breached if dishonesty or fraud is alleged. The International Committee of Medical Journal Editors

5

("ICMJE") sets forth the best practices and ethical standards in the conduct and reporting of published research in scientific journals. The ICMJE's "Responsibilities in the Submission and Peer-Review Process" provides, in part, "*Confidentiality may have to be breached if dishonesty or fraud is alleged, but editors should notify authors or reviewers if they intend to do so and confidentiality must otherwise be honored*.") (Ex. A[5]) (emphasis added); *see also* Ex. B (International Journal of Biology of Exercise Privacy and Confidentiality Policy, stating, "Reviewers also have rights to confidentiality, which must be respected by the editor. Confidentiality may have to be breached if dishonesty or fraud is alleged but otherwise must be honoured."); Ex. C (Sao Paulo Medical Journal Confidentiality Policy, stating the same).[6]

## III.   ARGUMENT

### A.   The JSCR Purports to Be a Scientific Journal

The NSCA, and its expert, describe the JSCR as a scientific journal. For example, the JSCR home page describes the JSCR as a "Sport **Science** Journal." (Ex. D.) Similarly, the JSCR web home page "Greeting from the Editor" (Dr. Kraemer) provides, "We publish more applied sport **science** and conditioning papers than any other journal in the world. . . . From studies on sets and reps for optimal resistance training programs to applied science of sport to nutritional interactions with training, manuscripts seek to improve the knowledge based practices in the world of strength and conditioning and improve our understanding of sport **science**." (*Id.* emphasis added).

---

[5] References to lettered exhibits refer to the exhibits to the Declaration of Mitch Danzig in support of Plaintiff's Joint Motion for Determination of Discovery Dispute, submitted herewith.

[6] Similarly, even in the highly regulated health-care context, federal courts have recognized that any peer-review "privilege" is outweighed by the importance of collecting relevant information during a government investigation. *See, In re Admin. Subpoena Blue Cross Blue Shield of Massachusetts, Inc.*, 400 F.Supp.2d 386, 392 (D. Mass. 2005); *In re Baptist Mem'l Hosp.*, 2004 WL 2905391, at *3 (W.D. Tenn. June 22, 2004); *Accreditation Ass'n for Ambulatory Health Care, Inc. v. U.S.*, 2004 WL 783106, at *3 (N.D. Ill. Jan. 8, 2004).

Other examples of the NSCA describing the JSCR as a scientific journal include, but are not limited to, the following:

- The JSCR website provides instructions for authors that states, "The editorial mission of the JSCR, formerly the Journal of Applied Sport Science Research (JASSR), is to advance the knowledge about strength and conditioning through research. Since 1978 the NSCA has attempted to 'bridge the gap' from the scientific laboratory to the field practitioner. . . . This journal wishes to promote the publication of peer-reviewed manuscripts that add to our understanding of conditioning and sport through applied exercise and sport science." (Ex. E.)

- Under "Original Research,", JSCR website states: "A primary goal of JSCR is to provide an improved **scientific** basis for conditioning practices." (*Id.*)

Additionally, various NSCA representatives—including its 30(b)(6) designee—described the JSCR as scientific.[7] The JSCR also expresses an intent to comport with appropriate standards for scientific publication. The JSCR claims to use double-blind peer review, with at least two reviewers for each manuscript that passes initial perusal. (Ex. E.) The JSCR also requires that research must have been approved by the appropriate "Institutional Review Board (IRB) or Ethics Board" and must incorporate appropriate informed consent from research subjects. (Ex. E.)

**B.  Scientific Journals Routinely Publicly Identify the Names of Contributing Peer Reviewers and Any Confidentiality Concerns Can Be Adequately Addressed Through the Parties Protective Order**

In contrast to the NSCA's previous position that the names of peer reviewers should per se be treated as confidential, many leading scientific journals publicly thank their peer reviewers by name. *See*, e.g., Ex. F (Journal of American Medical Association ("JAMA") giving thanks by publishing the names of 3,804 peer reviewers who reviewed manuscripts for JAMA in 2012; Ex. G (JAMA publicly thanking the 3,960 peer reviewers who reviewed manuscripts for JAMA in in 2013);

---

[7] See Ex. J (Kraemer deposition, at 12-15, 21, 47, 57, 84); Ex. K. (Cinea deposition, at 61, 75, 224, 230, 237, 248, 273-75; Ex. L (Triplett deposition, at 68-69, 123-24).

and Ex. H (JAMA publicly thanking the 3,813 peer reviewers who reviewed manuscripts for JAMA in in 2014; *see also* Ex. I (Annals of Internal Medicine publicly publishing the names of its 2014 peer-reviewers). Accordingly, the names of the peer-reviewers are not per se confidential. The scientific journal industry merely maintains confidentiality—absent fraud allegations—with respect to the particular articles contributed to by a peer-reviewer. Here, the Erratum alone establishes that the evidence at hand far surpasses mere allegations of fraud. Further, any confidentiality or "chilling effect" concerns can be addressed through the parties' Protective Order by designating the documents and related testimony CONFIDENTIAL or CONFIDENTIAL-FOR COUNSEL ONLY.

### C. CrossFit, Inc. Has Illustrated—and the NSCA's Erratum Confirms—Scientific Misconduct During the NSCA's Peer Review Process Justifying Disclosure of the Peer-Reviewer Identities

Scientific journals permit disclosure of peer-review identities when fraud or scientific misconduct is alleged. (Exs. A-C.) In addition to improprieties during the peer-review process described herein, CrossFit, Inc.'s trial expert has issued a report thoroughly detailing the NSCA's extensive ethical breaches during the Devor Study's peer-review process. (Ex. M.) Dr. Haavi Morreim's report includes, but is not limited to, the following:

- The standards for properly managing article submissions;
- The standards for properly managing allegations of scientific misconduct;
- The NSCA's failure to comport with the appropriate standards during the Devor Study's peer-review process; and
- The NSCA's failure to comport with the appropriate standards for failing to manage the allegations of scientific misconduct relating to the Devor Study.

The NSCA's plan to manipulate the Devor Study through its peer review process was in place before the first round of peer reviews. For example, before detailing the various ethical breaches during the three manuscript revisions to the Devor Study (Ex. M at pp. 10-15), Dr. Morreim flags that Dr. Kraemer sought to manipulate the peer-review process even before the first round of peer reviews:

The problems begin even before the first round of peer reviews. In an email dated June 20, 2012, Editor-in-Chief William Kraemer assigns the Devor article to Travis Triplett as senior editor for shepherding the piece through the review process. It appears that, even at that early point Kraemer is proposing that Triplett should ensure that a certain kind content must be included if the article is to be accepted for publication – namely, that "a lot of context is needed for this," that the paper should say there is a cost to becoming fit by way of CrossFit ("fit at what cost"). Kraemer further suggests that Triplett should secure "some good reviewers to take a close look at this as catabolism will break you down but while fit are you in a catabolic state etc, . . . " While I cannot be certain, Kraemer appears to be alerting Triplett to certain consequences of a catabolic state that he believes may lead to CrossFit-associated harm. In both these directives, then, Kraemer appears to be instructing Triplett to choose reviewers who will require the authors to say (or perhaps to instruct her reviewers to tell the authors to say) that CrossFit can cause harm, as a kind of prerequisite for publishing the article. (Ex. M at 10.)

The NSCA then flawlessly executed its plan to fabricate injury data in the Devor Study. Dr. Morreim's report highlights how Dr. Kraemer hand-selected a biased senior editor, instructed his senior editor to hand pick peer-reviewers, and improperly injected the NSCA's biased, unscientific conclusions into the Devor Study. The NSCA's representatives' stunning deposition testimony strongly suggests Dr. Kraemer believed his team's unethical manipulation of the peer-review process was bulletproof by simply deferring to the sanctity of the JSCR's self-proclaimed rigorous peer-review process.

For example, during the first wave of revisions on August 28, 2012, "the cover letter accompanying the peer reviewers' comments takes a significant step beyond an ordinary review process as [Dr.] Kraemer suggests that authors need to add some specific substantive content regarding injuries to the manuscript." (Ex. M[8] at 10.) Dr. Kraemer improperly admonishes the authors that they should "caution" readers that "many people do get injured" during CrossFit training despite having no scientific basis to support that statement. (*Id.*) During the second wave of peer-

---

[8] The Devor Study's Participants' names have been redacted from Dr. Morreim's report, which are only mentioned in one paragraph. An un-redacted version of Dr. Morreim's Report has not been filed under seal because the names of participants are not relevant for purposes of this motion.

reviews on October 13, 2012, the peer reviewers take Dr. Kraemer's lead and zero in on injury data. (Ex. M at 11-12.) At this point in the peer-review process, there was no evidence the authors had measured any data relating to injuries. Dr. Morreim notes that inviting the authors to collect after-the-fact injury data "would be inviting bad science." (Ex. M at 11.) And further revealing the peer reviewers' agenda, the final version of the Devor Study claims the injury data was collected during the Devor Study. At a minimum, the peer reviewers knew, or should have known, that the injury data was not measured during the Study. They nonetheless approved the Devor Study for final publication with the unsupported injury data. The peer-reviewers should be deposed to assess why they did not raise any concerns about the injury data magically appearing without a shred of scientific support except for the CHAMP Paper pushed by Dr. Kraemer. Without deposing the Peer Reviewers, CrossFit, Inc. cannot meaningfully assess the scope of the peer reviewers' direct connection to the injury data in the Devor Study as the Court suggested in the Order. (Order, Dkt. No. 57, at p. 13.)

During his deposition, Dr. Kraemer made the incredible claim that despite serving as the Editor in Chief of a leading journal in the biomedical science of sport, he is unaware of any rules or regulations regarding ethics in publishing in sports science. (Ex. J, Kraemer deposition, at 14-15.) In a transparent effort to insulate the agenda-driven peer-review process from outside scrutiny, Dr. Kraemer also testified that the only approach to take when confronted with evidence of scientific misconduct is to trust the authors. (*Id.* at 157) This stunning testimony is another example undermining the NSCA's claim that the JSCR comports with the appropriate standards for scientific publication by using double-blind peer review.

New documents produced after the First Order also provide strong evidence that the peer-reviewers were involved with the fraudulent injury data. For example, the NSCA's publisher—Lippincott Williams & Wilkins—produced various documents that should have been produced by the NSCA in discovery. One

document is a ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

█████████████.[9] As a result, CrossFit, Inc. should be permitted to confirm with the peer-reviewers whether their comments appearing in the manuscript revisions actually came from them and whether Dr. Kraemer or Triplett provided any specific direction or expectations relating to the injury data.

Accordingly, discovery after the Order denying the First Motion to Compel has led to corroborated evidence of, at best, scientific misconduct and, at worst, intentional fraud, during the peer-review process justifying disclosure of the peer-reviewers' identities.

**D.     The Peer Reviewers' Identities are Relevant to CrossFit, Inc.'s Claims and Proportional to the Needs of the Case**

Under the recently amended Federal Rule of Civil Procedure 26, two factors are relevant in evaluating whether requested information is within the permitted scope of discovery.  First, the requested discovery must be "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b).  Second, the requested discovery must be "proportional to the needs of the case." (*Id.*)

Fraud unquestionably occurred during the peer review process and CrossFit, Inc. cannot fully assess the scope of the NSCA's malfeasance to support its claims without deposing the hand-selected peer reviewers.   In the Order, the Court noted that the peer-review comments alone do not appear to directly relate to the injury data and the peer-review comments would provide sufficient evidence of bias.  (Order at 13.)  The peer-review comments alone, however, do not detail any pre-existing

---

[9] See Danzig Declaration, ¶14, Ex. N.

relationships the peer-reviewers had with Dr. Kraemer, Dr. Triplett, the CHAMP initiative, or other anti-CrossFit initiatives. They also do not reveal any instructions the Peer Reviewers received from Dr. Kraemer or Dr. Triplett. Equally concerning, CrossFit, Inc. has reason to believe the peer-reviewers may have allowed Dr. Kraemer to ghost-write comments as a "peer-reviewer" using the JSCR Editorial Management System.

As detailed below, CrossFit, Inc.'s requested disclosure of the peer reviewers' identities is well within the permissible scope of discovery because the peer reviewers' identities are directly relevant to CrossFit, Inc.'s claims, and the disclosure of their identities is proportional to the needs of the case.

### 1. The Peer Reviewers' Identities are Critically Relevant to CrossFit, Inc.'s Claims

In the Ninth Circuit, a plaintiff that shows deliberately false advertising under the Lanham Act (15 U.S.C. § 1125(a)) is entitled to a "presumption of consumer deception and reliance," thereby alleviating that plaintiff's obligation to establish deception by direct evidence. *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040-1041 (9th Cir. 1986). Moreover, evidence that a corporate defendant's employees possessed information indicating that an advertisement was misleading may be imputed to the knowledge of the corporate defendant itself under California's false advertising statute (Cal. Bus. & Prof. Code § 17500). *People v. Forest E. Olson, Inc.*, 137 Cal. App. 3d 137, 140 (1982) ("Among [defendant's employees], [defendant] clearly had the information proving the advertisements were misleading; this knowledge is imputed to the corporate defendant itself."). Such evidence is also critical to the measure of a plaintiff's damages, including the availability of multiple damages and/or an award of attorney's fees. *See U-Haul*, 793 F.2d at 1041-1042 (awarding profits, double damages, and attorney's fees under the Lanham Act for deliberately false advertising by defendant).

Here, the identities of the peer reviewers are highly relevant to CrossFit, Inc.'s

12

1  claims.  For years, senior staff members of the NSCA have worked to promote the

2  notion that CrossFit training is risky and dangerous in an effort to limit CrossFit,

3  Inc.'s impact on the NSCA's revenues from fitness certification, licensing, and

4  education.[10] Indeed, Dr. William Kraemer and Dr. Travis Triplett were deeply

5  involved in prior efforts to dig up and promote harmful information regarding injuries

6  in CrossFit, Inc. as early as 2010.[11]  Not coincidentally, Dr. Kraemer and Dr. Triplett

7  were also responsible for hand-selecting and specifically instructing the Devor

8  Study's peer reviewers regarding the false injury data at the heart of this case.[12]

9  CrossFit, Inc. must be able to examine the peer reviewers' previous relationships with

10  Dr. Kraemer, Dr. Triplett, the NSCA, the ACSM or the CHAMP initiative.

11      Accordingly, the identity of those peer reviewers – and related information

12  from those reviewers regarding the peer review process for the Devor Study – is

13  plainly relevant to the NSCA's state of mind in publishing the Devor Study and to the

14  damages CrossFit, Inc. may be entitled to based on the NSCA's actions (and

15  inactions). *See U-Haul*, 793 F.2d at 1040-1042 (finding "presumption of consumer

16  deception and reliance" and profits, double damages, and attorney's fees under

17  Lanham Act due to defendant's deliberately false advertising).

18      **E.    Disclosing the Peer Reviewers' Identities is Proportional to the
           Needs of the Case**

19

20      Federal Rule of Civil Procedure 26(b) lists six factors considered in analyzing

---

[10] *See, e.g.,* Ex. O at Sanford/Bergeron000510 ("I think we would want to review what the criteria for certification are – I have read educational materials from CrossFit that are not base on science or standard practices.  We are working on an alternative certification for DoD thru [sic] NSCA and ACSM, but that will take some time."); *id.* at Sanford/Bergeron000510-511 ("Additionally, strongly recommend against [DoD] resource approval for ECP 'certification' courses[.] Maybe put Strongly recommend certification from professional associations (NSCA, ACSM) rather than ECP 'certification' courses.");

[12] *See* Ex. Q, Email from Dr. William Kraemer to Dr. Travis Triplett dated June 20, 2012, NSCA0000134 ("get some good reviewers to take a close look at this as catabolism will break you down but while fit are you in catabolic state [sic].").

13

the proportionality of requested discovery: (i) the importance of the issues at stake in the action; (ii) the amount in controversy; (iii) the parties' relative access to relevant information; (iv) the parties' resources; (v) the importance of the discovery in resolving the issues; (vi) and whether the burden or expense of the proposed discovery outweighs its likely benefit. Each of these factors weighs in favor of disclosing the peer reviewers' identities. First, as discussed above, the peer reviewers' identities are clearly relevant to show the NSCA's state of mind in publishing the Devor Study and the measure of CrossFit, Inc.'s damages. Second, the amount in controversy is substantial, as the false and harmful Devor Study has become the most-viewed article in JSCR history. (Ex. R.) Third, the JSCR is the only party with access to the peer reviewers' identities, as CrossFit, Inc. has issued more than 20 document and deposition subpoenas in this case without discovering the reviewers' identities. Fourth, the NSCA's resources are substantial, as the NSCA is the "leader in research and education of strength and conditioning professionals" and enjoys extensive revenues from certification as "one of the largest certifiers of trainers in the country." (FAC at ¶¶17 – 19.) Fifth, identifying and deposing the peer reviewers is critical to resolving the issues in this case, as only the peer reviewers themselves would be able to provide information as to the instructions provided to them in connection with the Devor Study and additional information relating to the peer review process.

Finally, and most notably, there is little or no burden on the NSCA from disclosing the peer reviewers' identities that would outweigh the benefits of such disclosure. Revealing the identities of the peer reviewers will not require the expenditure of significant resources and discovery in this case has completely discredited the NSCA's claim that "the identities of the peer reviewers should be protected from disclosure for reasons of confidentiality and the integrity of the peer

14

review process."[13] In reality, the JSCR's peer review process in at least the instant case has been devoid of integrity. For instance, discovery in this case has shown that Dr. William Kraemer instructed Dr. Travis Triplett to select peer reviewers for the Devor Study who would highlight injury data as a concern[14] and Dr. Kraemer ghost-wrote editorial comments under his wife's name in communications sent to the authors of the Devor Study.[15]

For these reasons, the identities of the peer reviewers are important to CrossFit, Inc.'s claims and proportional to the needs of this case. Thus, the NSCA must disclose the peer reviewers' identities pursuant to Federal Rule of Civil Procedure 26(b).

### 1. The Eastern District of New York's Holding in *Solarex Corp. v. Arco Solar, Inc.* Affords the NSCA No Protection from the Disclosure of the Peer Reviewers' Identities

In its initial Order on the First Motion to Compel, the Court found persuasive the Eastern District of New York's holding in *Solarex Corp. v. Arco Solar, Inc.*, 121 F.R.D. 163 (E.D.N.Y. 1988). Recently discovered information, however, has shown that *Solarex* affords the NSCA no protection. In its analysis of *Solarex*, this Court noted that "the identity of the peer reviewer remains confidential to ensure the 'complete and candid advice' by peer reviewers."[16] The Court then described relevant factors to this analysis and cited the Solarex court's holding that disclosure is not warranted where a party's desire to learn a peer reviewer's identity is merely a "fishing expedition" with "nothing in the record to indicate … any substance to the [party's] theory…"[17]

None of the concerns articulated by the court in *Solarex* are present in this

---

[13] *See* Order Re Joint Motion for Determination of Discovery Dispute (Peer Review and Compensation Discovery), Dkt. No. 57, at p. 10.
[14] Ex. Q.
[15] *See* Ex. J (Kraemer deposition at pp. 82:9-24.)
[16] Order Re Joint Motion for Determination of Discovery Dispute (Peer Review and Compensation Discovery), Dkt. No. 57, at p. 12.
[17] *Id.* at pp. 12-13.

case. Here, there is no need to ensure "complete and candid advice" by JSCR peer reviewers because discovery has shown that the "advice" from the Devor Study's peer reviewers related to the injury data was not their own. Instead, the peer reviewers' comments at issue were, at best, provided at the behest of NSCA senior staff members looking to further the NSCA's own commercial interests. Unlike in *Solarex*, CrossFit, Inc.'s request to obtain the peer reviewers' identities is far from a "fishing expedition," and instead is based upon detailed factual showings that: the JSCR peer review process for the Devor Study was riddled with improprieties; the JSCR's peer review improprieties directly caused the inclusion of false and harmful injury assertions in the Devor Study; and that the NSCA was looking to publish such false and harmful information in a calculated effort to further the NSCA's own commercial interests. Under these circumstances, nothing in *Solarex* lends any support of the NSCA's contention that the identities of the Devor Study's peer reviewers should remain protected from disclosure.

**F. The Editor in Chief and Hand Selected Senior Editor of the Devor Study Have Been Intimately Involved with the NSCA's Efforts to Unfairly Compete with CrossFit, Inc.**

The scope of the NSCA's malfeasance during the peer-review process is best understood in the context of the NSCA's historic effort to attack CrossFit, Inc.'s reputation in the marketplace. CrossFit is a worldwide phenomenon and a unique brand of fitness training, which began increasing in popularity around 2000. (First Amended Complaint ("FAC") ¶ 3; Answer ¶ 3 [Dkt. No. 9].) Since then, CrossFit, Inc. has experienced a meteoric rise, and it now has over 80,000[18] credentialed CrossFit trainers, a million participants, and over 13,000 licensed affiliate gyms. (FAC ¶ 3.)

The NSCA is a pillar of the traditional fitness establishment. (*Id.* ¶ 15.) It is

---

[18] Since the initial Complaint was filed, the number of credentialed CrossFit trainers has increased to over 116,000.

among the largest certifiers of personal trainers and strength and conditioning professionals in the world. (*Id.* ¶ 15.) Like CrossFit, Inc., a large portion of the NSCA's revenues are attributable to the credentialing and certification of fitness trainers and accompanying renewal and continuing education requirements for trainers. (*Id.* ¶ 17.) The NSCA consists of at least 24,000 members and describes itself as a "leader in research and education of strength and conditioning professionals." (*Id.* ¶ 16.) The NSCA publishes a world-renowned journal, the JSCR (*Id.* ¶ 22.) The NSCA claims that the JSCR's publications are "some of the most sought after in the industry . . . [and] top resources for your continuing education and professional development." (FAC ¶ 23.) CrossFit, Inc.'s success in recent years is an existential threat to the NSCA. As more and more people move from the NSCA's traditional fitness model to CrossFit training, there will be fewer and fewer trainers seeking NSCA certifications. The NSCA knows it cannot challenge CrossFit training's efficacy: Research shows that CrossFit training is more effective than traditional fitness programs. Thus, the NSCA instead chose to engage in a smear campaign – using its JSCR as a platform to malign CrossFit training as "unsafe."

### 1. The NSCA Begins a Smear Campaign Led by the Same Individuals Who Manipulated the Devor Study Peer Review

The NSCA's scheme was first put into action in 2008. In response to CrossFit, Inc.'s growth and increasing market presence, the NSCA and its powerful friends in the fitness community banded together in an effort to regain their market share, particularly among the military and law enforcement community where CrossFit training had become increasingly popular and where the NSCA had decided in 2008 to launch a campaign to become more competitive and to gain larger market share. Specifically, beginning as early as 2008, the NSCA started directly contributing to a larger campaign to label the CrossFit exercise program as unsafe and was also independently disparaging CrossFit training ███████████████████████████ ███████████████████████████████████████████ One missing critical

piece, however, preventing the NSCA and its counterparts' attacks from gaining traction was an actual scientific study concluding that CrossFit training is, in fact, more dangerous than other fitness programs. (FAC ¶ 5; Answer ¶ 5.)

Recognizing CrossFit, Inc.'s threat to the NSCA's business model, senior staff members of the NSCA's academic journal, the JSCR, joined an initiative led by the NSCA's industry peer– the American College of Sports Medicine (the "ACSM") – to promote a false image of CrossFit training as unsafe. That initiative in September 2010 led to the ACSM convening a so-called workshop (the "CHAMP Workshop") that included key military decision-makers and NSCA representatives, who would later (conveniently) be in charge of the Devor Study's peer review process. The CHAMP Workshop's goal was to ████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████

### 2. Defendant First Openly Targets CrossFit Training through the CHAMP Paper

In 2011, the ACSM (with assistance from the NSCA) led the charge against CrossFit training by publishing a "Consensus Paper" (the "CHAMP Paper"). (Ex. U.) By no coincidence, Dr. Kraemer, the NSCA/JSCR's Editor-in-Chief (who later managed the Devor Study Peer Review) was one of its authors. (*Id.*) The CHAMP Paper raised numerous unfounded and certainly unsubstantiated concerns, and then asserted that CrossFit training is dangerous. (*Id.*) Internal correspondence amongst the CHAMP Paper's authors shows that CrossFit, Inc.'s threat to their certification revenues was at the forefront of the authors' minds in drafting the Paper. (Ex. O.) For example, email correspondence between several authors warns, "I think we would want to review what the criteria for certification are – I have read educational materials from CrossFit that are not based on science or standard practices. We are working on an alternative certification for DoD thru NSCA and ACSM, but that will take some time." (*Id.*)

### 3. NSCA/JSCR Successfully Influence the Opinions of the CHAMP Paper

The NSCA/JSCR staff members responsible for overseeing the peer review process for the Devor Study also played a key role in the development and publication of the CHAMP Paper. Two senior JSCR staff members were solely responsible for selecting the peer reviewers for the Devor Study: JSCR Editor-In-Chief, Dr. William J. Kraemer, and JSCR Senior Associate Editor, Dr. N. Travis Triplett. (Ex. J at p. 157:18-22.) Both Dr. Kraemer and Dr. Triplett were instrumental in the development of the CHAMP Workshop and the publication of the CHAMP Paper. Dr. Kraemer was involved in all phases of the CHAMP Workshop and co-authored the CHAMP Paper. (Ex. U.) ██████████████████

████████████████████████████████████████████████████████

██████ Dr. Kraemer then furthered that agenda by presenting and leading the CHAMP Workshop's discussion of ████████████████████████████████

████████████████ Dr. Triplett was similarly involved in the early stages of the CHAMP Workshop. Before the Workshop, the ACSM's National Director of Certification engaged Dr. Triplett to write a "White Paper" addressing the following pre-determined conclusions about CrossFit training:

- ████████████████████████████████████████
  ██████
- ████████████████████████████
- ████████████████████████████████
- ████████████████████████████████████
- ████████████████████████████████████████
  ██████████████

Dr. Triplett eventually provided the ACSM with such a "White Paper,"

---

[19] "HIT" stands for "High Intensity Training," a term the CHAMP Paper uses to describe CrossFit training.

For her efforts in reaching these pre-determined (and unscientific) conclusions based on anecdotal information, Dr. Triplett received a payment from the ACSM. (Ex. X.)  Dr. Triplett also served as a key presenter at the CHAMP Workshop, offering "Training Recommendations" to attendees that favored traditional training protocols over the training methods utilized by CrossFit.  (Ex. Y.)

### 4. The CHAMP Paper Authors Admit The Paper Is Purely "Anecdotal"

Since the publication of the Devor Study, it is often cited alongside the CHAMP Paper as evidence that CrossFit training is dangerous.  CrossFit, Inc. has deposed nearly every author of the CHAMP Paper, and these depositions show that the CHAMP Paper had no scientific basis.  Indeed, the authors uniformly confirmed that the CHAMP Paper is entirely anecdotal and does not (and cannot) support the proposition that CrossFit training is more dangerous than any other fitness program.  For example, CHAMP Paper co-author Francis O'Connor testified that the Paper was intended to be anecdotal only and noted that "for anyone to read this paper and say that this paper says there is more injuries with Crossfit (sic), they're not reading the paper . . . The paper concludes that it's a gap.  We do not know if Crossfit (sic) creates more injuries or less injuries.  We don't know."  (Ex. Z at 133:15-25; 135:5-12.)  Mr. O'Connor also confirmed there is no documented evidence suggesting CrossFit training or similar programs increase injury risk.  (*Id.*) Similarly, CHAMP Paper co-author Walter Thompson testified that the conclusion and related citations supporting the conclusion that CrossFit training and related programs contain a "disproportionate" risk of injury are simply wrong.  (Ex. AA at 170-171.)

Tellingly, the original version of the Devor Study submitted by the authors to

the NSCA/JSCR did not even reference or cite the CHAMP Paper. (Ex. BB at ¶ 11.) It was only after the Kraemer-driven peer review process that the CHAMP Paper became the first citation in the final version of the Devor Study.

### 5. The NSCA Manipulates the Devor Study to Publish False Injury Data and Further Its Anti-CrossFit Agenda

In 2012, the Devor Study (conducted at the Ohio State University) was presented to the NSCA for publication in the JSCR. In early 2013, the JSCR published the Study online (authored by Steven T. Devor, Michael M. Smith, Allan J. Sommer, and Brooke E. Starkoff). It was entitled "Crossfit-based high intensity power training improves maximal aerobic fitness and body composition" and ultimately appeared in the JSCR's November 2013 hard-copy issue. (Ex. CC.)

### G. The Original Manuscript of the Devor Study Contained No Injury Data

Before undergoing the NSCA's self-proclaimed "rigorous, double blind peer-review process," the Devor Study sought to measure certain performance gains associated with CrossFit training. Indeed, the original manuscript presented to the NSCA concluded that the CrossFit training program significantly improved fitness and did not include any reference whatsoever to injury data. (Ex. BB at ¶ 11.) This was not surprising because the Study's authors did not set out to study the injury rate and kept no records of any injuries. (*Id.* at ¶¶ 10-11.) The evidence CrossFit, Inc. obtained during discovery demonstrates that the NSCA seized the opportunity presented by the original Devor Study manuscript to finally manufacture a "scientific" study concluding CrossFit training was unsafe.

By the time the Devor Study went through the NSCA's peer-review process, it magically transformed. The editorial and peer-review notes provided to the Devor Study authors by Dr. Kraemer and Dr. Triplett demonstrate how unscientific the peer-review process was and how Dr. Kramer and Dr. Triplett manipulated the process and demanded inclusion of (false) injury data and anecdotal commentary about the

supposed dangers of CrossFit training. (Ex. DD[20].) This biased peer review process and editorial malpractice led to the final published version of the Devor Study including (false) injury data claiming that the CrossFit program injured 16% of the study participants to the extent that they were unable to complete the study. (*Id.*) The NSCA finally had the "scientific" data its anti-CrossFit agenda was missing since at least 2008; Of course, that data was made-up.

The NSCA's plan worked, at least in the short term. The Devor Study was the most popular study in the Journal's history. (Ex. R.) CrossFit, Inc.'s worldwide competitors latched onto the Devor Study, claiming there was now scientific evidence that CrossFit training is dangerous. It spread like wildfire through social media and other media outlets severely damaging the CrossFit brand. When CrossFit, Inc. first learned of the Devor Study by viewing an "ahead of print" online version, it began its own investigation relating to the injury data. CrossFit, Inc. contacted the study's authors, the JSCR Editor-in-Chief and the study's data coordinator and quickly learned that the injury data was not reliable and likely fabricated. For example, one of the Devor Study's authors confirmed he had no knowledge regarding the injury data, including where or when the injuries occurred. (Ex. EE.) Equally concerning, the Devor Study's data coordinator indicated the injury data was fabricated. (Ex. FF.)

Before final publication, CrossFit, Inc. sent the NSCA a detailed email detailing the evidence that the Devor Study's injury data was, at best, unreliable, and, at worst, fabricated. (Ex. GG.) The NSCA received the email, shared it amongst its leadership, but chose not to investigate or take further action based on a direct order from Dr. Kraemer. (Ex. K at 284:20-285:22.) The NSCA intentionally ignored the ample evidence provided to it of the Devor Study's falsity and published the Devor

---

[20] See, e.g., Ex. DD at p. 5 (noting, in part, manuscript was "not given a high priority score" because "You also need to caution readers as to the context of your findings due to the fact many people do get injured doing these types of workouts" and reminding authors, "Remember the paper can still be rejected if the reviewers are not impressed with the sophistication of the revisions made."

Study containing the fraudulent injury data.

## H.    The Devor Study Relied on Anecdotal Evidence and Falsified Data

The Devor Study purported to track a ten-week CrossFit training program, using the athlete-members of a local CrossFit Affiliate gym in Ohio, and conducting the testing at Ohio State University.  While the Devor Study noted that CrossFit training improved the athletes' fitness levels, it also reported that 16% of the study participants dropped out of the program due to "overuse or injury."  That assertion was based on completely falsified data.  CrossFit, Inc. interviewed the study coordinator and the vast majority of those participants who did not complete the study.  They all denied reporting to the scientists a failure to finish (or "test-out") because of injuries.  (Dkt. No. 73.)  Indeed, the subject participants asserted that they had no contact with Professor Devor and his team regarding their reasons for not completing the study, or regarding injuries in general.  (*Id.*) CrossFit, Inc. made these issues known to the NSCA, both with an email to the NSCA Board and in discussions with Dr. Kraemer before the Devor Study was published.  (Ex. GG.)

The purported "overuse or injury" data published in the Devor Study was contrived by the NSCA to dissuade people from pursuing CrossFit training as a form of exercise, and thereby drive trainers away from CrossFit Inc.'s credentialing and certification business and toward the NSCA.  Moreover, the harm to CrossFit, Inc. was not limited to the JSCR's publication of the Devor Study; indeed, in news coverage of the Devor Study, media outlets focused on the injury data and the (false) high injury rate to the exclusion of the study's findings regarding the benefits of CrossFit training.  One such article, in a national magazine, was titled "Is CrossFit Killing Us?" (Ex. HH.)  Accordingly, any argument that the overall Devor Study was "positive" for CrossFit training is belied by how the media and fitness industry utilized and referenced the Study.

///

///

23

## 1. The NSCA Was On Notice of the Fraudulent Data Since May 2013 But Refused to Acknowledge Falsity Until September 2015

As discussed above, in May 2013, CrossFit, Inc. representative Russell Berger emailed the NSCA Board of Directors. (Ex. GG.) Mr. Berger's email noted that CrossFit, Inc.'s investigation revealed that the data in the Devor Study was fabricated. Mr. Berger's email also provided a link to a full article he wrote in the CrossFit Journal, which thoroughly detailed CrossFit, Inc.'s investigation into the Devor Study. (*Id.*) When CrossFit, Inc. deposed the NSCA's 30(b)(6) company representative—Keith Cinea, the NSCA's Publications Director—he confirmed the NSCA had received and reviewed Mr. Berger's email but essentially did nothing in response. (Ex. K at 234:12-236:1.) Mr. Cinea further noted that he did not refer Mr. Berger to the NSCA's manuscript clarification process. (*Id.* at 240:17-241:18.)

Mr. Cinea also testified that he reviewed Mr. Berger's email with Dr. Kraemer. He asked Dr. Kraemer if the NSCA should respond, and Dr. Kraemer said no. (*Id.* at 284:20-285:22.) Mr. Cinea also testified that he and Dr. Kraemer initially concluded the injury data in the Devor Study was credible, accurate, and did not need to be questioned or investigated. (*Id.*) Mr. Cinea also confirmed that as of today he no longer believes the injury data is credible and accurate based on the declarations he reviewed from those participants in the study who were alleged to have been injured. (*Id.* at 286:10-287:9.) CrossFit, Inc. and its legal team ultimately obtained sworn declarations from all but one study participants—an individual who did not wish to speak to attorneys—allegedly injured in the Devor Study. (Dkt. No. 73.) The "injured" participants uniformly swore under penalty of perjury that they were not injured during the CrossFit training examined in the Study, and that they never told anyone (including the Devor Study's authors) that they were. For nine months after the NSCA received the participants' declarations, the NSCA did nothing, all while numerous depositions in this case fleshed out the NSCA's gross manipulation of the Devor Study. In September of 2015, long after the mountain of evidence against the

24

NSCA was plainly irrefutable, the NSCA finally issued an Erratum addressing the injury data. (Ex. II.)

### 2. The NSCA/JSCR's Erratum Confirms the Injury Data Was Fabricated

Despite CrossFit, Inc. presenting the NSCA with evidence before the final study was published that would cause any reasonable person (let alone a "scientist") to question the accuracy of the injury data, and after the study's publication presenting the NSCA with objective proof of the data's falsity, the NSCA chose to publically stand behind the Devor Study and its peer-review process. It made that choice knowing that CrossFit, Inc. would continue to be harmed in the market (the NSCA's benefit) as long as the Devor Study remained in publication without any retraction. Approximately nine months after the NSCA's receipt of the participants' sworn declarations, the NSCA finally conceded that the injury data in the Devor Study was false, by publishing an Erratum. (Ex. II.) Problematically, the Erratum contained more misleading information, was not made reasonably available to the public, and was not properly linked to the Devor Study. As one example of misleading information, the Erratum noted that two of the individuals who did not complete testing, did so because of "injury or health conditions." (*Id.*) In reality, both of these participants' injuries were unrelated to their participation in the CrossFit training program.

## IV. CONCLUSION

For the foregoing reason, CrossFit, Inc. requests an Order (1) requiring the NSCA and its agents to identify the peer reviewers by name; (2) permitting CrossFit, Inc. to depose the peer-reviewers; (3) requiring the NSCA to supplement its discovery responses and document productions with un-redacted versions of the documents containing the peer-reviewers' names; (4) requiring the NSCA to confirm under penalty of perjury that it has provided complete responses and document productions to CrossFit, Inc.'s previous discovery requests concerning the peer-

reviewers and (5) requiring the NCSA to instruct its publisher to produce un-redacted versions of the previously-produced documents.

**DEFENDANT'S RESPONSE**

# I.    INTRODUCTION

This litigation is the textbook definition of a "manufactured controversy": that is, a controversy wholly contrived by Plaintiff CrossFit, Inc.'s ("Plaintiff" or "CrossFit") desire to neutralize the influence of academic scientists in determining the safety of its exercise program.  The instant lawsuit arises from a single sentence and a lead-in to a concluding paragraph in a November 2013 article published in Defendant National Strength and Conditioning Association's ("Defendant" or "the NSCA") Journal of Strength and Conditioning Research ("JSCR").  Since the article's publication, CrossFit has insisted that this sentence-and-a-half, in an article that praises CrossFit's efficacy as a training regimen (referred to herein as the "Devor Study" for its lead author), contains false information stating that nine CrossFit participants dropped out of the study due to injury or overuse.

In its ongoing effort to squelch any academic criticism of its fitness program, CrossFit zeroed in on this secondary conclusion, and has claimed that its publication—again, in an academic article praising CrossFit—was a deliberate falsehood on the part of the NSCA designed to destroy CrossFit, even though CrossFit's motion concedes that in the intervening years, its number of certified trainers has increased substantially.  (*See supra* p. 18 n.18.)  After Defendant published an Erratum in 2015 that provided context for the injury data and noted that the article's conclusion about CrossFit's efficacy remained unchanged, CrossFit has redoubled its efforts to paint the NSCA as the villainous architect of the aforementioned conspiracy, falsely claiming that this was a tacit admission the article contained fraudulent data.

The present discovery dispute is CrossFit's latest attempt to manufacture some colorable basis to compel the identities of Defendant's anonymous peer reviewers and chill any further academic discourse on its training program; however, just like its first bite at the apple, CrossFit's motion on this topic suffers from the same fatally

speculative flaws.  As this Court held in its first order denying CrossFit's motion, CrossFit's motion failed because: (1) the identities of the peer reviewers are not relevant to CrossFit's causes of action; (2) the communications between the authors and peer reviewers already have been fully disclosed and show no improprieties; and (3) Defendant's need for confidentiality outweighs CrossFit's supposed need for disclosure of peer reviewer identities.  (Doc. No. 57 at pp. 13-15.)  Here, all three of these reasons still hold true.

First, the primary argument that CrossFit provides for its entitlement to this discovery is an attenuated theory that Defendant "cherry-picked" the individuals who peer reviewed the Devor Study, and that those peer reviewers somehow exerted "editorial pressure" on the authors through their comments.  However, as this Court noted in its initial order, if the peer reviewers were biased or were somehow able to influence the Devor Study's authors to include allegedly false injury data, "it would probably be apparent in their 'fully disclosed' communications."  (Doc. No. 57 at p. 14.)  Unsurprisingly, CrossFit's evidence shows that only **<u>one</u>** peer reviewer even mentions injury data in an isolated comment, and that CrossFit's ethics expert, Dr. Morreim, actually **<u>praises</u>** this peer reviewer's conduct.  (*See* Danzig Decl., Ex. M at 11-13.)

In truth, Dr. Morreim's report largely revolves around criticizing editorial comments made by Dr. Kraemer, the JSCR's editor in chief, and not at all around the peer reviewers themselves: this confusion of the issues pervades CrossFit's motion.  Further, even on this front, Dr. Morreim admits that it is not entirely clear whether the JSCR's editors violated any ethical standards for peer review during the article's assignment to Dr. Triplett and the peer reviewers, conceding that **"I cannot be certain"** the JSCR editors acted improperly.  (*See* Danzig Decl., Ex. M at p. 10.)  Yet CrossFit goes on to claim, based on this flimsy and speculative evidence, that the NSCA engaged in "extensive ethical breaches" and "flawlessly executed its plan to fabricate injury data" based on the same report. (*See supra* pp. 9-10.)  CrossFit's facts

do not match its rhetoric.

Second, as this Court noted in its previous order, there is nothing to indicate the peer reviewers had any direct contact with the authors or researchers: no evidence connects the peer reviewers to the allegedly inaccurate injury data. (Doc. No. 57 at pp. 7, 13.) Here, too, CrossFit makes no attempt to make this showing, and merely confirms the "very limited role" the peer reviewers served. (*See id.* at pp. 13-14.) CrossFit also fails to explain how cherry-picking has any legal relevance to its causes of action, instead citing just two inapposite cases to make a woefully insufficient showing. (*See supra* at pp. 13-14.) For example, CrossFit makes the bizarre argument that under its California false advertising claim, "evidence that a corporate defendant's **employees** possessed information indicating that an advertisement was misleading may be imputed to the knowledge of the corporate defendant." (*See supra* at pp. 13-14.) As CrossFit is well aware, this argument is completely meritless because the JSCR's peer reviewers are not employees, but are unpaid volunteers. (*See, e.g.*, Ex. 9,[21] Kraemer Depo. at 78:18-23, 79:23 – 80:1; Ex. 10, Cinea Depo. (Vol. II) at 274:20-24; Ex. 12, Cinea Decl. ¶ 8.)

Third, CrossFit's attenuated "cherry-picking" theory should not overcome the NSCA's very strong interest weighing against disclosure of confidential peer reviewer identities. The JSCR relies on unpaid volunteers to conduct peer reviews of manuscripts, including the Devor Study. These reviewers use a double-blind process, which enhances the scientific credibility of studies published in the JSCR. Revealing the identities of the journal's reviewers would inhibit future reviewers from being candid in their criticism, and would hamper the NSCA's ability to attract sufficiently qualified scientists to conduct reviews. This is true even if the identities are disclosed only in the present lawsuit per the stipulated Protective Order governing this case.

---

[21] Unless otherwise stated, all exhibits referenced in Defendant's Response are attached to the separately filed Declaration of Kenneth S. Kawabata ("Kawabata Decl.").

(Doc. No. 14.)

Although CrossFit insists that its "new" evidence "provide[s] irrefutable evidence of scientific misconduct and fraud during the subject peer review process," (*see supra* at p. 2), the only truly new evidence CrossFit can offer the Court is Defendant's publication of an Erratum in 2015. CrossFit argues stridently that the Erratum is an admission the data was fraudulent, but this is simply untrue. In reality, the Erratum only provided context for the Devor Study's injury data, explaining (1) that although the authors had attributed the injury data to statements from the gym owner participating in the study, the gym owner denied making those statements, and (2) that ten out of the eleven participants who did not complete the study had provided reasons, with only two mentioning injury or health conditions. (Danzig Decl., Ex. II.) This does not amount to an admission that the data was fraudulently obtained.

Otherwise, CrossFit's purported "new" evidence is an expert report and a selective citation of supposedly leading ethics authorities in scientific journals, all of whom **may** permit the disclosure of peer reviewer identities when presented with allegations of fraud or scientific misconduct. Neither is new evidence obtained as a result of discovery in this action, and the expert report—which is just an opinion— and the scientific journal guidelines—which are not controlling legal authority— could have been submitted with CrossFit's initial motion.

In sum, the only new evidence CrossFit can offer is just as speculative as the evidence it submitted with its first attempt to compel peer reviewer identities. The Court should deny CrossFit's motion, this time with prejudice.[22]

---

[22] CrossFit's prolix motion apparently was filed to harass Defendant and/or sap Defendant's resources. At least **one third** of the **28-page motion** regurgitates facts and argument from its pending motion for partial summary judgment, **at times word-for-word**, even though much of that argument is immaterial to the instant discovery dispute. (*Compare supra* pp. 18-27 *with* Doc. No. 73-2 [Mem. P. & A.] at pp. 5-13.) For example, CrossFit's motion argues that CrossFit is a superior workout program to Defendant's methodology, and that following the Devor Study's publication, Defendant failed to correct the record when accused of fraud by a CrossFit representative. Neither

## II. CROSSFIT HAS NO EVIDENCE TO SHOW LEGAL RELEVANCE OF THE PEER REVIEWERS' IDENTITIES TO ITS CLAIMS

### A. CrossFit fails to show that the peer review process was fraudulent or improper

Perhaps the most fatal flaw with CrossFit's motion is its inability to explain in a coherent manner, beyond blusterous argument, how the peer review process was at all fraudulent or improper. Much like the rest of its motion, CrossFit cites to evidence that does not support its arguments, and fails to provide any new facts that would respond to the flaws in its discovery request that were identified in the Court's original order. As the Court noted in that order, the evidentiary record showed that "the peer reviewers had a very limited role in connection with the publication of the Devor Study" and, moreover, that there was nothing to indicate the peer reviewers "had any direct contact with the authors or with anyone involved with conducting the Devor Study." (Doc. No. 57 at p. 13.)

Here, too, CrossFit still fails to show any increased role by the peer reviewers, and instead misrepresents the Rule 26 report of their expert, Dr. Morreim, to manufacture an argument that the peer review process was improper. CrossFit falsely claims that their expert report shows, during the second wave of peer review, "the peer reviewers tak[ing] Dr. Kraemer's lead and zero[ing] in on injury data," (*see supra* at p. 11), but the evidence does not show this. The report actually shows that only **one** peer reviewer suggested the addition of injury data, and the report actually **compliments** the peer reviewer's suggestion for being "reasonable, limited, and careful." (Danzig Decl., Ex. M at p. 11.)[23] In truth, CrossFit's expert report does not

---

of these allegations in the FAC have anything to do with whether the **peer reviewers** acted improperly. (*See supra* pp. 18-19, 24-27.) CrossFit's renewal of the instant motion is a transparent attempt to try its entire case in a discovery motion, and it should be readily apparent that CrossFit's motion was filed in bad faith.

[23] CrossFit's argument that the peer reviewers must be deposed to "assess why they did not raise any concerns about the injury data magically appearing without a shred of scientific support except for the CHAMP paper," (*see supra* at p. 11), misses the mark. As discussed below in further detail, if the authors indicate that they collected certain data, peer reviewers are not expected to discover or raise concerns about that data. (*See infra* Part IV.B.)

mention a single impropriety on the part of the peer reviewers, and this is the sole mention of a peer reviewer discussing injury data. (*See id.* at pp. 11-13.) If even CrossFit's expert report on the "extensive ethical breaches during the Devor Study's peer review process" does not demonstrate any fraudulent, improper, or unethical behavior on the part of the peer reviewers, then CrossFit doubtlessly has failed to provide any evidence beyond speculation that would show the peer reviewers' identities have any relevance to the inclusion of any allegedly fraudulent injury data. This is nothing but another false controversy that was wholly invented by CrossFit.

Moreover, CrossFit cannot show that the sole peer reviewer who suggested the addition of injury data was asking the authors to collect dubious, after-the-fact injury data. While CrossFit assumes that the peer reviewer was making such a request, the comment at issue—the same one praised by CrossFit's expert—shows the reviewer believed the data was collected during the study, as the basis for suggesting the inclusion of the injury data was to explain "why 54 [participants] started, and 43 finished." (Ex. 1 at NSCA00304.) CrossFit's expert concedes that the peer reviewer "simply points out that there was a significant dropout rate and asks for information about injuries," and agrees that "injury rates might be important enough that, if they are not at least noted in some way, the paper might perhaps be found unworthy of publication." (Danzig Decl., Ex. M at p. 11.) Given these concessions by CrossFit's expert, it is clear that the peer reviewers' identities are neither relevant nor necessary to CrossFit's case.

In a further effort to confuse the issues, CrossFit mischaracterizes Dr. Kraemer as having "ghostwritten" editorial comments under his wife's name, and then makes the ludicrous claim that Dr. Kraemer **may** have also ghostwritten peer reviewers' comments. (*See supra* at pp. 12, 16.) This is exactly the sort of unsupported speculation that led this Court to deny CrossFit's initial motion. As Dr. Kraemer explained at his deposition, it is merely the convention at the JSCR that any of his comments are submitted to article authors under his wife's name, as his wife's

"managing editor" position is akin to a conduit that "shuffles computer information between the editors and the players in the system." (Ex. 9, Kraemer Depo. at 81:23 – 83:7.)[24] Aside from the fact that Dr. Kraemer's actions have nothing to do with showing any improprieties by the peer reviewers, this editorial convention is not mentioned once by CrossFit's expert as improper or unethical, despite dedicating several pages to outlining perceived ethical breaches by Dr. Kraemer. (*See* Danzig Decl., Ex. M at pp. 10-15.) This argument by CrossFit is perhaps the best example of how speculative its motion is, and the Court should deny it with prejudice accordingly.

When the Court denied CrossFit's initial motion, the Court correctly noted that the fully disclosed peer-review comments themselves bore little relationship to the allegedly fraudulent injury data. (Doc. No. 57 at pp. 13-14.) All that CrossFit has done to change the Court's mind is engage in wilder speculation, while misrepresenting evidence that actually contradicts CrossFit's position and basing its entire motion on a **single** innocuous peer review comment that reasonably suggested the inclusion of injury data. CrossFit's motion is clearly meritless and should be denied with prejudice.

**B.    CrossFit fails to show that the peer review process is relevant to tis claims for false advertising and/or unfair competition**

**1.    CrossFit's legal authority is threadbare and inapposite**

As this Court noted in its initial order denying CrossFit's motion to compel, CrossFit had not explained how any of its allegations about the peer review process related to its false advertising and/or unfair competition causes of action. (Doc. No. 57 at 14:19-22.) CrossFit now attempts to do so by citing a sprinkling of inapposite

---

[24]  CrossFit also alleges that because Dr. Kraemer never once logged into the Editorial Management System for the JSCR using his own credentials, it follows that he ghostwrote the peer reviewers' comments. (*See supra* at p. 12.) As with the rest of CrossFit's motion, this is nothing more than speculation. Further, seeing as how Dr. Kraemer testified that his comments always appeared under his wife's name, his failure to use his own login merely affirms that testimony.

cases regarding the Lanham Act and California false advertising statute, and making the exaggerated argument that the peer reviewers' identities are "critical" to CrossFit's claims. (*See supra* at pp. 13-14.)[25] Upon closer examination, none of these cases support CrossFit's position.

CrossFit's first argument in favor of relevance, citing *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040-41 (9th Cir. 1986), is that proving deliberate falsity in a Lanham Act case leads to a presumption that consumers were deceived by and relied upon the false advertisement. (*See supra* at p. 13.) However, this citation fails because CrossFit has not shown that the peer reviewers themselves had any reason to believe or know that the data submitted by the Devor Study was false. (*See infra* Part IV.B.) Although CrossFit argues that Dr. Kraemer and Dr. Triplett were responsible for "hand-selecting and specifically instructing the Devor Study's peer reviewers regarding the false injury data at the heart of this case," (*see supra* at p. 14), there is no evidence to suggest that the peer reviewers did anything to influence the article. CrossFit's own expert on ethics stated in her report that only **one** peer reviewer even suggested the inclusion of injury data, and the expert in fact **praised** that peer reviewer's behavior. (Danzig Decl., Ex. M at pp. 11-13.) Moreover, the evidence shows that peer reviewers are under no obligation to investigate data for its truth or falsity. (*See, e.g.*, Ex. 8 at "The peer-review system".) In light of these facts, CrossFit's argument in favor of relevance fails here—it is obvious that the identities of the peer reviewers have no legal relevance to CrossFit's claims under the Lanham Act.

Mystifyingly, CrossFit also argues that under its California false advertising

---

[25] In total, CrossFit's legal argument attempting to explain the relevance of the peer reviewers' identities to its claims consists of three paragraphs that constitute approximately two to three pages of a 28-page motion. (*See supra* pp. 13-15.) CrossFit's motion makes this incredibly brief argument despite the Court's caution that any further motions must "establish the relevance of [the peer reviewers' identities] to its false advertising and/or unfair business competition causes of action." (Doc. No. 57 at p. 16.) This should clarify to the Court that CrossFit has no legal basis to show the peer reviewers' identities are relevant to its claims.

claim, "evidence that a corporate defendant's **employees** possessed information indicating that an advertisement was misleading may be imputed to the knowledge of the corporate defendant." (*See supra* at pp. 13-14 (emphasis added) (citing *People v. Forest E. Olson, Inc.*, 137 Cal.App.3d 137, 140 (1982).) As CrossFit is well aware, the JSCR's peer reviewers are not employees, but are unpaid volunteers. (*See, e.g.*, Ex. 9, Kraemer Depo. at 78:18-23, 79:23 – 80:1; Ex. 10, Cinea Depo. (Vol. II) at 274:20-24; Ex. 12, Cinea Decl. ¶ 8.) Accordingly, this case also fails to show any relevance that the peer reviewers' identities would have to CrossFit's claims.

CrossFit's minimal citations to inapposite case law show that this motion is nothing but a groundless attempt to seek irrelevant information. CrossFit's motion should be denied with prejudice accordingly.

### 2. CrossFit has failed to distinguish Solarex from the instant case

Initially, CrossFit correctly notes that the Court denied its first motion because *Solarex Corp. v. Arco Solar, Inc.*, 121 F.R.D. 163 (E.D.N.Y. 1988) was persuasive authority on the subject of a motion to compel peer reviewer identities. (*See supra* at p. 17; Doc. No. 57 at pp. 11-13, 16.) CrossFit then attempts to distinguish *Solarex* by jumping to a conclusion unsupported by the facts, stating that "discovery has shown that the 'advice' from the Devor Study's peer reviewers related to the injury data was not their own." (*See supra* at p. 17.) There is absolutely no citation to anything in the record that would support this conclusion, and that is because CrossFit has no evidence to support it. (*See supra* Part II.A.)

The exact same public policies implicated by *Solarex* apply here. In *Solarex*, the court held that independent peer review is important because it contributes to the advancement of science. 121 F.R.D. at 171. Additionally, the court held that disclosing the identity of reviewers would inhibit rigorous scrutiny of articles and produce a "chilling effect" on candid peer evaluations in the future. *Id.* at 180. Finally, the Court noted that the publisher was not a party to the present litigation. That factor, it held, made it more likely that production of the requested material

would unduly burden the publisher. *Id.* at 179.

Again, CrossFit can only identify a single peer reviewer comment that even suggested the inclusion of injury data, and that peer reviewer and the comment were praised as ethical by CrossFit's own expert. (Danzig Decl., Ex. M at pp. 11-13.) Additionally, CrossFit seeks discovery from non-parties to this litigation in the form of the peer reviewers, whom it has indicated an intent to depose. And, ignoring this Court's prior order, CrossFit does not even attempt to argue that the peer reviewers had any direct contact with the authors of the article. CrossFit cannot show the peer review process directly caused the inclusion of any allegedly false data, and *Solarex* therefore still controls this discovery dispute.

### 3. The burden to Defendant outweighs the benefits of disclosure

Undaunted, CrossFit makes the conclusory argument that pursuant to Rule 26(b), the benefits of disclosing peer reviewer identities outweigh the burden faced by Defendant. (*See supra* at pp. 15-16.) In so doing, CrossFit wholly ignores the damage this would do to Defendant's ability to recruit further peer reviewers, who are merely unpaid volunteers, not to mention the peer reviewers' ability to be wholly candid in their criticisms of academic papers. CrossFit also ignores the fact that courts in the Ninth Circuit protect confidential academic information where the opposing party's interest in not disclosing it outweighs the requesting party's need to access it. *Richards of Rockford, Inc. v. Pacific Gas & Electric Co.*, 71 F.R.D. 388, 389-90 (N.D. Cal. 1976). While a private litigant has an interest in accessing information necessary to resolve a dispute, "society has a profound interest in the research of its scholars, work which has the unique potential to facilitate change through knowledge." *Id.*; *see also Dow Chem. Co. v. Allen,* 672 F.2d 1262, 1275 (7th Cir. 1982) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us not merely to the teachers concerned.") (citation omitted).

The JSCR is an academic research journal that depends on unpaid volunteers to

36

provide peer review comments.  (Ex. 12, Cinea Decl. ¶¶ 5-8.)  Because of the heightened academic rigor that a research journal entails, the JSCR occasionally must recruit peer reviewers with advanced degrees from the relatively small academic community specializing in exercise medicine.  (*Id.* ¶¶ 8-9.)  The JSCR also utilizes a "double-blind" peer review process to ensure that neither the authors nor the peer reviewers know each other's identities, ensuring that the peer reviewers can be as candid as possible in their critiques and there are no subtle biases towards the authors. (*Id.* ¶¶ 5-7.)  Owing to the small size of the relevant academic community and the candor that anonymous peer review entails, identifying the peer reviewers would not only chill otherwise candid peer reviewer commentary and weaken the resulting articles, but would also limit the JSCR's ability to attract sufficiently qualified scientists for its peer reviews.  (*Id.* ¶¶ 9-11.)  This is especially true if the JSCR's peer reviewers could potentially be identified and subjected to depositions.  (*Id.* ¶ 11.)

When this Court denied CrossFit's first motion, it recommended that CrossFit "exhaust[] other sources and mak[e] further inquiries about the peer review process" to establish a "genuine need to obtain evidence directly from the peer reviewers that it cannot obtain by other means."  (Doc. No. 57 at p. 16.)  In its motion, CrossFit admits that following the Court's order, CrossFit "took numerous party and third-party depositions and propounded written discovery" on the peer-review process.  (*See supra* at pp. 3-4.)  But, even after taking all of that discovery, CrossFit's evidence submitted with its motion shows minimal—if not zero—relevance of the peer reviewers' identities to CrossFit's causes of action, and a very high burden to Defendant if the identities are disclosed.  *See In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 249 F.R.D. 8, 12-13 (D. Mass. 2008) (finding that peer reviewer confidential comments were too attenuated, in part because the comments hardly spoke about the issues that were the basis of plaintiff's claims). CrossFit's evidence shows that: (1) there was only one peer review comment regarding injury data; (2) CrossFit's ethics expert praised that peer reviewer's

comment as reasonable and ethical; and (3) CrossFit has no evidence beyond rank speculation that the peer reviewers' comments were written by anyone other than the reviewers themselves.  (*See supra* Part II.A.)

In light of Rule 26(b)'s factors and the public policies outlined in *Solarex* and *Richards*, this Court should deny CrossFit's motion with prejudice.

### 4.    CrossFit's motion poses grave First Amendment concerns

Finally, as this Court noted in its first order, CrossFit's motion poses First Amendment concerns because identifying the peer reviewers would chill further participation of sufficiently qualified volunteer scholars to peer review the JSCR's manuscripts.  (Doc. No. 57 at p. 15; *see also* Ex. 12, Cinea Decl. ¶¶ 8-11.)  CrossFit has neither the evidence nor the law to defeat this overarching and dispositive issue, while Defendant has both evidence and law in support.  Defendant's evidence establishes the strong need for confidentiality, in order to recruit volunteer peer reviewers from the small pool of sufficiently qualified scholars and ensure that those peer reviewers will submit fully candid reviews, resulting in finished articles of sufficient academic rigor.  (Ex. 12, Cinea Decl. ¶¶ 5-11.) Moreover, the law is well developed on this topic, with the federal courts deciding repeatedly that scientific articles are protected noncommercial speech under the First Amendment. *See, e.g.*, *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F.Supp.2d 384, 455-56 (D.N.J. 2009) (collecting cases).

In light of these strong evidentiary and First Amendment concerns buttressing the confidentiality of peer reviewers, Defendant respectfully requests that this Court deny CrossFit's motion with prejudice.

### III.    CROSSFIT MISCHARACTERIZES THE SCIENTIFIC CONTEXT OF THE CHAMP ARTICLE TO FALSELY PORTRAY THE NSCA AS THE ARCHITECT OF A CONSPIRACY AGAINST CROSSFIT

Much of CrossFit's moving papers have little to do with the peer reviewers themselves, and more to do with attempting to try its entire case through a discovery motion.  CrossFit makes grandiose claims of an NSCA conspiracy to disparage

38

CrossFit in the marketplace, but even those contentions fail under scrutiny. As CrossFit argues, the genesis of Defendant's alleged conspiracy to disparage CrossFit as unsafe comes from the 2011 CHAMP conference and resulting article regarding high-intensity workout programs such as CrossFit. (*See supra* at pp. 19-23.) CrossFit's evidence, when viewed beyond the rhetoric of CrossFit's motion, does not show a conspiracy to disparage CrossFit, but rather shows a group of scientists deeply concerned about reports of injuries associated with poorly supervised extreme exercise programs, including CrossFit, and with good reason. As CrossFit is well aware, its program had already been linked to severe and life-threatening injuries several years before the CHAMP paper was published. Properly following the scientific method, the scientists generated a hypothesis that poorly supervised extreme workouts could lead to injuries, and called for experimental testing to confirm that hypothesis. This was all in line with the scientific method, and permitting CrossFit to interfere with this cornerstone of academic inquiry would chill any further research on this topic.

### A. Scientists properly applying the scientific method generate hypotheses from anecdotal reports of injury

In short, the scientific method "is based on generating hypotheses and testing them to see if they can be falsified." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 593 (1993). As part of this process, scientists universally agree that anecdotal evidence—e.g., case reports of individual injuries—is generally unscientific with regards to showing **causation**, but is highly useful for the generation of **new hypotheses to be tested by scientific research**. (*See, e.g.*, Ex. 2, "How to Read a Case Report" at p. 1374 ("Case reports are well suited for hypothesis generation."); Ex. 3, "How to review a case report" at p. 1; Ex. 4, Kempen, "Appropriate Use and Reporting of Uncontrolled Case Studies in the Medical Literature" at p. 1; *see also Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 505 (W.D. Pa. 2003) ("[A]n insufficient body of reliable scientific evidence may nevertheless be enough to justify

39

that a hypothesis or possibility is worth testing . . . ."); *Chapman v. P&G Distrib., LLC*, 766 F.3d 1296, 1300 (11th Cir. 2014) ("A case report in 2008 hypothesized zinc in denture adhesives may lead to copper deficiency, which could cause neurologic injury.").)

### B. CrossFit acknowledges case reports of life-threatening injuries resulting from its workout program

With these principles in mind, it should be noted that CrossFit is no stranger to case reports of severe injuries occurring after participants engaged in its exercise program. In 2005, CrossFit's journal published an article by its founder, Greg Glassman, that discussed five case reports of exertional rhabdomyolysis, "a potentially lethal systemic meltdown initiated by the kidneys in response to the presence of shed muscle-fiber debris and exhaust in the bloodstream." (Ex. 5 at pp. 1-2.) The very same article suggested that these injuries occurred because "these folks were exposed to too much work in too short a time." (*Id.* at p. 3.)[26] The article further acknowledged that the NSCA had "run articles in its magazine and presented experts on rhabdo at its events" after CrossFit first reported the issue in its journal. (*See id.* at p. 2.) In fact, the primary concern that led to the NSCA-sponsored CHAMP conference, as outlined in its materials cited by CrossFit, was anecdotal reports of ████████████████████████████████ (Danzig Decl., Ex. V (emphasis added).) Likewise, one of CrossFit's exhibits regarding the CHAMP article contains a news article detailing a lawsuit against a CrossFit gym for causing "permanent disability" to a former sailor due to exertional rhabdomyolysis, and that same news article, citing the CrossFit "rhabdo" article authored by Glassman, refers to "an emerging body of evidence that CrossFit may be damaging to participants' health." (*Id.*, Ex. O at Sanford/Bergeron 000517.)

---

[26] The article also introduced a cartoon character, "Uncle Rhabdo," which attempted to make light of this life-threatening condition by "comically" portraying a sad-faced athlete on kidney dialysis with several organs having fallen from his body. (*See* Ex. 5 at p. 1.)

**C.    Based on CrossFit's own theory for what could be causing the injuries, research scientists propose a hypothesis through the CHAMP paper and call for testing of that hypothesis**

Naturally, given CrossFit's admission that cases of this life-threatening condition were associated with its workouts, research scientists properly applying the scientific method would generate a hypothesis that CrossFit and other such extreme workout programs **could** injure participants through doing, in CrossFit's words, "too much work in too short a time."  In a few years, that is precisely what happened.  The CHAMP conference, and the paper that it produced, hypothesized that programs like CrossFit **could** be risky due to offering "a variety of high-intensity exercises and often timed maximal number of repetitions with short rest periods between sets," and that this **could** explain the anecdotal reports of various injuries, including exertional rhabdomyolysis, associated with such programs.  (*See* Danzig Decl., Ex. U [CHAMP Paper] at p. 383.)  Compounding this concern, there also were beliefs in the fitness community that CrossFit's educational materials might not be based on scientific evidence.  (*See* Danzig Decl., Ex. O at Sanford/Bergeron 000510.) Thus, the CHAMP paper followed the scientific method by forming a hypothesis based on case reports, and acknowledged in its opening paragraphs that causation was an open question: that is, the "evidence-based, peer-reviewed literature" did not yet "clarify any notable injury risk potential" stemming from extreme conditioning programs that would "validate or dismiss" the anecdotal reports of increased risk of injury.  (Danzig Decl., Ex. U at p. 384.)

In an effort to portray the CHAMP conference as malevolent, CrossFit points to emails and documents relating to the conference, and suggests that the NSCA and Dr. Triplett were both part of a concerted effort to disparage CrossFit with the CHAMP conference.  (*See supra* at pp. 19-22.)  Here, too, CrossFit misrepresents these emails and documents, █████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

1 ████████████████████████████████████████████████████

2 (Danzig Decl., Ex. T at ██████████████████████████; *see also id.*,

3 Ex. P at ACSM00001468 ████████████████

4 ████████████████████████████████████████████████████

5 ██; Ex. W at ████████████.)  Other documents mischaracterized by CrossFit

6 show that the authors of the CHAMP article only intended to propose—not

7 establish—that there was a possible injury risk associated with CrossFit and other

8 extreme exercise programs. (*Id.*, Ex. O at Sanford/Bergeron 000507-508.)

9      In its motion, rather than acknowledge or discuss this context in which the

10 CHAMP paper was published, CrossFit instead presents the CHAMP paper in a

11 vacuum, and then cherry-picks the testimony of several CHAMP paper authors to

12 imply that the paper's status as an "anecdotal" paper is somehow improper or

13 unscientific.  (*See supra* at pp. 22-23.)  CrossFit's argument is that if a scientific paper

14 contains any anecdotal evidence, that paper has "no scientific basis."  (*See id.*)

15 However, this is simply false: as discussed above, the scientific method is clear that

16 anecdotal evidence can be used to create a hypothesis, and then that hypothesis is

17 tested in a laboratory setting.  (Ex. 2; Ex. 3; Ex. 4.)

18      Along these lines, the deposition testimony of the authors shows that the

19 CHAMP paper followed the scientific method.  Co-author Francis O'Connor testified

20 that the paper was an early foray into finding an explanation for anecdotal reports of

21 injuries associated with extreme exercise programs, and its purpose was to

22 acknowledge that there was a gap in scientific data that required further study.

23 (*See* Danzig Decl., Ex. U at p. 388; Ex. Z at 133:15-25, 135:5-12.)  In other words,

24 the CHAMP paper proposed a hypothesis that would need future testing for

25 verification.  Despite CrossFit's apparent umbrage with the scientific method itself,

26 the CHAMP paper was completely in line with good scientific practices by proposing

27 a hypothesis and asking for further research to test the hypothesis.

28      Similarly, co-author Walter Thompson testified that while the CHAMP paper

42

may have been poorly worded, it nevertheless should be interpreted in its proper context because "[b]ack in 2010 . . . we didn't have a lot of scientific literature or medical literature" discussing injuries associated with programs such as CrossFit. (Ex. 6, Thompson Depo. at 166:5 – 168:6.)  He further added that while he might have preferred to add more citations to improve the paper's support, there may not have been any other references available at that time, and he would not have "walked away from a paper" because it was missing "another reference or two." (*Ibid.*) Without this context, CrossFit's cherry-picked citation falsely implies that Dr. Thompson would indeed have "walked away" from the paper's conclusion: this Court should not entertain its antics.

Additionally, CrossFit completely mischaracterizes the CHAMP paper's conclusions, all of which were largely positive for exercise programs like CrossFit, and instead argues that the paper was designed to disparage CrossFit as unsafe.  In reality, the paper concluded that because programs like CrossFit had positive fitness outcomes and were "likely to remain on the landscape of available and promoted physical conditioning options," the best possible outcome would be to encourage monitoring participants for signs of overexertion—in other words, precisely what CrossFit recommended in its 2005 article discussing exertional rhabdomyolysis. (*Compare* Danzig Decl., Ex. U at p. 388 *with* Kawabata Decl., Ex. 5 at p. 3 (discussing new "rhabdo abatement program" that would offer classes for newcomers where "the pace, and hence power output, is kept low").)  And, while CrossFit suggests that the paper concluded there was a higher injury risk from extreme programs, in fact the paper's conclusion was that there **could** be a higher injury risk when those programs were performed **inappropriately**—again, precisely what CrossFit had recommended, and simply stating a hypothesis that required further testing. (*Ibid.*)

///

///

## IV. CROSSFIT PROVIDES CHERRY-PICKED EVIDENCE TO FALSELY ARGUE THAT THE ACADEMIC COMMUNITY ROUTINELY "UNMASKS" ANONYMOUS PEER REVIEWERS

### A. Scientific journals do not universally identify peer reviewers

In its motion, CrossFit attempts to argue that it is an ethical standard in the scientific journal industry to disclose peer reviewer identities when fraud or dishonesty is alleged. (*See supra* pp. 6-7.) CrossFit's argument is particularly galling because it has cited the ICMJE "best practices and ethical standards" in the "Legal Standard" section of its brief, but presents no legal authority for this proposition. (*See supra* at p. 6.)

CrossFit's argument also fails insofar as it implies that because some scientific journals identify their peer reviewers *en masse* to thank them publicly, it necessarily follows that peer reviewer identities can be linked to the articles they reviewed. (*See supra* at p. 8.) Publicly thanking the entire slate of peer reviewers is a matter of courtesy, and does not disclose the articles reviewed by those individuals. CrossFit's evidence fails to show that scientific journals routinely "unmask" confidential peer reviewers to disclose the articles they edited.

Further, aside from the fact that CrossFit cannot show that any fraud or dishonesty occurred during the peer review process, (*see supra* Part II.A), the fact remains that the ICMJE document cited by CrossFit simply recommends "best" practices, and are not the law. This is supported by the fact that other journals do not have substantially congruent "best" practices. (*See* Ex. 7, COPE Guidance on Cooperation Between Research Institutions and Journals on Research Integrity Cases, at p. 3 ("While these guidelines encourage exchange of information between institutions and journals regarding cases of possible and proven misconduct, we recognize that full disclosure may sometimes be restricted by considerations of confidentiality (e.g. to protect the identity of a whistleblower), **conventions about confidential communication (e.g. peer review comments)**, and legal considerations."); Ex. 8, Nature, Peer-review policy, at "Peer-review publication

44

policies" ("Under normal circumstances, blind peer-review is protected from legislation. We cannot, however, guarantee to maintain this confidentiality in the face of a successful legal action to disclose identity **in the event of a reviewer having written personally derogatory comments about the authors in his or her reports.**").)

The above-cited evidence emphatically rebuts CrossFit's claim that scientific journals routinely disclose peer reviewer identities when faced with allegations of fraud or dishonesty. The leading journal <u>Nature</u> states that it will only disclose a peer reviewer's identity if the journal is successfully sued for defamation arising from disparaging peer review comments. (*See* Ex. 8 at "Peer-review publication policies".) Ironically, CrossFit has cherry-picked a smattering of journal policies that are favorable to its position, while simultaneously accusing Defendant of cherry-picking peer reviewers that had a vendetta towards CrossFit. This Court should recognize CrossFit's hypocritical disregard of the standards of scientific journals, and should deny the instant motion with prejudice.

### B. Peer reviewers and scientific journals are not expected to discover dubious data as a matter of course

Next, CrossFit accuses Defendant and its peer reviewers of improperly failing to recognize that the injury data was not measured during the study. (*See supra* at p. 11.) As part of this argument, CrossFit accuses Dr. Kraemer of attempting to "insulate the agenda-driven peer review from outside scrutiny" by testifying that he must "trust the authors" when confronted with purported evidence of "scientific misconduct," and argues that this is not up to the scientific standard of care. (*Id.* at pp. 11-12.)[27]

---

[27] In its motion, CrossFit misrepresents Dr. Kraemer's testimony to argue that if Dr. Kraemer was confronted with evidence of scientific misconduct before an article's publication, he would still trust the authors. This is not what Dr. Kraemer stated in his testimony. In actuality, Dr. Kraemer initially testified that he would trust the authors, but clarified several pages beforehand—and in CrossFit's out-of-context excerpt—that he would need "credible sources" or "credible evidence" to

However, CrossFit does not cite a single piece of evidence or case for this assertion, and that is because it cannot: "trust[ing] the authors" is generally all that peer reviewers can do. Indeed, the peer reviewed journal <u>Nature</u> states that peer reviewers "can only evaluate what the authors chose to include in the manuscript," and expressly disclaims "**the expectation in the popular press that peer review is a process by which fraudulent data is detected before publication**." (Ex. 8 at "The peer-review system" (emphasis added).) Similarly, following the revelation of a major research fraud in 2006, an editorial in the scientific journal <u>Nature Neuroscience</u> concurred that "[s]cience is a communal enterprise built on trust," and added that peer reviewers "are asked to judge whether a report's conclusions are solid based on the data and not whether the data themselves are fraudulent." (Ex. 11; *see also id.* ("Ultimately, clever fraud can be detected only by people working in the lab who have access to the raw data or by other labs who try to replicate this work later.").) In light of the foregoing, CrossFit's argument fails because it is neither "stunning" nor "incredible" to state, as Dr. Kraemer did, that he and the peer reviewers could only trust what the authors had written. (Ex. 9, Kraemer Depo. at 20:12-20, 20:24 – 21:15 (testifying that his role is "not [as] a reviewer" and peer reviewers "review the article to the best of [their] ability").)

Unsurprisingly, CrossFit's expert does not opine that the peer reviewers acted improperly by failing to recognize any purportedly fraudulent data. This supposed omission by the peer reviewers receives no mention in the expert report whatsoever. (*See* Danzig Decl., Ex. M at pp. 11-13.) CrossFit's argument does not pass muster and its motion should be denied with prejudice accordingly.

## V.   CONCLUSION

This Court should not grant CrossFit's second request to go on a "fishing

---

change that view. (*See* Ex. 9, Kraemer Depo. at 156:2 – 157:12.) CrossFit's cherry-picked citation of Dr. Kraemer's testimony is misleading and this Court should disregard it.

expedition" for information, (*Solarex, supra*, 121 F.R.D. at 179), based on pure
speculation that the peer review process caused the inclusion of false data, and
certainly not when **only one** innocuous peer reviewer's comment, out of many other
peer review comments, even suggested the inclusion of that data, and was praised by
CrossFit's expert as reasonable and ethical. It should be readily apparent to this Court
that the evidence does not match CrossFit's bluster, and its attempts to falsely suggest
there were improper peer review comments should not be rewarded.

 To prevent any further meritless attempts to compel this irrelevant and
burdensome information, Defendant respectfully requests that this Court enter an
order denying CrossFit's motion with prejudice.

 Respectfully submitted,

Dated: May 5, 2016

| MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, PC | MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP |
|---|---|
| By: *s/Micha Danzig* | By: *s/Kenneth S. Kawabata* |
| Micha "Mitch" Danzig (SBN 177923) Justin S. Nahama (SBN 281087) | Kenneth S. Kawabata (Bar No. 149391) |
| 3501 Carmel Mountain Rd. #300 Telephone: (858) 314-1500 Facsimile: (858) 314-1501 *mdanzig@mintz.com* *jsnahama@mintz.com* | 550 West C Street, Suite 1900 San Diego, CA 92101 Telephone: (619) 515-0269 Facsimile: (619) 515-0268 *ksk@manningllp.com* |
| *Counsel for Plaintiff CrossFit, Inc.* | *Counsel for Defendant National Strength & Conditioning Association* |

Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative Policies and Procedures of the United States District Court for the Southern District of California, I certify that the content of this document is acceptable to counsel for the Defendant and that I have obtained authorization from Kenneth S. Kawabata to affix his electronic signature to this document.

_s/Micha Danzig_
Micha Danzig

CROSSFIT, INC., v. NATIONAL STRENGTH AND CONDITIONING

ASSOCIATION,

District Court Case No. 14-cv-1191-JLS(KSC)

I, Justin Nahama, hereby certify that I am over the age of eighteen and not a party to the within action; I am employed by Mintz Levin Cohn Ferris Glovsky and Popeo, PC, in the County of San Diego at 3580 Carmel Mountain Road, Suite 300, San Diego, CA 92130.

On May 6, 2016, I served the document below described as :

**JOINT MOTION FOR DETERMINATION OF DISCOVERY DISPUTE [PEER REVIEWER IDENTITIES]**

The document was served by the following means:

- **BY ELECTRONIC TRANSMISSION VIA NEF:** I hereby certify that I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system, which sent Notifications of Electronic Filing to the persons at the e-mail addresses listed immediately below. Accordingly, pursuant to the Court's Local Rule 5.4(c), I caused the document(s) to be sent electronically to the persons listed immediately below.

I declare under penalty of perjury under the laws of United States of America that the foregoing is true and correct.

Executed on May 6, 2016, at San Diego, California.

_s/Micha Danzig_
Micha Danzig

# SERVICE LIST

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

CROSSFIT, INC., v. NATIONAL STRENGTH AND CONDITIONING

ASSOCIATION,

District Court Case No. 14-cv-1191-JLS(KSC)

MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
Kenneth S. Kawabata
ksk@manningllp.com
550 West C Street
Suite 1900
San Diego, CA 92101
Telephone: (619) 515-0269
Facsimile: (619) 515-0268

Anthony J. Ellrod
aje@manningllp.com
801 S Figueroa St.
Los Angeles, CA 90017
Telephone: (213) 624-6900
Facsimile: (213) 624-6999