UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CROSSFIT, INC., a Delaware corporation,<br><br>                                    Plaintiff,<br><br>v.<br><br>NATIONAL STRENGTH AND CONDITIONING ASSOCIATION, a Colorado corporation,<br><br>                                    Defendant. | Case No.:  14cv1191 JLS (KSC)<br><br>**ORDER (1) GRANTING CROSSFIT, INC.'S PARTIAL MSJ AND (2) GRANTING IN PART AND DENYING IN PART NATIONAL STRENGTH AND CONDITIONING ASSOCIATION'S MSJ**<br><br>(ECF Nos. 77 & 102) |

Presently before the Court are Plaintiff CrossFit, Inc.'s (CrossFit) Motion for Partial Summary Judgment on the Element of Falsity (CrossFit MSJ), (ECF No. 77), and Defendant National Strength and Conditioning Association's (the NSCA) Motion for Summary Judgment, or Alternatively Partial Summary Judgment (NSCA MSJ), (ECF No. 102-1).  Also before the Court are the NSCA's Opposition to (NSCA Opp'n), (ECF No. 91), and CrossFit's Reply in Support of (CrossFit Reply), (ECF No. 100), the CrossFit MSJ, as well as CrossFit's Opposition to (CrossFit Opp'n), (ECF No. 111), and the NSCA's Reply in Support of (NSCA Reply), (ECF No. 112-1), the NSCA MSJ.

For reasons stated below, the Court **GRANTS** CrossFit's MSJ and **GRANTS IN PART AND DENIES IN PART** the NSCA's MSJ.

# BACKGROUND

## I. Factual Background

CrossFit's fitness training program involves "varied functional movements performed at a relatively high intensity," and began increasing in popularity in 2000. (CrossFit MSJ at 7.)[1] The company generates revenue by credentialing and certifying trainers through its seminar programs and through licensing the CrossFit trademark and other intellectual property to affiliate gyms. (CrossFit MSJ at 8.) It has credentialed more than 80,000 trainers, has more than one million participants, and has more than 13,000 licensed affiliate gyms. (CrossFit MSJ at 7.)

The NSCA is a nonprofit corporation that is "dedicated to the educational and professional exchange of ideas in the areas of strength development, athletic performance, and fitness." (NSCA MSJ at 7.) Among other things, the NSCA offers educational publications, certifies fitness professionals who pay a fee and pass an exam, and puts on national conferences and events. (NSCA MSJ at 7.) One of the NSCA's publications is its "flagship journal," the Journal of Strength and Conditioning Research (JSCR). (NSCA MSJ at 8.)

CrossFit casts itself as a relative newcomer to the fitness industry and the NSCA as the establishment. (CrossFit MSJ at 8–9.) CrossFit's theory of this case is that the NSCA has a motive to disparage CrossFit's training program because, "[a]s more and more people move from the NSCA's traditional fitness model to CrossFit training, there will be fewer and fewer trainers seeking NSCA certifications." (CrossFit MSJ at 9.) According to CrossFit, its popularity poses "an existential threat to the NSCA." (CrossFit MSJ at 9.) The response to this threat, CrossFit contends, was "to engage in a smear campaign—using its JSCR as a platform to malign CrossFit training as 'unsafe.'" (CrossFit MSJ at 9.)

/ / /

/ / /

---

[1] Pinpoint citations to docketed materials refer to the CM/ECF page number electronically stamped at the top of each page, and do not refer to the original page numbering of the document.

In November 2013, researchers Steven T. Devor, Michael M. Smith, Allan J. Sommer, and Brooke E. Starkoff published an article in the JSCR titled "Crossfit-based high intensity power training improves maximal aerobic fitness and body composition." (Nahama Ex. A, ECF No. 73-5.)  The study examined fitness results from more than fifty individuals participating in a CrossFit training program called "The Challenge." (CrossFit MSJ at 6.)  Although much of the article praised CrossFit's effectiveness, CrossFit takes issue with two passages and their underlying data that CrossFit says have seriously damaged its reputation and caused it to lose customers.  The first such passage states:

> Out of the original 54 participants, a total of 43 (23 males, 20 females) fully completed the training program and returned for follow up testing. Of the 11 subjects who dropped out of the training program, two cited time concerns with the remaining nine subjects (16% of total recruited subjects) citing overuse or injury for failing to complete the program and finish follow up testing.

(Nahama Decl., Ex. A, ECF No. 73-5 at 5.)  The article revisits this point several pages later:

> A unique concern with any high intensity training programs such as HIPT or other similar programs is the risk of overuse injury.  In spite of a deliberate periodization and supervision of our Crossfit-based training program by certified fitness professionals, a notable percentage of our subjects (16%) did not complete the training program and return for follow-up testing.

(*Id.* at 8.)  Once published, the Devor Study received much attention, both in social media outlets and from news media.  (*See* Nahama Decl. Ex. CC, ECF No 73-34.)

CrossFit has identified the individuals who purportedly did not complete the study because of "overuse or injury," (Nahama Decl., Exs. C, D, & KK), and the NSCA does not dispute that the list of individuals identified comprises those counted as suffering from overuse or injury in the Devor Study, (*see* Nahama Decl., Ex. II, ECF No. 73-40, at 6).  Many of these individuals provided declarations explaining their actual reasons for not completing The Challenge:

///

| PARTICIPANT | DECLARATION |
|---|---|
| 9 | Completed The Challenge, however did not attend second round of testing due to other commitments. |
| 22 | Coach at gym, not a participant in The Challenge. Completed first round of testing out of curiosity. |
| 26 | Completed The Challenge, however did not complete second round of testing because he left early. |
| 33 | Did not complete The Challenge because she moved out of state before it ended. |
| 34 | Did not complete The Challenge because of work-related time commitments. |
| 37 | Completed The Challenge and attended the second round of testing. Unclear why data not used in study. |
| 43 | Coach at gym, not a participant in The Challenge. Completed first round of testing out of curiosity. |
| 47 | Did not complete The Challenge because of pre-existing health condition not caused by Challenge. |
| 53 | Completed The Challenge and attended the second round of testing. Unclear why data not used in study. |
| 54 | Did not complete The Challenge because of weightlifting injury sustained outside of The Challenge. |

(*See* Nahama Decl., Exs. D–N.)

The Devor Study authors say they received this injury data from the owner of the gym where The Challenge was conducted. In particular, author Dr. Smith maintains that gym owner Mitch Potterf told him those individuals did not complete the study because they "had certain injuries or were preparing to participate in a CrossFit games and they were overtrained or not able to exercise." (Smith Dep., 65:3–8, Nahama Decl., Ex. KK, ECF NO. 77-18, at 5.) Mr. Potterf denies making this statement:

> Q. Okay. So in terms of the nine citing overuse or injury for failing to complete the program, and finish follow-up testing, that's untrue?
> [Potterf.] Yeah. Nobody told me they were injured. And if you talk to them; they'll say they weren't injured, so I don't know where that comes from.
> Q. You have no idea where that came from?
> [Potterf.] That nine stated overuse or injuries?
> Q. Correct.

(Potterf Dep., 131:19–132:3, Nahama Decl., Ex. LL, ECF No. 73-43, at 4.)

## II.     Peer Review and Pre-Publication

Originally, the injury data were not part of the study.  Dr. Smith stated in an affidavit that the initial manuscript submitted to the JSCR did not include any injury data, and that he only included them after "the peer reviewers and JSCR editors requested information about why 11 participants failed to test out." (Nahama Decl., Ex. AA, ECF No. 73-32, at 4.)  Dr. Smith stated that he was able to add that information because he "already knew why the 11 participants failed to test out," (*id.*); that is, he maintains that Mr. Potterf had informed him that those individuals suffered from overuse or injury.  CrossFit contends that the inclusion of these data at the JSCR editorial staff's direction is evidence of the NSCA's desire to "manufacture a 'scientific' study concluding CrossFit training was unsafe." (CrossFit MSJ at 13.)

In a message sent on August 28, 2012, JSCR Managing Editor Dr. Kraemer cautioned Dr. Smith about the state of the manuscript, and indicated that the study needed to address the risk of injury.  He wrote:

> You also need to caution readers as to the context of your findings due to the fact many people do get injured doing these types of workouts.  Typically a lack of general prepartion [sic] is seen or people do to [sic] much to [sic] quickly and get hurt so how this was dealth [sic] with is of particular importance (see Bergeron MF, et al. Consortium for Health and Military Performance and American College of Sports Medicine consensus paper on extreme conditioning programs in military personnel. . . .).  The reviewers wanted to give you a chance to revise and address the experimental concerns but context is also important for the readers as well as controls used.  Thus, you and your research team need to really revise your paper with these factors and concerns in mind as you revise your paper.
>
> You need to address these concerns in detail and and [sic] bring the writing style and clarity up to a much higher level.  Remember the paper can still be rejected if the reviewers are not impressed with the sophistication of the revisions made.

(Nahama Decl., Ex. BB, ECF No. 73-33, at 6.)  Consequently, Dr. Kraemer was one of the authors of the article to which he directed Dr. Smith.  (*See* Nahama Decl., Ex. Q, ECF No.

73-21.) That paper concluded that "extreme conditioning programs" such as CrossFit were dangerous. (*Id.*)

Before the Devor Study ran in the November issue of the JSCR, it was published online. CrossFit personnel began investigating the data at that time. A CrossFit representative interviewed Dr. Devor asking him about the injury data. (*See* Nahama Decl. Ex. DD, ECF No. 73-35.) Dr. Devor was equivocal about those data and the accuracy of the statement in the Devor Study extrapolating on the data, saying, for example, "I think that's why the statement in the paper is as it is. Because we can't say for sure. I mean, is it implied? Yes. And I think it's reasonable to assume that's what happened. But you're right, we can't say that with absolute certainty . . . ," (*id.* at 10), or that "I don't know the source of the injury. The only thing I know . . . is what the people apparently said to [co-author Dr.] Mike [Smith]. And I'm willing to put stock in that," (*id.* at 9). Dr. Devor then suggested that CrossFit talk to Dr. Smith, saying "I will get [him] to communicate with you to the best of my ability." (*Id.* at 12.) Two days later Dr. Devor emailed the CrossFit representative stating, "I have spoken with Dr. Smith at Gonzaga University. We will have no further comment on our [JSCR] CrossFit publication." (*Id.*)

**III.   Prior Summary Judgment Motion and Order**

CrossFit moved for summary judgment on the element of falsity on January 30, 2015. (ECF No. 38-1.) In its July 20, 2015 Order, the Court denied CrossFit's motion without prejudice. (Order, ECF No. 63, at 13.) The Court found that CrossFit had met its burden of identifying evidence—the participants' declarations—showing the statistic cited in the Devor study was actually false, and that the burden therefore shifted to the NSCA to identify evidence from which a reasonable trier of fact could conclude the information was not actually false. (*See id.* at 8, 10.) The Court denied CrossFit's motion without prejudice, however, to allow the NSCA to conduct "further discovery related to (1) whether CrossFit accurately identified the individuals and (2) whether those individuals in fact made statements with respect to overuse or injury." (*Id.* at 12.)

///

### IV. The JSCR's Erratum

Since the Court denied CrossFit's first motion for summary judgment, the JSCR published the following erratum (the Erratum):

> In reference to Smith, MM, Sommer, AJ, Starkoff, BE, and Devor, ST. Crossfit-based high-intensity power training improves maximal aerobic fitness and body composition. [citation], the authors have stated that the reasons for participants not completing follow-up testing, as reported in the article, were provided to the authors by the club owner. The club owner has denied that he provided this information.
>
> After the article was published, 10 of the 11 participants who did not complete the study have provided their reasons for not finishing, with only 2 mentioning injury or health conditions that prevented them from completing follow-up testing.
>
> In light of this information, injury rate should not be considered a factor in this study. This change does not affect the overall conclusion of the article.

(Nahama Decl., Ex. B, ECF No. 73-6.)

### V. Sampling Fallout From the Devor Study

For purposes of this litigation, CrossFit's expert Dr. Michael R. Solomon conducted an experiment involving a "representative sample" of 604 American adults who have purchased a gym membership in the past twelve months or intended to purchase a gym membership in the next twelve months. (*See* Danzig Decl., Ex. II, ECF No. 111-21, at 46–47.) The experiment involved showing some participants the Devor Study with the original statement reporting a 16% injury rate and others a modified version of the Devor Study with the following language substituted in: "CrossFit's programs injury rates are very much in line with injury rates for the physical fitness industry as a whole." (*Id.* at 47.) Respondents exposed to the original 16% rate "Were 2.4 times as likely to rate CrossFit training as *dangerous*," and were "twice as unlikely to say they would purchase a 12 month trial membership for CrossFit training." (*Id.* (emphasis original).)

Dr. Solomon concludes that the Devor study "contributed substantially" to the "revenue, attendance and credential declines that began in 2013." (*Id.* at 63.) In what he labels "extremely conservative damage estimates" on the low end, Dr. Solomon concludes

Case 3:14-cv-01191-JLS-KSC   Document 121   Filed 09/21/16   PageID.8427   Page 8 of 20

that CrossFit lost $4 million to $8 million from "revenues relating to the fees that consumers pay for seminars at CrossFit, Inc. affiliate gyms." (*Id.* at 67.)

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to a claim or defense or part of a claim or defense. Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of dispute regarding a material fact. *Id.* When a party seeks summary judgment as to an element for which it bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

14cv1191 JLS (KSC)

designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248.  The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings."  *Anderson*, 477 U.S. at 256.

## ANALYSIS

CrossFit's Amended Complaint states causes of action for: (1) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a); (2) false advertising in violation of California Business and Professions Code § 17500 (the FAL); (3) unfair competition in violation of California Business and Professions Code § 17200 (the UCL); (4) declaratory relief; and (5) trade libel.  (Am. Compl. ¶¶ 69–105, ECF No. 71-6.)  CrossFit states that falsity is an element of each of these claims, and seeks summary judgment that the injury data in the Devor study were false.  (CrossFit MSJ at 25, 29.)

The NSCA seeks summary judgment that the articles published in the JSCR are not commercial speech, and are therefore shielded by the First Amendment from liability under the Lanham Act and California Business and Professions Code regardless of the truth or falsity of those publications.  (NSCA MSJ at 5.)  The NSCA also seeks summary judgment as to CrossFit's trade libel claim because CrossFit cannot prove special damages, as opposed to general damages, and CrossFit's declaratory judgment claim because it is "superfluous to other causes of action."  (NSCA MSJ at 7.)

Although CrossFit's MSJ predates the NSCA's, the Court first addresses the NSCA's MSJ because, if granted in its entirety, it would render CrossFit's MSJ moot.

## I. The NSCA's MSJ

### A. *Commercial Speech*

The NSCA argues that the statements in the Devor Study are noncommercial speech that receive strong protection under the First Amendment, and are therefore not actionable under the Lanham Act, the UCL, or the FAL.  (NSCA MSJ at 15.)  CrossFit counters that the First Amendment does not insulate "economically motivated false statements about competitors."  (CrossFit Opp'n at 15.)

The Lanham Act and California's FAL provide private causes of action for false advertising, and California's UCL provides a private cause of action for unfair competition. For a representation or expression to be actionable under the Lanham Act it must be: "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services." *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1536 (S.D.N.Y. 1994). These representations do not necessarily need to be "classic advertising," but may also be "informal types of 'promotion.'" *Id.* However, informal promotion must still "be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Id.* The NSCA contends that CrossFit cannot establish the first element, that the statements in the Devor Study were commercial speech.

Although both commercial and noncommercial speech enjoy some degree of First Amendment protection, noncommercial speech receives stronger protection. *See Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 956–57 (9th Cir. 2012). The First Amendment insulates noncommercial expression from liability under false advertising laws. *See Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 68 (1983); *Gordon & Breach*, 859 F. Supp. at 1536–37. When commercial speech is false or misleading, it "is not protected by the First Amendment at all." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 434 (1993) (Blackmun, J. concurring); *see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980) ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading."). Commercial speech that is false or misleading is therefore actionable under false advertising laws such as the Lanham Act and the California Business and Professions Code. *See Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 114 (6th Cir. 1995) ("[W]e hold that the alleged misrepresentations contained in the [trade journal] article represent commercial speech and are actionable under the Lanham Act.").

///

In the Ninth Circuit, courts determine whether expression is commercial speech by, first, considering whether it fits the traditional definition of commercial speech because it "does no more than propose a commercial transaction." *Dex Media*, 696 F.3d at 958 (quoting *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)).

Second, if the expression does not fit within the traditional definition commercial speech, courts consider the factors outlined in *Bolger*, looking to whether: "(1) the speech is admittedly advertising, (2) the speech references a specific product, and (3) the speaker has an economic motive for engaging in the speech." *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004) (citing *Bolger*, 463 U.S. at 66–67); *see also Dex Media*, 696 F.3d at 958. An economic motive alone, however, does not make speech commercial. *Dex Media*, 696 F.3d at 960.

Speech may be classified as commercial even when it contains "discussions of important public issues." *Bolger*, 463 U.S. at 67–68 ("Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues."); *see also Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734–35 (9th Cir. 1999) (adopting the four-factor test for determining whether "representations constitute 'commercial advertising and promotion'" stated in *Gordon & Breach*, 859 F. Supp. at 1536).

Third, courts must consider whether the "commercial aspects of the speech are 'inextricably intertwined' with otherwise fully protected speech, such that the publication sheds its commercial character and becomes fully protected speech." *Dex Media*, 696 F.3d at 960. In that case, courts may not "parcel out the speech, applying one test to one phrase and another test to another phrase." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796 (1988).

Courts are particularly careful when reviewing causes of action directed toward academic works, "because academic freedom is 'a special concern of the First Amendment.'" *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 496 (2d Cir.

2013) (quoting *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967)). In *ONY*, for example, the Second Circuit concluded that "to the extent a speaker or author draws conclusions from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions, on subjects about which there is legitimate ongoing scientific disagreement, those statements are not grounds for a claim of false advertising under the Lanham Act." *Id.* at 498. Significantly, the Second Circuit noted that "it is relevant that plaintiff does not allege that the data presented in the article were fabricated or fraudulently created." *Id.* at 497.

Viewing the evidence of the facts underlying the publication of the Devor Study in the light most favorable to CrossFit—the nonmovant for purposes of the NSCA MSJ—the injury data in the Devor Study would not be shielded by the First Amendment by virtue of being presented in an academic journal. Based on the evidence in the record, a reasonable fact finder could conclude that the NSCA fabricated the injury data and published them in the JSCR knowing they were false with the intention of protecting its market share in the fitness industry and diminishing the burgeoning popularity of the CrossFit program. If the trier of fact were to draw that conclusion from the evidence, the injury data would be commercial speech.

As the Supreme Court noted in *Bolger*, the fact that items of commercial speech appear alongside discussions of matters of public importance does not insulate that speech under the First Amendment. *See Bolger*, 463 U.S. at 67–68. The Devor Study as a whole does far more than merely proposing a commercial transaction, but the excerpts based on potentially fabricated data about a competitor's product may nonetheless be commercial speech. Looking at the communication from the JSCR editorial staff to the Devor Study authors, a reasonable fact finder could conclude that the NSCA pressured the authors to include data disparaging CrossFit's exercise regimen, and the editor-in-chief's admonition—"[r]emember the paper can still be rejected if the reviewers are not impressed with the sophistication of the revisions made"—could be construed as a veiled threat that the JSCR would not be interested in publishing the Devor Study if it did not include

information showing "the fact many people do get injured doing these types of workouts," whether or not that "fact" was true in this qualitative study. (*See* Nahama Decl., Ex. BB, ECF No. 73-33, at 6.) There is, of course, a countervailing inference to be drawn—that the editor-in-chief was simply bringing his knowledge of the fitness industry to bear and sincerely believed (or for that matter still believes) that CrossFit has a high injury rate, as opposed to an attempt to denigrate CrossFit for the NSCA's benefit. This possible inference, however, does not entitle the NSCA to summary judgment.

To the contrary, the evidence now before the court could reasonably support the inference that the injury data were false and—worse—that the NSCA knew they were false and published them anyway in an attempt to protect its position in the market. If a party intentionally publishes false data about a competitor's product to protect its own market share, that speech is commercial in nature and not subject to the same degree of protection as noncommercial speech.

The Devor Study does not explicitly promote the NSCA's products or services, but nonetheless satisfies some of the *Bolger* factors. The first *Bolger* factor weighs against a finding of commercial speech because publication in an academic journal is not admittedly advertising. The second factor—reference to a specific product—is typically geared toward self-promotion as opposed to disparagement of another's product. *See, e.g.*, *Am. Acad. of Pain Mgmt.*, 353 F.3d at 1106. Although not dispositive for purposes of the Court's First Amendment analysis, the Lanham Act is directed toward false or misleading representations of fact about "the nature, characteristics, qualities, or geographic origin of his or her *or another person's* goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). Of course, speech does not necessarily need to mention one's own product to be commercial, just as an advertisement may impliedly promote one product by disparaging another—a point particularly salient in an election season. *See Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 518 (7th Cir. 2014) ("The notion that an advertisement counts as 'commercial' only if it makes an appeal to purchase a particular product makes no sense today, and we doubt that it ever did."); *cf. Coastal Abstract Serv.*, 173 F.3d at 735

(affirming the jury's finding that representations about a competitor to one of "two or possibly three institutions" forming "the relevant purchasing public" was a "promotion" within the meaning of the Lanham Act). Because the injury data disparage a competitor's product and there is some evidence that those behind the injury data knew the data were false and stood to gain from their publication, this factor weighs in favor of a finding of commercial speech. As for the third factor, again drawing all reasonable inferences in CrossFit's favor, the NSCA had an economic motive for publishing this data, specifically in preserving or expanding its market share in the fitness industry and curtailing the burgeoning popularity of CrossFit.

Lastly, the Court concludes that the commercial speech elements of the Devor study are not inextricably intertwined with noncommercial speech. Although they appear in the same article as speech deserving greater First Amendment protection, assuming the injury data were false and injected into the article to deride CrossFit's product, it would have been easy enough to publish an article with data that were not made up, and one could easily imagine the Devor Study without the statements premised on these false data. In fact, the Erratum shows that the parts of the article that may constitute commercial speech are not inextricably intertwined with the remainder of the article. That is, the Erratum advises readers that the "injury rate should not be considered a factor in this study" but that it "does not affect the overall conclusion of the article." (Nahama Decl., Ex. B., ECF No. 73-6, at 2.)

Thus, the Court **DENIES** the NSCA's MSJ on this point.

**B.**   *CrossFit's FAL Claim*

The NSCA argues CrossFit's FAL claim fails as a matter of law because the Devor Study and statements in question do not specifically mention the NSCA's products or services. (NSCA MSJ at 25.) The NSCA bases this argument on the plain text of the statute, specifically that the FAL prohibits "a defendant's untrue statements that have the intent 'to dispose of real or personal property or to perform services,' but only as to 'any statement, **concerning that real or personal property or those services** . . . or concerning

any circumstance or matter of fact **connected with the proposed performance or disposition thereof**.'" (NSCA MSJ at 25 (emphasis original) (quoting FAL, Cal. Bus. & Prof. Code § 17500).)

As CrossFit points out, the NSCA does not cite any case law to support this proposition. The Court is not persuaded that a defendant cannot, as a matter of law, be liable under the FAL for false advertising directed at another's products as opposed to false advertising promoting one's own products, and therefore **DENIES** the NSCA's MSJ on this point.

### C. *CrossFit's Trade Libel Claim*

The NSCA next argues that it is entitled to summary judgment in its favor on CrossFit's trade libel claim because CrossFit lacks sufficient evidence to prove special damages.

"Trade libel is defined as an intentional disparagement of the quality of" one's product, "which results in pecuniary damage to plaintiff." *Erlich v. Etner*, 224 Cal. App. 2d 69, 73 (1964). The plaintiff must prove "that the publication has played a material and substantial part in inducing others not to deal with him, and that as a result he has suffered special damages." *Id.* "[I]n the usual case, . . . the plaintiff must identify the particular purchasers who have refrained from dealing with him, and specify the transactions of which he claims to have been deprived." *Id.* at 73–74.

Some courts, however, have allowed plaintiffs to show instead a "general loss of custom[ers]," by "showing an established business, the amount of sales for a substantial period preceding the publication, the amount of sales subsequent to the publication, [and] facts showing that such loss in sales were the natural and probable result of such publication." *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1113 (C.D. Cal. 2004) (quoting *Isuzu Motors Ltd. v. Consumers Union of United States, Inc.*, 12 F. Supp. 2d 1035, 1047 (C.D. Cal. 1998)); *see also Fowler v. Curtis Pub. Co.*, 182 F.2d 377, 379 (D.C. Cir. 1950); *Erick Bowman Remedy Co. v. Jensen Salsbery Laboratories*, 17 F.2d 255, 261 (8th Cir. 1926).

In *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. 02 CV 2258 JM (AJB), 2007 WL 935703, at *8 (S.D. Cal. Mar. 7, 2007), the defendant moved for summary judgment against the plaintiffs' trade libel claim on the grounds that the plaintiffs had not "produced any admissible evidence that the statements caused consumers not to buy from Plaintiffs." The court rejected this argument because there was evidence from two consumers who had seen the publication in question—one who said the publication "was back there in [his] mind" and resulted in him "hesitat[ing]" in buying the plaintiffs' products, and another who stated that he had seen the publication. *Id.* There was also testimony that a marketer "de-emphasized" the plaintiff's product as a result of the publication, that four million individuals had seen the publication, and that plaintiff's revenue had declined. *Id.* Taken together, this evidence gave rise to a genuine dispute of material fact on the trade libel claim and precluded summary judgment. *Id.* at 10. The court stated, "a rational trier of fact could conclude that consumers saw the statements on the Internet, that consumers were deterred from buying Plaintiffs' products after being exposed to the statements, that distributors were likewise deterred from selling Plaintiffs' products, and that Plaintiffs lost revenues as a result." *Id.*

Likewise, the evidence before the Court in this matter could support an inference that would-be CrossFit customers caught wind of the injury data—either from the Devor Study itself or from a citation to it—and decided not to participate. CrossFit identifies evidence that the Devor Study received much attention in the traditional and social media, exposing many potential customers to the injury data. CrossFit's expert's report attempts to quantify the results of that exposure in a systematic manner. The authorities the NSCA cites for its argument on this point do not show that the expert evidence provided from Dr. Solomon's experiment and in his expert report are insufficient as a matter of law to show damage as required in a trade libel cause of action. To the contrary, the results are at least somewhat probative of the fact that potential customers who see the injury rate reported in the Devor Study were likely to refrain from dealing with CrossFit.

Thus, the Court **DENIES** the NSCA's MSJ as to CrossFit's trade libel claim.

### D. *CrossFit's Declaratory Judgment Claim*

The NSCA urges the Court to dismiss CrossFit's declaratory judgment cause of action as superfluous. CrossFit contends that it seeks relief not available through its other causes of action: "a declaration that the NSCA made a false statement about the injury rate." (CrossFit Opp'n at 30.) A declaratory judgment must pertain to a claim "of a justiciable nature, thus excluding an advisory decree upon a hypothetical state of facts." *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 325 (1936).

The decision on whether to grant declaratory relief is a matter of discretion for the district court, and "should be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties." *United States v. State of Wash.*, 759 F.2d 1353, 1356–57 (9th Cir. 1985).

The relief CrossFit seeks in its declaratory judgment cause of action goes no further toward settling the legal relations or terminating these proceedings than does CrossFit's motion for partial summary judgment on the element of falsity. Rather, it appears that with this claim CrossFit seeks an abstract statement that the data were false. Practically speaking, the Court is already providing such a statement by ruling on CrossFit's Motion for Partial Summary Judgment, which is limited only to the question of whether the injury data were false. However, the Court provides that ruling to dispose of a particular element of legally cognizable causes of action, and thereby narrows the issues for trial. CrossFit's declaratory judgment cause of action is superfluous in this case, and the Court therefore exercises its discretion to dismiss it. Accordingly, the NSCA's MSJ on this point is **GRANTED**.

### II. CrossFit's MSJ

CrossFit asks the Court for summary judgment in its favor that the injury data in the Devor study were false. CrossFit adds that events that have transpired since the Court denied its first motion for summary judgment further bolster its position that the injury data are false. In particular, the NSCA published the Erratum "confirming the 'injury' data . . .

is false" and the NSCA failed to depose or take relevant discovery from the individuals who were counted as injured in the Devor study but later stated they were not injured. (CrossFit MSJ at 5–6.)

For purposes of the Lanham Act and the California Business and Professions Code, a party may demonstrate falsity by showing a statement "was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997); *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994) ("This Circuit has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act.").

In its prior Order on summary judgment, the Court denied CrossFit's motion so the NSCA could take "further discovery related to (1) whether CrossFit accurately identified the individuals and (2) whether those individuals in fact made statements with respect to overuse or injury." (Order, ECF No. 63, at 12.) However, the NSCA has identified no evidence obtained in the interim showing that CrossFit did not accurately identify the individuals in the study or showing that they in fact made statements with respect to overuse or injury.

As before, the Court concludes that the declarations from these Devor Study participants show the data were false and that the NSCA has presented no evidence to the contrary. The NSCA argues the Court should conclude the injury data are not actually false because "Mr. Potterf's statements recounted by Dr. Smith, rebuts CrossFit's evidence and thereby gives rise to a genuine issue of material fact." (NSCA Opp'n at 10.) This argument is irrelevant to the instant motion, which does not seek summary judgment that the authors of the Devor Study knew the data were false. At most this would show that Dr. Smith *believed* that the individuals reported they were injured during The Challenge, but in the context of the other evidence it does not support a reasonable inference that these individuals in fact reported dropping out because of injury. CrossFit seeks summary

judgment that the injury data in the Devor Study were false, and that the participants who were counted as injured because of The Challenge in the Devor Study "were not injured during the Devor Study, and they never told anyone they were injured." (CrossFit Reply at 2.)  What the JSCR editorial staff and authors knew or believed about the injury data may ultimately be relevant to whether the statements in the Devor Study are constitutionally protected speech, but they are not relevant to the question of whether the data are actually false.

Viewing the evidence in the light most favorable to the NSCA, declarations of two participants may at most raise a dispute of fact over whether *those individuals* reported being injured at the time of the Devor Study, (*see* NSCA Opp'n at 15), although the declarations do not indicate that they were injured doing the workouts in The Challenge, (*see* Nahama Decl., Ex. E ("I did not complete The Challenge or participate in the second round of testing because I was suffering from a health condition that was exacerbated by any physical activity.  My health condition was not caused by my participation in The Challenge or CrossFit, and in fact predated my involvement with CrossFit."); Nahama Decl., Ex. F ¶ 4 ("I did not complete The Challenge or participate in the second round of testing because I injured my back.  I sustained this injury while lifting, but this lifting was not a part of The Challenge.").)  Even if a fact finder concluded that two participants were injured or their health conditions were exacerbated by The Challenge and that they reported these injuries to Mr. Potterf, who then passed that information on to Dr. Smith, that would still leave only two, rather than nine, participants who dropped out due to injury, and the statement that "the remaining nine subjects (16% of total recruited subjects)" dropped out because of overuse or injury would still be false.[2]

---

[2] The parties discuss the admissibility of Dr. Smith's testimony pertaining to what Mr. Potterf told him on hearsay grounds.  The Court declines to resolve this dispute at this time, however, because even if the Court credited as true that Mr. Potterf told Dr. Smith these individuals dropped out due to overuse or injury, in the absence of any evidence detracting from the veracity of the majority of the participants' declarations that they were not injured at all, this report from Mr. Potterf would be insufficient to create a genuine dispute of fact as to whether the injury data were true or false.  As indicated above, what Mr.

Lastly, although the Erratum stops short of plainly stating that the injury data were false—as one might expect given the pendency of this litigation—it at least indicates that the Devor Study authors no longer stand behind it. Taken together with the other evidence, the Erratum corroborates the Court's previous finding that CrossFit's evidence shows the data were false.

CrossFit has presented evidence showing the injury data were in fact false—regardless of whether the authors knew it at the time—and the NSCA has identified no evidence to the contrary. Accordingly, the Court **GRANTS** summary judgment in CrossFit's favor on the element of falsity as it pertains to each of CrossFit's causes of action.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** the NSCA's MSJ and **GRANTS** CrossFit's MSJ.

Dated:  September 21, 2016

Hon. Janis L. Sammartino
United States District Judge

---

Potterf told Dr. Smith is likely relevant to what the NSCA knew or believed when it published the Devor Study. If necessary, the Court will resolve this evidentiary matter in that context.