LATHAM & WATKINS LLP
Daniel Scott Schecter (SBN 171472)
*daniel.schecter@lw.com*
David F. Kowalski (SBN 265527)
*david.kowalski@lw.com*
355 South Grand Avenue
Los Angeles, CA  90071
Telephone:   (213) 485-1234
Facsimile:   (213) 891-8763

LATHAM & WATKINS LLP
Blair Connelly (SBN 174460))
*blair.connelly@lw.com*
William O. Reckler (admitted *pro hac vice*)
*william.reckler@lw.com*
885 Third Avenue
New York, NY  10022
Telephone:   (212) 906-1658; Facsimile: (212) 751-4864

Micha "Mitch" Danzig (SBN 177923)
mdanzig@mintz.com
Justin Nahama (SBN 281087)
jsnahama@mintz.com
Natalie A. Prescott (SBN 246988)
naprescott@mintz.com
Wynter L. Deagle (SBN 296501)
wldeagle@mintz.com
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO PC
3580 Carmel Mountain Road, Suite 300
San Diego, CA  92130
Telephone:   (858) 314-1500; Facsimile: (858) 314-1501

Attorneys for Plaintiff
CROSSFIT, INC.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CROSSFIT, INC., a Delaware corporation, | Case No. 3:14-cv-01191-JLS-KSC |
| Plaintiff, | **CROSSFIT, INC.'S REPLY IN SUPPORT OF MOTION FOR TERMINATING SANCTIONS, OR IN THE ALTERNATIVE ISSUE, EVIDENTIARY AND MONETARY SANCTIONS** |
| v. | |
| NATIONAL STRENGTH AND CONDITIONING ASSOCIATION, a Colorado corporation, | **[REDACTED]** |
| Defendant. | Date:        March 23, 2017<br>Time:        1:30 p.m.<br>Dept.:       4A<br>The Hon. Janis L. Sammartino |

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION .......................................................................... 1

II.     REPLY ARGUMENT ..................................................................... 3

     A.     The NSCA's Efforts to Hide Behind The ESI Order Only Confirms Its Intentional Discovery Abuse Because Nearly All of the Withheld Documents Fall Within the ESI Order's Date Range. ............................ 3

     B.     The NSCA's Opposition Confirms It Withheld Information about the NSCA's Servers and an Unknown Quantity of ESI. ................................. 5

     C.     The NSCA's Excuse for Torrey Smith's Direct Order to Withhold Responsive Records is Further Evidence of Intentional Discovery Misconduct. ................................................................................ 8

     D.     The NSCA's Efforts to Distort a Pending Discovery Dispute Is Irrelevant to the NSCA's Discovery Abuse. ............................................. 9

     E.     The NSCA Actively Concealed Evidence Detailing Its Efforts to Unfairly Compete with CrossFit's Certification Business. ........................ 9

         1.     The NSCA concealed their efforts to promote their certifications in the military while making false claims about CrossFit training. 10

         2.     The NSCA concealed documents detailing their commercial intent to publish the Devor Article and efforts to compete with CrossFit in the international fitness community. .......................... 13

     F.     The NSCA concealed documents detailing the their efforts to disparage CrossFit in the law enforcement and school (physical education) markets ................................................................................ 13

i

G.    The NSCA's 30(b)(6) Deposition Testimony Confirms It Intentionally Withheld Information from CrossFit and Violated the Court's Discovery Order. ................................................................. 14

H.    If Terminating Sanctions Are Not Imposed, Then Leave to Amend CrossFit's Complaint and a Thorough Forensic Analysis of the NSCA's Servers are Necessary to Fairly Redress the Harm to CrossFit. ........................................................................ 16

III.    CONCLUSION ............................................................. 18

1

2

## <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

4

**Federal Cases**

5

*N. Am. Watch Corp. v. Princess Ermine Jewels*,
      786 F.2d 1447 (9th Cir. 1986) ................................................................. 16

*Valley Eng'rs v. Electric Eng'g Co.*,
      158 F.3d 1051 (9th Cir. 1998) ........................................................... 1, 17

6

7

8

9

**Other Authorities**

10

Fed. R. Civ. P. 15 ..................................................................................... 17

Fed. R. Civ. P. 26 ............................................................................. 4, 7, 16

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# I.    INTRODUCTION

"*Where a party so damages the integrity of the discovery process that there can never be assurance of proceeding on the true facts, a case dispositive sanction may be appropriate.*"  *Valley Eng'rs v. Electric Eng'g Co.*, 158 F.3d 1051, 1058 (9th Cir. 1998 ███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████  Why would the NSCA produce ██████████████

████, but withhold all of the related email communications detailing who the document was shared with and how the NSCA's leadership used it?  Why would the NSCA's Certification Director instruct NSCA employees to withhold internal NSCA documents from 2012 relating to CrossFit's certifications? Why would the NSCA argue it had no commercial incentive to publish false information about CrossFit (and move for summary judgment on these grounds), but withhold the very documents that detail the NSCA's efforts to promote its own certifications to the US military ████████

█████████████████████?  Why would the NSCA wait 9 months to issue a misleading Erratum, rather than a full retraction, after it learned that the Study participants were not injured?  And why would the NSCA assure CrossFit it never had any internal or external communications about CrossFit training and never tried to limit the growth of CrossFit's certifications, while it withheld dozens of emails confirming that these assurances were demonstrably false?

While the NSCA's Opposition ("Opp") fails to answer any of these questions, the withheld documents do.  Perhaps most telling, the Opp does not provide a single assurance its federal document production is somehow complete.  Nor does it dispute the NSCA's perjury in at least two 30(b)(6) depositions and Messrs. Clayton's and Cinea's respective declarations; that CrossFit was denied a fair opportunity to take discovery on these documents; and that CrossFit was prevented from fairly assessing the full scope of its damages.  Instead, the Opp offers hearsay-based excuses that, as

1

1  explained below, are belied by common sense and the NSCA's own conduct.

2      The Opp centers on the argument that the date range in the ESI Order justifies

3  the NSCA's intentional efforts to withhold an unknown quantity of responsive

4  documents. *But the Opp ignores that the overwhelming majority of the withheld*

5  *documents—identified so far—fall within this date range*.[1]  And the Opp does not

6  dispute that these <u>examples</u> of withheld documents within the ESI date range reveal

7  that an <u>unknown quantity</u> of responsive ESI on the NSCA's servers exists and was

8  withheld.   Further illustrating an intentional plan to withhold key documents, *none* of

9  the withheld documents containing the search term "CrossFit" that fall within the ESI

10  date range relate to innocuous information.  Rather, every single withheld document

11  involves information about the scope of the NSCA's unfair competitive efforts that

12  directly expose the false statements in the NSCA's 30(b)(6) testimony and the

13  declarations of Keith Cinea and Nick Clayton.

14      The Opp makes no effort to explain why the NSCA falsely assured CrossFit

15  and this Court that there were <u>zero</u> documents or information concerning internal or

16  external communications about CrossFit training, that the NSCA never tried to create

17  a Certification similar to CrossFit's, and that the NSCA never "made any efforts to

18  limit the growth of CrossFit's certification or the proliferation of CrossFit."

19  (Sanctions Motion ("Mot.") at 8:23-26, Ex. S.)  While the NSCA stands behind these

20  misrepresentations in its Opp, the mountain of withheld documents and outright false

21  testimony confirm the NSCA actively concealed a plan to intentionally spread false

22  information about CrossFit training in order to revamp the NSCA's certification

23  business.  Several egregious examples of the NSCA's efforts to compete with

24  CrossFit in various markets include, but are not limited to:

25  • ███████████████████████████████████████████████████

26   ███████████████████████████████████████████████████

27  _____

28  [1] For example, all withheld documents identified in CrossFit's Reply Brief fall within
   this date range, as do the majority of key exhibits in CrossFit's moving papers (e.g.,
   Exs. C, I, K, L, AA, AK, AN, AV, AX, BD, BH, and BL.)

2

1   ████████████████████████████████ (Exs. BZ, BA.)[2] This
    withheld evidence prevented CrossFit from identifying information regarding the
2   NSCA's commercial incentive to publish, and not meaningfully retract, the false
    injury data in the Devor Article.

3   • ███████████████████████████████████████████████
4   ███████████████████████████████████████████████
5   ███████████████████████████████████████████████
6   ███████████████████████████████████████████████
    ████████ In the event this case is not terminated, CrossFit requests leave to
7   amend its complaint to fairly address the NSCA's intentional defamatory conduct.

8   • ████████████████, the NSCA was creating "canned presentations" for industry
9   conferences and trade shows.  The NSCA's goal was to position its certifications
    as "the elite personal training certification in the industry" that should *Play off of*
10  *the crossfit craze; intelligent Crossfit-style training (e.g., TSAC…)."*  (Ex. CD.)
    This withheld evidence—in contrast to Mr. Cinea's declaration—confirms the
11  NSCA was in fact creating certifications to mimic the CrossFit model.

12      The NSCA's campaign to prevent CrossFit from fully and fairly assessing the

13  NSCA's commercial motive and the scope of CrossFit's damages warrants

14  terminating sanctions.  If the Court concludes terminating sanctions are not justified,

15  then evidentiary/issue sanctions, a forensic analysis of the NSCA's servers, and an

16  opportunity for CrossFit to assert additional claims are necessary to try and address

17  the harm.  And given the NSCA's systemic misconduct, the Court should impose

18  monetary sanctions requiring the NSCA to bear the cost for the forensic analysis,

19  attorneys' fees and costs to bring this misconduct to light, and subsequent discovery.

20  **II.   REPLY ARGUMENT**

21      **A.   The NSCA's Efforts to Hide Behind The ESI Order Only Confirms
            Its Intentional Discovery Abuse Because Nearly All of the Withheld
22          Documents Fall Within the ESI Order's Date Range.**

23      The Opp asserts the NSCA's discovery misconduct is excused because the

24  NSCA was only obligated to produce documents created between January 1, 2008

25  and May 12, 2014, the date range in the ESI Order. (Opp at 2-3:7.)  In so arguing, the

26  NSCA overlooks that most of the withheld documents identified by CrossFit in its

27  _____

28  [2] All exhibits will be to the Nahama Declaration submitted in support of CrossFit's
    moving papers and the Nahama Reply Declaration unless otherwise noted.

Sanctions Motion fall within this date range **and** that the NSCA produced documents from outside of the ESI Order date range. As such, this argument is nothing more than a poorly conceived red herring.

As a starting point, the majority of the withheld documents fall within the date range of the ESI Order. This fact alone confirms the relevance of the withheld documents and the severity of the NSCA's misconduct. The documents from before May 12, 2014 demonstrate the NSCA's unfair competitive efforts before and after the Devor Article was published, as well as during the peer review process. Further, the NSCA's reliance on the ESI Order is misplaced because the order itself does not excuse them from responding to discovery requests nor does it excuse them from their Rule 26 obligations. Notably, the NSCA does not cite any legal authority whatsoever in support of this novel argument. Additionally, the NSCA's argument that it had no obligation to produce any documents created after May 12, 2014 is belied by the fact that it did produce responsive documents from outside this time frame. In its Fourth Set of Requests for Production, the NSCA agreed to produce all documents referring or relating to the Erratum that the NSCA issued in <u>September 2015</u>. (Ex. CE.) The Fourth Set of Requests – like CrossFit's other document requests – did not limit the time frame to documents created between January 1, 2008 and May 12, 2014. Nor did the NSCA object on the basis that the timeframe was outside of the ESI date range. Instead, the NSCA selectively produced documents created after May 12, 2014, all while it withheld documents confirming – in contrast to Cinea's sworn testimony – that the NSCA was aware that the Erratum harmed CrossFit by suggesting two Study participants were injured. (Mot. at 3-4, Ex. M.)

The NSCA's discovery gamesmanship here is improper and intentional. And its poorly conceived argument regarding the ESI Order date range does not excuse the NSCA's failure to produce an unknown quantity (of at least hundreds) of responsive documents – especially given that the majority of the withheld documents fall within the ESI Order date range.

4

**B.**   **The NSCA's Opposition Confirms It Withheld Information about the NSCA's Servers and an Unknown Quantity of ESI.**

Rather than provide declarations from its IT Director, IT Manager, or a forensic expert, the NSCA once again asks this Court to rely on the hearsay-based representations from Mr. Cinea.[3]   Cinea's Opp Declaration, however, provides conclusive evidence that the NSCA violated the Court's July 15, 2015 Order, which required the NSCA to explain, on a custodian-by-custodian basis, the processes used to locate responsive documents and any gaps in production (the "Discovery Order"). (Dkt. No. 59 at p. 9, Ex. 9 to Kawabata Decl.)

In his Opp Declaration, Cinea shares for the first time that the NSCA has <u>an unknown quantity of emails and documents</u> in folders that allegedly were not searchable.  (Cinea Opp Decl., ¶5.)  But before the withheld documents came to light, the NSCA assured the Court that its "J Drive" contained the full universe of responsive ESI, that it was adequately preserved, and that the NSCA's email had been copied and preserved by its IT Manager.  (Cinea August 2015 Declaration, Ex. B, ¶8.)  But when compared to Cinea's Opp Declaration, it becomes clear that the NSCA's J Drive and email preservation did not contain the full universe of discoverable ESI, and that the NSCA failed to properly search the J Drive and email folders.  Compounding this problem, the NSCA never disclosed the existence of these purportedly unsearchable folders.

Cinea now claims that although Torrey Smith was the NSCA's Certification Director until May 13, 2013 (a crucial time frame for this action), there were an <u>unknown quantity</u> of responsive emails and documents unavailable during the federal-case discovery because the NSCA could not search for "archived emails and documents that were accessible only to the employee to whom those files belonged." (Cinea Opp Decl. at ¶5; Opp at 9.)  Now, apparently, based on Smith's return to the

---

[3] CrossFit has filed with the instant Reply Objections to the hearsay statements contained in in paragraphs 5, 7, and 8 of the Opp Declaration of Keith Cinea.

5

NSCA and the NSCA's filing of its state-court case, the NSCA has access to these archived emails and documents that were somehow not searchable earlier. Cinea also suggests - without providing any actual evidence - that the NSCA's searching capabilities *may* have increased between the federal and state cases because of an upgrade from Windows 7 to 10. (Cinea Opp. Decl. ¶8.)

Even accepting Cinea's unsupported, hearsay-based arguments, they confirm the NSCA did not search or produce an <u>unknown quantity</u> of ESI from an <u>unknown quantity</u> of its Directors' files that were somehow found in the state-court case. Further, even if true, **the majority of incriminating documents do not involve Torrey Smith – meaning that the NSCA has offered no explanation whatsoever for failing to produce the vast majority of documents it withheld from the time period covered by the ESI Order**. Moreover, even if true, the NSCA never informed the Court or CrossFit of this issue, which underscores the need for a forensic expert to facilitate a full and fair production.

Further, Cinea cannot reasonably claim he was unaware that the Court's Discovery Order required the NSCA to disclose any ESI sources it did not have access to. Cinea provided this level of detail in some instances, but withheld it relating to the incriminating, withheld documents. For example, in his August 2015 Declaration, Cinea addressed the documents in the NSCA's Editorial Management System (the system used for the Devor Article peer review process). There, Cinea stated, "No one at the NSCA's offices has access to this system." (Cinea August 2015 Declaration, Ex. B, ¶7(a).) Cinea then contacted Dr. William Kraemer, who is not an NSCA employee, to access the responsive information. (Id., Ex. B., ¶¶ 4, 7(a).) In stark contrast, here, Cinea concealed the existence of the allegedly inaccessible Torrey Smith email folders. And the NSCA's Opp and Cinea's Opp

Declaration make plain that - at best - the NSCA made no efforts whatsoever to obtain the password for these files or the files themselves from Torrey Smith.[4]

Cinea's Opp arguments further expose the NSCA's intentional misconduct for at least four other reasons. First, the withheld documents CrossFit has identified thus far involving Torrey Smith stem from his NSCA email address. (Ex. CC.) Thus, they should have been available on the NSCA's J drive, email server, or in the inboxes of the other NSCA recipients. Second, it would be highly unusual for the NSCA to permit its employees—especially its Directors—to bury emails and documents in an unsearchable folder. Consistent with its theme of making arguments without providing evidence, the NSCA has prevented CrossFit and the Court from assessing this argument by failing to provide or even reference the NSCA's email and/or IT policies. Third, even accepting the NSCA's unsupported arguments, once Torrey Smith returned to the NSCA and the NSCA had access to his email files, the NSCA violated its Rule 26 duty to search the email account and supplement the NSCA's production. Fourth, Cinea's <u>suggestion</u> that documents were somehow not produced because the NSCA upgraded from Windows 7 to 10 is silly. The overwhelming majority of the most incriminating withheld documents were created before May 12, 2014 (within the ESI Order date range). As a result, these documents existed on the NSCA's servers when the NSCA was responding to CrossFit's federal document requests (before the Windows upgrade). Notably, the NSCA has not provided any meta-data or admissible evidence confirming that these "archived emails and documents" were not searchable during discovery in the federal case. The NSCA

---

[4] The NSCA's counsel similarly did not disclose that Torrey Smith's email folders existed and were allegedly inaccessible in response to the Court's Discovery Order. In his Declaration to the Court, Mr. Kawabata instead assured the Court and CrossFit that he personally had "conveyed to Mr. Cinea the need to access all departments within the NSCA in order to obtain the information," that he personally reviewed all of the documents Mr. Cinea provided, and that he was "confident [he] had conveyed the appropriate instructions to the NSCA to provide all documents, even if they were not directly responsive to the written discovery, to allow [him] to determine whether or not certain information and documents were either responsive, not responsive or privileged." (August 7, 2015 Declaration of Kenneth S. Kawabata at ¶¶ 5, 8 (attached as Ex. 11 to Kawabata Opp Declaration).)

1    could have simply obtained a declaration from its Technology Director or its IT
2    Manager, both of whom Cinea referenced in his August 2015 declaration to actually
3    explain this issue. (Ex. B, ¶¶ 2(a), 3(3).)  But the NSCA's IT team is notably absent
4    from its Opp.  Cinea's Opp Declaration further undermines his and the NSCA's
5    credibility, confirms that the NSCA intentionally did not search the full universe of
6    responsive documents, and corroborates that the NSCA knowingly violated the
7    Court's Discovery Order by withholding evidence and details about the NSCA's
8    servers.

9       **C.    The NSCA's Excuse for Torrey Smith's Direct Order to Withhold
10              Responsive Records is Further Evidence of Intentional Discovery
              Misconduct.**

11           The NSCA Opp does not review or analyze a single specific withheld
12    document.  Rather, the NSCA makes the blanket claim that every single withheld
13    document is not responsive to CrossFit's federal discovery requests without
14    explaining how or why.  The Opp does, however, attempt to explain away the
15    NSCA's Certification Director's order to withhold documents from CrossFit.  (Opp at
16    9.)  The NSCA claims Smith's comments were merely an "advisement to legal
17    counsel" to evaluate privilege or responsiveness.  (Id.)  This attorney-crafted
18    argument is belied by the plain language in Smith's notes.

19           Smith's spreadsheet identifies a 2012 (within the ESI Order date range) "Job
20    Analysis Survey" focusing on the NSCA's Certifications that contains an unknown
21    quantity (but at least one) reference to CrossFit and CrossFit's certifications.  (Ex. A.)
22    Smith's comments are not a request for anyone to evaluate the document, but rather
23    (1) a direct admission that the NSCA competes with CrossFit by describing its
24    certifications as the NSCA's "core business" and (2) a direct <u>order</u> to not share the
25    document within anyone.  (Id., stating, "THIS REPORT AND FULL
26    INFORMATION SHOULD NOT BE SHARED WITH ANYONE.")  There is no
27    conditional language here asking for further review.

28

<u>This plainly responsive report has yet to be produced in either the instant action</u> <u>or State Court Action, and the Opp does not address whether it was even provided to</u> <u>counsel in the federal matter</u>.  Equally revealing, the NSCA does not provide a declaration from Smith, but rather filters hearsay, once again, through Cinea.  The NSCA's desperate attempt to explain an NSCA Director getting caught red-handed instructing NSCA employees to withhold documents justifies severe sanctions.

### D.    The NSCA's Efforts to Distort a Pending Discovery Dispute Is Irrelevant to the NSCA's Discovery Abuse.

Rather than respond substantively to the cited misconduct, the NSCA seeks to distract the Court with an inaccurate recitation of a previous discovery dispute between the parties.  The NSCA claims that CrossFit violated the parties' agreement to extend the discovery cutoff "solely for the purpose of obtaining additional time to conduct further third-party depositions," by serving the NSCA with a Fifth Set of Requests for Production of Documents after the original deadline had lapsed.  (Opp at 7.)  Not so.  As explained in the actual Joint Motion currently pending before the Magistrate, the Fifth Set of RFPs was served *before* the original deadline and thus was not the subject of the parties' third-party-deposition limitation.  (Dkt. 106.)  This red-herring does not absolve the NSCA of its well-documented discovery abuse.

### E.    The NSCA Actively Concealed Evidence Detailing Its Efforts to Unfairly Compete with CrossFit's Certification Business.

The Opp does not meaningfully dispute that the NSCA concealed an unknown number of documents preventing CrossFit from fairly assessing the NSCA's commercial efforts to compete with CrossFit's certification business in several markets.  By comparing the withheld documents to the documents the NSCA <u>did</u> produce in the federal action, the NSCA cannot reasonably claim the withheld documents are not responsive.  (See Opp at 4-5.)  For example, the NSCA produced ██████████████████████████ in the federal action (Ex. F), but withheld all email communications where NSCA leadership was discussing or attaching the

9

██████████████. (Ex. CF.)  In so doing, the NSCA prevented CrossFit from

discovering that the NSCA's leadership planned, ██████, and utilized this document

to unfairly compete with CrossFit, and how this ██████████████ related to the

Devor Article.  Without access to these documents, Clayton's declaration claiming

████████████████████████████████████████████████. (Mot. at

2:21-3:17, Ex. G.)

But during his deposition in the State Court Action Clayton ████████████████

██████████████████████████████████████████████████

██████████████████ and he shared the ██████████████ with Carwyn

Sharp and other NSCA Directors.  (Ex. H, bates stamped page 45; Ex. CF (Reviewing

first draft of the ██████████████, Sharp states "I found this incredibly

stimulating reading and very educational about CrossFit.")) The Opp does not address

this important point.  Clayton's perjury, and the NSCA's efforts to conceal it, exposes

their intentional discovery misconduct.

### 1. The NSCA concealed their efforts to promote their certifications in the military while making false claims about CrossFit training.

The NSCA and CrossFit both compete for revenue in the military community.

(FAC, ¶¶29,31.)  The FAC alleges, and the withheld documents confirm, that

CrossFit's novel approach to fitness was a direct threat to the NSCA's business

model.  (FAC, ¶30.)  The NSCA had notice that the false information in the Devor

Article was harming CrossFit in the military.  The complaint identifies four popular

military publications—Air Force Times, Army Times, Marine Corps Times, and

Navy Times—that quickly published articles citing the false injury data.  (FAC, ¶61.)

CrossFit's Sanctions Motion describes how the NSCA withheld internal emails

from November <u>2013</u> - less than 6 months after CrossFit put the NSCA Board on

notice of the scientific misconduct - illustrating the NSCA's commercial intent to

██████████████████████████████. (Motion at 2:13-16; 11:9-

11.) ██████████████████████████████████████

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████

3 ███████████████████████  But this was only the tip of the iceberg.

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████

7 ███████████████████████████████████████████████

8 ████████████████████████████████████████████

9 ██████████████████████████████████████████████

10 ████████████████████████

11 ████████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████████████████

14

15        The withheld documents reveal that the NSCA not only concealed all evidence

16 relating to its efforts to disparage CrossFit in the military community, but also

17 withheld documents illustrating the NSCA designed its TSAC Certification to mimic

18 CrossFit's certifications.  The below sampling of withheld emails contain clear

19 admissions that the NSCA was actively competing with, and communicating about,

20 CrossFit's certifications.  Cinea claimed this information did not exist.  (Ex. S.)  The

21 withheld documents include:[6]

22  • An April 21, 2013 email [████████████████████████], where Nick
       Clayton sends Sharp and other NSCA Directors an email providing suggestions
23     about having "canned presentations" for the NSCA to present at industry
       conferences and trade shows.  Clayton says the goal of the presentations is to
24     "position the NSCA-CPT as the elite personal training certification in the
       industry."  Clayton's email states, in part, that the canned presentation should
25     have the TSAC portion mimic CrossFit training:  **Training- either weight loss,**

---

26 [5] Illustrating just how far the NSCA will go to promote its certifications and unfairly
    compete with CrossFit. ████████████████████████████████████████████

27

28 [6] Exhibits CI and CJ to the Nahama Reply Declaration provide additional examples of
    withheld documents confirming that the NSCA continued to identify CrossFit's L1 as
    a competitive, accredited certification.

11

**or metabolic conditioning. Play off of the crossfit craze; intelligent Crossfit-style training (e.g., TSAC…)"** (Ex. CD.)

- An April 25, 2013 email from Sharp to NSCA Directors falsely claiming that CrossFit's certifications are not accredited and describing the NSCA's commercial opportunity "to have the TSAC-F to be put forward up to the Chief-of-Staff[7] as the gold standard for PT certifications and training." Sharp continues, "As I am working on this today I am trying to word why accreditation by the NCCA **elevates our certifications above non-accredited (such as CrossFit**, P90X, TRX etc etc.)" (Ex. CG, emphasis added.)



- A May 2013 email chain where Sharp and NSCA Directors are discussing their commercial efforts to improve certification revenue. ████████████████ ████████████████ should be turned into marketing materials because "Several individuals are trying to convince their leadership to implement the TSAC-F cert and NSCA education and I'd like to equip them for that fight." (Ex. CM.)

- On March 26, 2013—████████████████████████████████— Sharp and Torrey Smith (the NSCA's Certification Director who instructed NSCA employees to withhold documents relating to CrossFit's certifications, Mot. at 1:7-24. Ex. A) were discussing how the wording used in CrossFit's Level 1 certificate probably came from ANSI (CrossFit's accrediting body). (Ex. CC, emphasis added.)[8]

- On February 2, 2013, Nick Clayton forwards Sharp his CrossFit Level 1 ("L1") Certificate and tells Sharp to focus on the wording. The first line of the L1 Certificate says, "You passed the Level 1 Test and have been awarded our **ANSI Accredited** CrossFit Level 1 Trainer Certificate." (Ex. CN, emphasis added.)

These documents also confirm that Cinea, as a 30(b)(6) witness, withheld testimony that established the untruthfulness of his claim that the NSCA never sought to limit the growth of CrossFit's certifications and had no "internal or external communication regarding CrossFit's training regimen." (Mot. at 8:23-26 (Ex. S).) Further revealing that Cinea withheld this information, he testified that to prepare for the deposition, he met with Nick Clayton (and discussed the ███████████████ )

---

[7] The reference to the "Chief of Staff" suggests the NSCA was making false statements about CrossFit training to the senior officials in the military.
[8] This document also illustrates the NSCA's unreasonable claim that Torrey Smith's emails were unavailable during discovery in the federal case. Clearly, Smith's emails with other NSCA representatives were available on the NSCA server.

12

and spoke to each NSCA Director about the allegations in the complaint.  (Exs. CW, CX.)  Yet Cinea withheld the NSCA's efforts, driven by Clayton and Director Sharp, to unfairly compete with CrossFit in the military community.

**2.  The NSCA concealed documents detailing their commercial intent to publish the Devor Article and efforts to compete with CrossFit in the international fitness community.**

The following sample of withheld documents confirms the NSCA hid information relating to its commercial efforts to compete with CrossFit in the US and international markets:

- An October 24, 2012 email correspondence between Clayton and Sharp, subject line "CrossFit assistance," where Sharp asks Clayton to help him prepare for a presentation on new trends in the fitness industry that the NSCA will be presenting in China.  Clayton confirms he's happy to help and that he's actually attending CrossFit's Level 1 course that weekend ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  (Ex. CO.)



These documents, and Exhibits CQ and CR to the Nahama Reply Declaration, also reveal that the NSCA withheld evidence that its Directors had a commercial incentive to publish, and refuse to meaningfully correct, the false information in the Devor Article.

**F.  The NSCA concealed documents detailing the their efforts to disparage CrossFit in the law enforcement and school (physical education) markets.**

The NSCA also concealed documents and information about its commercial efforts to compete with CrossFit in the physical education and law enforcement

13

markets.  According to Cinea's sworn deposition testimony, these documents also do not exist.  (Ex. S.)  For example, the NSCA withheld:

- An September 13, 2012 email where the NSCA leadership is updated on the NSCA's attendance at the National Tactical Officers Association Conference that "hosted approximately 825 attendees for patrol and SWAT officers from various parts of the U.S. Smaller markets include some military/special forces and EMTs."  The summary provides suggestions to improve the NSCA's "TSAC effort" such as "having the education/hands-on session to be more relevant to the Crossfit brand/programming style with further explanation of the TSAC Program benefits. Most of the attendees are more familiar with the Crossfit brand."  (Ex. CT.)

- An April 28, 2014 email where Sharp forwards to a US Army Captain a report of the NSCA's attendance at an annual law enforcement conference in Texas, warning that CrossFit is growing in popularity in the law enforcement market. (Ex. CT.)

These documents, and Exhibit CS to the Nahama Reply Declaration, are additional evidence that the NSCA intentionally withheld this information.  The NSCA was frequently communicating (internally and externally) about CrossFit training for purposes improving NSCA certification revenue.

### G.   The NSCA's 30(b)(6) Deposition Testimony Confirms It Intentionally Withheld Information from CrossFit and Violated the Court's Discovery Order.

The Opp claims the NSCA did not violate the Court's Discovery Order by doubling down on Cinea's August 2015 Declaration.  (Opp at 7.)  But by comparing the withheld documents and Cinea's 30(b)(6) deposition testimony with Cinea's 2015 declaration, it becomes clear that Cinea lied in either his August 2015 Declaration to the Court or during his Rule 30(b)(6) deposition.  The document comparison also reveals that Lee Madden, another NSCA 30(b)(6) witness, perjured himself during his deposition.

Cinea's August 2015 Declaration asserts he personally approached each NSCA departmental Director and had them search "for any emails containing the word "crossfit" with "**no time parameters set for the search**."  (Mot. at 7:7-11, Ex. B,¶2(a).)  Cinea's declaration notes he personally spoke with Carwyn Sharp and oversaw Sharp's document-collection efforts.  (Id.)  But during his 30(b)(6)

14

deposition, Cinea withheld all of the information—detailed above—about Sharp's efforts to promote the NSCA's TSAC-F Certification while Sharp falsely claimed that CrossFit's certifications were not accredited.  (Ex. CG.)  Cinea's 30(b)(6) testimony that the NSCA "had no internal or external communication regarding CrossFit's training regimen . . . has not made any efforts to limit the growth of CrossFit certification or the proliferation of CrossFit, and it does not compete with CrossFit" thus cannot be true.  (Mot. at 8:23-26 (Ex. S).)  Either Cinea never spoke with the Sharp (and other Directors), the Directors lied to him, or Cinea withheld the information during his deposition.  Under the first two scenarios, Cinea's declaration is untrue and the NSCA violated the Court's Discovery Order.  Under the last scenario, the NSCA's Rule 30(b)(6) witness committed perjury.

As another example of Cinea's perjury, he testified that the NSCA was not concerned that the Erratum would mislead the public into thinking two people were injured during the CrossFit training underlying the Devor Study.  (Ex. CX.)  Yet Cinea concealed that he received an email from the NSCA's marketing team <u>days after the Erratum was published</u> warning Cinea that the Erratum's language was misleading the public into believing two study participants were hurt from CrossFit training. (Ex. M.)

As a third example, Lee Madden, another NSCA 30(b)(6), testified that she was unaware of **<u>any evidence</u>**—conversations or documents—suggesting the NSCA was concerned about CrossFit's impact on the NSCA's revenues or that the NSCA perceives CrossFit as a threat to its trainer certification programs.  (Ex. CY.)  But the NSCA withheld documents containing dozens of examples of the NSCA identifying CrossFit as a threat to its certification programs, as well as the NSCA's concern about CrossFit's impact on the NSCA's revenues.

The NSCA does not dispute that their 30(b)(6) witnesses agreed to testify about the NSCA's efforts to compete with CrossFit, communications about CrossFit training, efforts to promote high intensity training like CrossFit (e.g., the NSCA

TSAC-F), and efforts to limit the growth of CrossFit's certifications – all topics in CrossFit's 30(b)(6) notice.  (Mot. at 9-10, Ex. CV.)  Indeed, Cinea was directly addressing these topics when he assured CrossFit that no information or documents existed.

The combination of the NSCA's untruthful testimony and withheld documents prevented CrossFit from identifying the full scope of the NSCA's competitive efforts and accurately assessing the complete range of its damages.

**H.    If Terminating Sanctions Are Not Imposed, Then Leave to Amend CrossFit's Complaint and a Thorough Forensic Analysis of the NSCA's Servers are Necessary to Fairly Redress the Harm to CrossFit.**

The Opp also ignores that an <u>unknown quantity</u>, at least hundreds, of material documents were withheld from CrossFit.  The NSCA has taken no steps to confirm that its document production is now complete.  But it's clear that the NSCA did not search all available servers because all of the documents that contain the term "crossfit" <u>and</u> fall within the ESI Order date range would have been captured by the searches Cinea claims the NSCA ran on its email server.

The NSCA's argument that any prejudice to CrossFit for the non-production is addressed by the NSCA agreeing to allow CrossFit to use the withheld documents in the federal action is absurd for at least four reasons.  First, even the case law the NSCA cites—when read fully—confirms that its belated efforts are not sufficient. *N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986) ("Belated compliance with discovery orders does not preclude the imposition of sanctions.  Last-minute tender of documents does not cure the prejudice to opponents nor does it restore to other litigants on a crowded docket the opportunity to use the courts.")  Second, CrossFit has no assurance that the NSCA's document production is

now somehow complete.[9]  CrossFit should not be required to assume that all responsive documents in the federal action are buried somewhere in the NSCA's state-court production.  Third, if the documents were truly not responsive to CrossFit's discovery as the NSCA alleges, it would not have quickly agreed to allow CrossFit to use these withheld documents in the federal action.  (Opp at 4-5.)  And finally, the NSCA's "offer" noted that it would not stipulate to the admissibility of the withheld documents and only offered CrossFit one or two additional depositions.  Because the withheld documents had more than one or two custodians, the NSCA's offer precluded CrossFit from laying the foundation to actually use these documents at trial.

But for the NSCA's malfeasance, CrossFit would have thoroughly pursued discovery in connection with this withheld evidence and asserted additional claims to address the harm to CrossFit's military revenue.  Each of the aforementioned withheld documents is plainly responsive to CrossFit's first set of document requests.  (Mot. at 9-10, Ex. T (First Document Requests, see Nos. 2,7,25, and 30).)  These documents should have been produced on August 3, 2015 with the NSCA's first document production, which notably included the ████████████.  (Nahama Decl., ¶ 2.)  The documents could also have been produced on December 24, 2015, with the NSCA's final document production that occurred after CrossFit's supplemental discovery requests.  (Id.)  For these reasons, an independent forensic analysis, paid for by the NSCA, is necessary to meaningfully search the NSCA's servers to identify all responsive documents.  In addition, if terminating sanctions are not imposed, pursuant to FRCP 15, CrossFit respectfully requests (1) leave to file an amended complaint (2) an order **allowing only CrossFit** to re-open fact and expert discovery on these additional claims; and (3) for the NSCA to bear the costs and

---

[9] The Opp does not dispute that the NSCA had an obligation to supplement its discovery responses under FRCP 26 and in response to CrossFit's October 2015 supplemental discovery requests.

17

attorneys' fees for this discovery.

## III.   CONCLUSION

The NSCA's Opposition relies on a case explaining exactly why terminating sanctions are appropriate here: *"[I]t was a reasonable inference that if there was other discoverable material harmful to its case that its adversaries did not know about, it would be hidden forever. Where a party so damages the integrity of the discovery process that there can never be assurance of proceeding on the true facts, a case dispositive sanction may be appropriate."*   (Opp at 6-7 citing *Valley Eng'rs,* 158 F.3d at 1058.)   Not only did the NSCA conceal information and an unknown quantity of documents, it sought to leverage its misconduct by filing a motion for summary judgment centering on the issue of commercial competition.   And the NSCA would have proceeded to trial but for CrossFit discovering the misconduct days before the first pre-trial filings deadline.   For years, the NSCA exploited their discovery abuse by presenting untruthful testimony, declarations, and arguments in joint discovery motions and during summary judgment.   The NSCA's repeated, systemic misconduct and resulting irreparable harm to CrossFit warrants terminating sanctions.   If terminating sanctions are not imposed, harsh evidentiary, issue and monetary sanctions;[10] leave of court for CrossFit to amend its complaint; additional discovery; and a forensic analysis of the NSCA's servers must be a starting point.

Dated:  March 16, 2017              MINTZ LEVIN COHN FERRIS GLOVSKY
                                    AND POPEO PC

                                    By *s/Micha Danzig*
                                       Micha Danzig, Esq.
                                       Justin S. Nahama, Esq.
                                       Natalie A. Prescott, Esq.
                                       Wynter L. Deagle, Esq.

                                       Attorneys for Plaintiff
                                       CrossFit, Inc.

---

[10] CrossFit's fees in connection with this Reply Brief are $33,416.52. (Reply Declarations of J. Nahama, M. Danzig, and H. Silver filed concurrently herewith.) CrossFit's total fees in connection with its Sanctions Motion, excluding oral argument, are $95,133.23 (Reply fees plus $61,716.70 identified in moving papers).

18

## CERTIFICATE OF SERVICE

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of San Diego, State of California, and am not a party to the above-entitled action.

On March 16, 2017, I filed a copy of the foregoing document by electronically filing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| **Kenneth Shoji Kawabata** | ksk@manningllp.com, axe@manningllp.com, knn@manningllp.com |
| **Anthony J Ellrod** | aje@manningllp.com, nxl@manningllp.com |
| **Micha Danzig** | mdanzig@mintz.com, TLMayo@mintz.com, acarozza@mintz.com, amjahnke@mintz.com, docketing@mintz.com |
| **James D. Nguyen** | jimmynguyen@dwt.com, LAXDocket@dwt.com, deekeegan@dwt.com |
| **Daniel Scott Schecter** | daniel.schecter@lw.com |
| **Andrew D Skale** | askale@mintz.com, Docketing@mintz.com, KCosta@mintz.com, adskale@mintz.com |
| **Bruce Isaacs** | bruceisaacs@dwt.com, linapearmain@dwt.com |
| **Natalie Prescott** | NAPrescott@mintz.com, KWinterson@mintz.com, docketing@mintz.com |
| **Justin S. Nahama** | JSNahama@mintz.com, docketing@mintz.com, kjenckes@mintz.com |
| **David F. Kowalski** | david.kowalski@lw.com, alison.montera@lw.com, cary.port@lw.com |
| **Sean M. Sullivan** | seansullivan@dwt.com, LAXDocket@dwt.com, deekeegan@dwt.com |
| **William O. Reckler** | william.reckler@lw.com, jessica-bengels-2198@ecf.pacerpro.com, william-reckler-5795@ecf.pacerpro.com |
| **Paul A. Serritella** | paul.serritella@lw.com, elizabeth.evans@lw.com, jessica.bengels@lw.com, katelyn.beaudette@lw.com, rachel.kohn@lw.com, sadie.diaz@lw.com |
| **Wynter L. Deagle** | wldeagle@mintz.com, KCosta@mintz.com, docketing@mintz.com |

**David Samuel Bederman**        dsb@manningllp.com, exi@manningllp.com

**Diana Palacios**        dianapalacios@dwt.com, nancygonzalez@dwt.com

Executed on March 16, 2017, at San Diego, California.  I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

*s/Micha Danzig*

Micha Danzig