UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CROSSFIT, INC., a Delaware corporation,<br><br>                                    Plaintiff,<br><br>v.<br><br>NATIONAL STRENGTH AND CONDITIONING ASSOCIATION, a Colorado corporation,<br><br>                                    Defendant. | Case No.: 14cv1191 JLS (KSC)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SANCTIONS**<br><br>(ECF Nos. 150, 162) |

Presently before the Court is Plaintiff CrossFit, Inc.'s Motion for Terminating Sanctions, or in the Alternative Issue, Evidentiary, and Monetary Sanctions ("Sanctions Mot."). (ECF Nos. 150, 162.) Also before the Court is Defendant National Strength and Conditioning Association's ("NSCA") Opposition to ("Opp'n"), (ECF No. 156), and Plaintiff's Reply in Support of ("Reply"), (ECF No. 170), Plaintiff's Sanctions Motion. After considering the Parties' arguments and the law, as well as carefully examining all exhibits attached to the moving papers, the Court rules as follows.[1]

---

[1] Plaintiff has also filed an *Ex Parte* Motion for Leave to File a Supplemental Motion in Support of Pending Motion for Terminating Sanctions Based on Recently Discovered Additional Discovery Misconduct ("Supplemental Mot."). (ECF No. 174.) However, given the Court's ruling regarding the instant Sanctions Motion, and that the issues presented in the Supplemental Motion overlap those presented in the instant Sanctions Motion, the Court **DENIES AS MOOT** the Supplemental Motion.

# BACKGROUND

## I. Factual Background

CrossFit is a relatively recent entrant in the arena of fitness and personal training. (*See* Order Granting CrossFit Inc.'s Partial MSJ and Granting in Part and Den. in Part Nat'l Strength and Condit. Ass'n's MSJ ("MSJ Order") 2, ECF No. 121.) By contrast, NSCA is a nonprofit corporation that has been around for nearly half a century and is "dedicated to the educational and professional exchange of ideas in the areas of strength development, athletic performance, and fitness." (*See id.*) Both CrossFit and the NSCA generate revenue by credentialing and certifying trainers through their various programs. (*Id.*) NSCA also disseminates publications through its "flagship journal," the Journal of Strength and Conditioning Research ("JSCR"). (*Id.*)

CrossFit contends that its popularity poses "an existential threat to the NSCA" because as "more and more people move from the NSCA's traditional fitness model to CrossFit training . . . there will be fewer and fewer trainers seeking NSCA certifications." (*Id.*) In particular, CrossFit argues that in a specific study (the "Devor Study") the NSCA published false data regarding CrossFit participants' injury rates. (*Id.* at 3.) This Court previously concluded that the data were, as a matter of law, false. (*See generally id.*) CrossFit further contends that the NSCA's use of such false data was no accident—instead, CrossFit alleges that the NSCA had a commercial motive to publish these false data, both to harm CrossFit's market share and continued growth, and to bolster the NSCA's case for heightened government regulation regarding the fitness industry that might preclude CrossFit from continuing its certification programs and fitness centers in their current forms. (*See id.* at 2–8; Sanctions Mot. 1–4.)

For the NSCA's part, it denies any commercial motive, or that it even competes with CrossFit. (*See* Answer to Compl. ¶ 27, ECF No. 27; *see also* Sanctions Mot. Ex. S. (NSCA counsel noting that NSCA's representative "testified that the NSCA has not had internal or external communication regarding CrossFit's training regimen . . . , has not made any efforts to limit the growth of CrossFit certification or the proliferation of CrossFit, and . . .

does not compete with CrossFit").) Additionally, the NSCA notes that "nine months after receiving the participant declarations" proving the Devor Study's injury data were false, the NSCA issued an Erratum addressing the false injury data. (Sanctions Mot. 5.) CrossFit, however, maintains that the NSCA had a commercial motive to disparage CrossFit, that the NSCA views CrossFit as a competitor, and further "contends the Erratum was misleading" because it "still falsely suggested that two participants were injured during the study." (*Id.*) CrossFit has amended its complaint to add a cause of action to redress "the additional harm stemming from the misleading nature of the Erratum and the NSCA's failure to issue a full retraction." (*Id.*) "The NSCA has indicated that it intends to attack CrossFit's damages theories by arguing that the Erratum mitigated any damages and that CrossFit was responsible for the widespread distribution of the false data." (*Id.* at 3.)

## II. Procedural Background

After several years of litigation in this federal action, the NSCA filed a separate suit in state court against CrossFit alleging trade libel, defamation, and unfair business practices. (*Id.* at 5–6.) The subject matter of this action and the state-court action largely "directly overlap" such that discovery in both actions encompasses many of the same issues; indeed, the parties agreed to a state-court "protective order mirroring the protective order in this case." (*Id.*)

After a contentious discovery period and only weeks prior to several pretrial deadlines in this action, CrossFit received discovery from the state-court action that appeared to either directly respond to discovery propounded in this action or contradict assertions NSCA deponents had made in this action. (*Id.* at 6.) CrossFit then deposed Nick Clayton—the NSCA's "Education Coordinator"—in the state-court case, (*id.*), at which time Mr. Clayton <u>admitted that several of the statements in his federal-action declaration, submitted under penalty of perjury, were false</u>. (Sanctions Mot. Ex. I, 80:7–83:4, ECF No. 163-3, at 18–21.) Given this new information, CrossFit then "ran several controlled searches in the state-court production" which "yielded hundreds of documents material to the issues in this action and that the NSCA should have produced in response to CrossFit's

discovery requests in this case." (*Id.* at 6.) Although the documents are too numerous to comprehensively catalog, examples of withheld discovery are:

- Documents that affirmatively demonstrate Mr. Clayton's perjury. Specifically, Mr. Clayton attended a CrossFit "Level 1" certification and testified in this action that he did so only for his own personal interest and that he did not share the documents regarding the certification with anyone at the NSCA. (*Id.* Ex. I.) However, the withheld state-produced documents reveal (1) that Mr. Clayton shared his certification-created documents—which he titled "Competitive Analysis"—with many members of NSCA leadership, (*id.* Ex. H; *see also* Ex. AV (Clayton email specifying: "Attached is my evaluation of the CrossFit Level 1 Course. I was not sure what format it needed to be in; consider this draft 1. I'll make revisions as needed" (emphasis added))); (2) that Mr. Clayton and NSCA leadership focused specifically on the CrossFit certificate and its wording as compared to the NSCA's certificates, (*id.* Ex. K; *see also* Ex. J); and (3) that the NSCA in fact paid for Mr. Clayton to attend the CrossFit certification after Mr. Clayton submitted a detailed "Project Proposal" noting that CrossFit "is quite possibly the hottest trend in training and conditioning," (*id.* Ex. L);

- A 2013 "Executive Summary" prepared for an NSCA Board of Director's "strategic planning retreat." The Executive Summary notes that "the greatest challenge facing the NSCA" is "[c]ompeting organizations and third-party fitness programs, including CrossFit" and that "[t]he long overdue modernization of military training protocols will leave a vacuum of expertise that if the NSCA doesn't pro-actively get involved in, some idiotic organization like CrossFit will." (*Id.* Ex. C.);

- An email from the NSCA's Media Relations Manager to many high-ranking NSCA officers. The email was issued several days after the NSCA published the Erratum and notes that "the point of confusion on the erratum is mostly based on the two people mentioned who stated injury/medical condition for not

completing." (*Id.* Ex. M.) It continues: "Because we did not clarify that the injury and medical condition were not associated with their workouts at the club people are assuming that they were." (*Id.*);

- Several emails and internal NSCA documents titled, for example, "More CrossFit Media," that tracked media coverage of the Devor Study or the Erratum and updated various NSCA team members on the same. (*E.g.*, *id.* Exs. D, N.);

- An email in which an NSCA director told a member of the United States Air Force, who was considering NSCA certifications in regards to "establishing a . . . standard for the training of fitness professional in the Air Force," that "CrossFit is not included in [NSCA's] competitor analysis as it is <u>neither accredited nor was it designed to directly meet the needs of military personnel</u> . . . ." (Reply Ex. CB.);

- Several NSCA emails discussing state legislative efforts to more tightly regulate the fitness profession and corresponding certifications, including an email summarizing a presentation for the NSCA's Board of Directors and noting that the Board "is fully on board . . . and is leaning toward taking a more proactive role in legislation (. . . by proxy [through an advocacy organization])." (*E.g.*, Sanctions Mot. Exs. AM, AN.);

- A document cataloging "Request" numbers and "File Title[s][,]" in which the NSCA's certification director wrote that a document where "CrossFit" certifications were mentioned was "THE JOB ANALYSIS REPORT INFORMATION THAT THE NSCA CERTIFICATIONS ARE BUILT FROM (CORE BUSINESS) AND IS CONFIDENTIAL AND PROPRIATORY [sic] INFORMATION THAT IS CRITICAL TO THE SUCCESS OF OUR CERTIFICATION PROGRAM – THIS REPORT AND FULL INFORMATION SHOULD NOT BE SHARED WITH ANYONE." (*Id.* Ex. A (capitalization in original).)

/ / /

Given that pretrial proceedings were only several weeks away at the time CrossFit discovered these documents, CrossFit simultaneously moved to continue the pretrial proceedings and for sanctions against the NSCA. (ECF Nos. 150, 153.) Given the gravity and uncertainty of the discovery misconduct, the Court continued the pretrial proceedings. (ECF No. 155.) The Court now addresses the pending Sanctions Motion.

## LEGAL STANDARD

"Federal Rule of Civil Procedure 37 authorizes the district court, in its discretion, to impose a wide range of sanctions when a party fails to comply with the rules of discovery or with court orders enforcing those rules." *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983). Additionally, district courts have inherent power to "impose sanctions including, where appropriate, default or dismissal." *Thompson v. Hous. Auth. of City of L.A.*, 782 F.2d 829, 831 (9th Cir. 1986) (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626 (1961)). However, because dismissal is such a severe remedy it should be imposed only in extreme circumstances, and "only where the violation is 'due to willfulness, bad faith, or fault of the party.'" *In re Exxon Valdez*, 102 F.3d 429, 432 (9th Cir. 1996). To guide its discretion, "a district court should consider a five-part test, with three subparts to the fifth part, to determine whether a case-dispositive sanction" is appropriate. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007). These factors are:

> (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. The sub-parts of the fifth factor are whether the court has considered lesser sanctions, whether it tried them, and whether it warned the recalcitrant party about the possibility of case-dispositive sanctions.

*Id.* (footnotes removed). However, "[t]his 'test' is not mechanical. It provides the district court with a way to think about what to do, not a set of conditions precedent for sanctions or a script that the district court must follow . . . ." *Id.*

# ANALYSIS

In the present case, Plaintiff moves for (1) terminating sanctions or, in the alternative, (2) issue, evidentiary, and monetary sanctions. (*See generally* Sanctions Mot.; Reply.) Defendants have submitted an eleven-page Opposition with five-and-a-half pages of background, four pages in part opposing terminating sanctions and in part again summarizing relevant background, and a single paragraph opposing issue, evidentiary, and monetary sanctions. (*See generally* Opp'n.) Because an award of terminating sanctions would render Plaintiff's request for additional sanctions largely moot, the Court first addresses terminating sanctions.

## I. Terminating Sanctions

Plaintiff argues that the five factors weigh heavily in favor of terminating sanctions. Defendant opposes by first arguing that the NSCA cannot make the threshold showing of willfulness, bad faith, or fault on behalf of the NSCA, in part due to the varying scope of discovery between the two actions, (Opp'n 6–9), and in part due to the return of an employee not previously available during the federal court action and because "the availability of a new computer operating system" made "a wider range of documents . . . accessible" in the state-court discovery. Defendant next argues that the NSCA would be irreparably prejudiced by dismissal, and that CrossFit is not truly prejudiced because the NSCA "has agreed to CrossFit utilizing the documents produced in the state court in the federal action[,]" the NSCA has agreed to allow CrossFit to take additional depositions, and the relevant pretrial dates are continued sufficiently to allow CrossFit time to adequately prepare for trial. (*Id.* at 9–10.) In its Reply, CrossFit points out the numerous issues the NSCA's Opposition did not address, and therefore tacitly concedes, as well as arguing that the Opposition "offers hearsay-based excuses that . . . are belied by common sense and the NSCA's own conduct." (*See generally* Reply.) The Court agrees with Plaintiff.

As an initial matter, the Court agrees with Plaintiff that there is ample evidence of willfulness, bad faith, or fault. To start, the NSCA produced Mr. Clayton's "Competitive

Analysis" document in the federal litigation, (Reply Ex. F), but never produced the recently discovered documents detailing the NSCA's planning, funding, and receipt of the Competitive Analysis. And Mr. Clayton expressly admitted in his state-court deposition that he lied in his federal deposition. (Sanctions Mot. Ex. I.) Defendant <u>does not once address this, let alone mention it, in its Opposition</u>. (*See generally* Opp'n.) Next, one of the NSCA's 30(b)(6) witnesses—Keith Cinea—stated that the NSCA was not concerned that the Erratum was misleading, (Reply Ex. CX), and, because the Erratum is a foundational component of CrossFit's damages calculations and claims, CrossFit requested all documents "referring or relating to the Erratum[,]" (Sanctions Mot. Ex. W). However, Defendant never produced in the federal action <u>multiple documents referencing the Erratum</u>, including one email sent by the NSCA marketing team only several days after the Erratum was issued and pointing out that many people were confused by the Erratum's implication that two people were injured by CrossFit when, in fact, they were not. (*Id.* Ex. M.) Again, the Opposition <u>nowhere</u> addresses or even mentions these startling federal-discovery omissions. (*See generally* Opp'n.) Additionally, a foundational component of the NSCA's case is that it did not view CrossFit as a competitor and therefore had no commercial incentive to take any action against CrossFit. (*See, e.g.*, Answer to Compl. ¶ 27 (denying that NSCA competes with CrossFit.) But <u>numerous</u> previously undisclosed documents indicate exactly the opposite. (*E.g.*, Sanctions Mot. Ex. C; Reply Ex. CB.)

Unfortunately, the Court could go on. But the Court does not need to. There is plainly sufficient evidence to find willfulness, bad faith, or fault on the part of the NSCA in withholding the recently discovered documents and in lying under oath in the federal proceedings. *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 947–48 (9th Cir. 1993).

Furthermore, nearly every factor weighs in favor of imposing terminating sanctions. First, the public's interest in expeditious resolution of litigation would be served. Not only are significantly more hours of the Parties' and the Court's time now going to be devoted to this matter solely due to Defendant's misconduct, but the sheer breadth of the misconduct means that terminating the case would essentially be a cleaner and more

expedient disposal given the high number of issue and evidentiary sanctions the Court will award. Second, the court's need to manage its dockets counsels in favor of termination, especially given the tremendous resources this case has already taken away from other, deserving litigants, and the numerous discovery issues already presented and continuing to be presented to Magistrate Judge Karen S. Crawford for resolution. Third, although the risk of prejudice to the party seeking sanctions does not here weigh as heavily in favor of terminating sanctions, it nonetheless weighs slightly in favor of terminating sanctions given the sheer breadth of misconduct and Defendant's refusal to accept responsibility for the same.[2] Plaintiff should rightly wonder whether documents have been—or will now be—destroyed. *See Valley Engineers Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1058 (9th Cir. 1998) ("Considering how Electric Engineering acted regarding the Carroll memorandum, it was a reasonable inference that if there was other discoverable material harmful to its case that its adversaries did not know about, it would be hidden forever."). Fourth, the public policy favoring disposition of cases on their merits, although usually weighing against terminating sanctions, slightly weighs in favor of terminating sanctions in the present case. Specifically, "[t]here is no point to a lawsuit . . . if it merely applies law to lies[,]" *id.*, and here, it is only largely by luck that Plaintiff discovered this expansive catalog of highly relevant documents mere weeks before pretrial deadlines came due.

        This brings the Court to the fifth and final factor: the availability of less drastic sanctions. The sub-parts of the fifth factor are whether the court has considered lesser sanctions, whether it tried them, and whether it warned the recalcitrant party about the

---

[2] As <u>one</u> example, NSCA's Corporate Counsel—Keith Cinea—declares in support of Defendant's Opposition that:

> At the time I conducted the search for documents as part of the federal action, the NSCA's operating system consisted of Windows 7. The NSCA upgraded its operating system to Windows 10 sometime between the discovery in the federal and state cases. The search in the state case utilized Windows 10. My understanding is that utilizing the Windows 10 system may have resulted in more expansive search capabilities.

(Cinea Decl. ¶ 8.)

possibility of case-dispositive sanctions. In the present case, this factor therefore weighs slightly against terminating sanctions, but only because all of Defendant's misconduct was discovered in one moment, almost immediately prior to the relevant pretrial deadlines. *But see Hester v. Vision Airlines, Inc.*, 687 F.3d 1162, 1170 (9th Cir. 2012) ("[I]t is appropriate [for a district court] to reject lesser sanctions where the court anticipates continued deceptive misconduct." (second alteration in original) (quoting *Computer Task Grp., Inc. v. Brotby*, 364 F.3d 1112, 1116–17 (9th Cir. 2004))).

After weighing all of the factors—and considering that they are merely a guide, rather than a set way of analyzing terminating sanctions—the Court concludes that it is well within its discretion to award terminating sanctions. <u>However</u>, the Court nonetheless declines to do so at this time. In particular, the issue and evidentiary sanctions the Court ultimately awards, *infra* Part II, significantly narrow the issues remaining for trial, and there is currently no indication that the NSCA has actually destroyed evidence. And, indeed, "[w]hat is most critical for case-dispositive sanctions, regarding risk of prejudice and of less drastic sanctions, is whether the discovery violations 'threaten to interfere with the rightful decision of the case.'" *Valley Eng'rs Inc.*, 158 F.3d at 1057.

However, in addition to the issue and evidentiary sanctions the Court awards in the next Section, the Court agrees with Plaintiff that Defendant has made no assurances that it has now produced all relevant documents. And even if Defendant had made such an assurance, there would be little reason to believe such an assertion. Accordingly, the Court awards the following Sanctions to address these valid concerns:

(1) Plaintiff **SHALL** commission a neutral forensic analysis of the NSCA's servers and Defendant **SHALL** pay all costs relating to such forensic analysis;

(2) Defendant **SHALL** <u>within fourteen days</u>, under penalty of perjury, acquire declarations from all relevant NSCA personnel either (a) assuring or reaffirming that no documents relevant to this litigation have been destroyed or (b) admitting to any destruction;

(3) If at the conclusion of the neutral forensic evaluation it appears that documents have been destroyed, or that the discovery misconduct is substantially greater than the scope of which Plaintiff is currently aware, Plaintiff is **GRANTED LEAVE TO RENEW** its Motion for Terminating Sanctions and present the newly discovered evidence; and

(4) Defendant **SHALL LODGE** <u>within fourteen days</u> a copy of the document referenced in Plaintiff's Sanction Motion Exhibit A so that the Court may conduct an *in camera* review of the document. Additionally, Plaintiff **SHALL PROVIDE** a copy of this Order to the neutral forensic analyst so that she may search for other instances of the document referenced in Exhibit A—or its deletion—and any surrounding context.[3]

## II. Issue, Evidentiary, and Monetary Sanctions

CrossFit supplies a list of thirty potential issue and adverse inference sanctions. (Sanctions Mot. Ex. AW.) The NSCA opposes in a single paragraph, seemingly arguing that once CrossFit uncovered the discovery misconduct the NSCA engaged with CrossFit in several meet and confers and agreed to certain aspects of the relief CrossFit requested. (Opp'n 10.) However, these several meet-and-confer efforts do not alter the Court's previous conclusion that it would be a valid exercise of the Court's discretion to <u>dispose of the case in its entirety</u>. That same analysis here counsels in favor of awarding CrossFit issue and adverse inference sanctions as follows:

(1) It is taken as established that the NSCA had a commercial motivation for making the false statement in the Devor Study.

---

[3] Defendant alleges that the comment next to the responsive yet unproduced email—"THIS REPORT AND FULL INFORMATION SHOULD NOT BE SHARED WITH ANYONE[,]" (Sanctions Mot. Ex. A)—was merely an "advisement[] to legal counsel as to the nature of such documents . . . so it could be determined whether such documents are privileged or not discoverable." (Opp'n 9.) Plaintiff counters that: "<u>This plainly responsive report has yet to be produced in either the instant action or State Court Action, and the Opp['n] does not address whether it was even provided to counsel in the federal matter.</u> Equally revealing, the NSCA does not provide a declaration from [the party who created the document], but rather filters hearsay, once again, through [NSCA corporate counsel] Cinea." (Reply 9 (emphasis original).)

11

14cv1191 JLS (KSC)

(2) It is taken as established that the NSCA and CrossFit are in commercial competition.

(3) It is taken as established that the NSCA made the false statement in the Devor Study with the intention of disparaging CrossFit and thereby driving consumers to the NSCA.

(4) It is taken as established that the NSCA was aware of the misleading nature of the Erratum.

(5) It is taken as established that the Erratum's statement, that two participants were injured during the course of the Study, misled the public and harmed CrossFit.

(6) It is taken as established that the NSCA's false statement in the Devor Study was disseminated sufficiently to the purchasing public to constitute advertising or promotion.

(7) It is taken as established that the NSCA caused the false statement in the Devor Study to enter interstate commerce.

(8) It is taken as established that it was foreseeable that the false statement in the Devor Study would be circulated to the media.

(9) It is taken as established that a loss in CrossFit's certification revenue was the natural and probable result of the false injury data in the Devor Study.

(10) The jury may, but is not required to, infer from the NSCA's spoliation of documents informing CrossFit's Lanham Act claim that the NSCA violated the Lanham Act as alleged in Count I of CrossFit's Complaint.

(11) The jury may, but is not required to, infer from the NSCA's spoliation of documents informing CrossFit's state law false advertising claim that the NSCA violated California Business and Professions Code § 17500 as CrossFit alleges in Count II of its Complaint.

///

///

(12) The jury may, but is not required to, infer from the NSCA's spoliation of documents that the NSCA's false statement in the Devor Study was made in a commercial advertisement about CrossFit's product.

(13) The jury may, but is not required to, infer from the NSCA's spoliation of documents that the NSCA's false statement in the Devor Study was commercial speech.

(14) The jury may, but is not required to, infer from the NSCA's spoliation of documents that CrossFit has been or is likely to be injured as a result of the false statement in the Devor Study.

(15) It is taken as established that the NSCA actively supported state legislation that would regulate personal trainers.

(16) It is taken as established that the NSCA was aware that the false statement in the Devor Study was being circulated to the media.

(17) The NSCA shall not be permitted to enter evidence that it does not compete with CrossFit.

Additionally, CrossFit is **GRANTED LEAVE TO FILE AN AMENDED COMPLAINT** <u>within thirty days</u> addressing alleged lost revenue from military certifications and the NSCA's allegedly intentional defamatory conduct. Further, CrossFit—and only CrossFit—is **GRANTED LEAVE** to reopen fact and expert discovery on all relevant claims. Finally, CrossFit requests all fees in connection with its Sanctions Motion and *ex parte* Continuance, totaling $95,133.23. However, upon review, one attorney's declaration in support of the fee award notes that he "spent at least 4.5 hours" in preparing the Reply Brief, and that his hourly rate in the matter "is $526.40." (Nahama Decl. ¶ 29, ECF No. 167-1.) Although he then lists his fees for such preparation as "$23,951.20" the actual total should be $2,368.80. Accordingly, the Court **AWARDS** Plaintiff $73,550.83 to account for this mathematical error. (Nahama Decl. ¶ 10, ECF No. 150-2; Danzig Decl. ¶ 1, ECF No. 150-15; Taylor-Copeland Decl. ¶ 1, ECF No. 150-16; Ospina Decl. ¶ 2, ECF No. 150-17; Nahama Decl. ¶ 29, ECF No. 167-1; Danzig Decl. ¶ 1,

ECF No. 167-28; Silver Decl. ¶ 1, ECF No. 167-29.) Defendant **SHALL** pay the fee award <u>within thirty days</u>.

## CONCLUSION

The Court **GRANTS** Plaintiff's Sanctions Motion as set forth above and **DENIES WITHOUT PREJUDICE** Plaintiff's Sanctions Motion regarding terminating sanctions. All specified deadlines **SHALL** be calculated from the date on which this Order is electronically docketed.

**IT IS SO ORDERED.**

Dated: May 26, 2017

Hon. Janis L. Sammartino
United States District Judge