UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CROSSFIT, INC., a Delaware corporation,<br><br>                    Plaintiff,<br><br>v.<br><br>NATIONAL STRENGTH AND CONDITIONING ASSOCIATION, a Colorado corporation,<br><br>                    Defendant. | Case No.: 14-CV-1191 JLS (KSC)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF CROSSFIT, INC.'S RENEWED MOTION FOR TERMINATING SANCTIONS**<br><br>(ECF Nos. 326, 359) |

Presently before the Court is Plaintiff CrossFit, Inc.'s Renewed Motion for Terminating Sanctions ("Mot.," ECF Nos. 326, 359), as well as Defendant the National Strength and Conditioning Association's ("NSCA") Opposition to ("Opp'n," ECF No. 353) and CrossFit's Reply in Support of ("Reply," ECF No. 369) the Motion. Also before the Court are the Final Report of Execution Against Agreed Upon Forensic Protocol ("Final Rep.," ECF No. 322) and Supplemental Status Report of Execution Against Agreed Upon Forensic Protocol ("Supp. Rep.," ECF No. 379-2), both prepared by the Court-appointed neutral forensic evaluator, Stroz Friedberg ("Stroz"), and the Parties' voluminous declarations and exhibits. *See* ECF Nos. 327–37, 346, 353, 358, 360–68, 370–75. The Court held a hearing attended by the Parties and Stroz on October 22, 2019. *See* ECF Nos.

387, 388 ("Tr."). Having carefully considered the Parties' arguments, the evidence, and the law, the Court **GRANTS IN PART** and **DENIES IN PART** CrossFit's Motion, as follows.

## BACKGROUND

The factual and procedural background through October 2018, are thoroughly documented in the Court's May 26, 2017 Order Granting in Part and Denying in Part Motion for Sanctions (ECF No. 176) and October 19, 2018 Order (1) Denying Defendant's Motion to Appoint Special Master, and (2) Setting Scheduling Order (ECF No. 302). *See* ECF No. 176 at 2–6; ECF No. 302 at 2–22. The Court incorporates by reference the facts as presented fully in those Orders and sets forth below factual and procedural developments since October 2018.

## I. Discovery from the Kraemers

On November 28, 2018, a digital forensics vendor selected by The Ohio State University ("OSU"), TCDI, collected data from Dr. William Kraemer's and Joan Kraemer's mobile devices. Final Rep. at 9. Although OSU authorized TCDI to turn over to Stroz the data from Ms. Kraemer's mobile device, Stroz has not received the data from Dr. Kraemer's mobile devices. *Id.*

On the same day that TCDI harvested data from the Kraemers' mobile devices, Stroz conducted informational interviews of Dr. and Ms. Kraemer "regarding their device and[]account usage, and preservation efforts related to NSCA business." *Id.* Dr. Kraemer informed Stroz that he had used an iPhone purchased by the NSCA between approximately 2016 and January 2018, and that he had purchased his current mobile device in January 2018. *Id.* at 10. In January 2018, with the help of OSU staff, Dr. Kraemer transferred data from his NSCA-owned iPhone to his new device. *Id.* With the assistance of OSU staff, Dr. Kraemer then performed a factory reset of his NSCA-owned iPhone, although he did not return the device to the NSCA. *Id.* Dr. Kramer also reset to factory defaults the four previous mobile phones he had used for NSCA business, three of which he returned to the NSCA and one of which was lost in 2010. *Id.*

2

During the pendency of this litigation, Dr. Kraemer has had three separate laptops: one at the University of Connecticut ("UConn") and two successive ones at OSU. *Id.* OSU technicians transferred data from Dr. Kraemer's UConn laptop to his first OSU laptop and from Dr. Kraemer's first OSU laptop to his second. *Id.*

Ms. Kramer has been using her current iPhone, which was purchased by the NSCA, since approximately five years ago. *Id.* Prior to that, she had used a flip phone purchased by the NSCA. *Id.* Ms. Kramer "wiped" the flip phone before returning it to the NSCA. *Id.*

On December 11, 2018, CrossFit re-deposed Dr. Kraemer. *See generally* Decl. of Justin S. Nahama in Support of Mot. ("Nahama Decl.," ECF No. 327) Ex. 76, ECF No. 327-76.

## II. Review of NSCA Asset Inventory

Although Stroz believed it had collected everything through its device-based collection efforts, *see* Tr. at 45:6–13, 48:13–16, on December 6, 2018, counsel for CrossFit provided to Stroz several asset inventories that the NSCA had produced.[1]  Final Rep. at 11. The asset inventories listed 538 records, some of which Stroz determined to be duplicates. *Id.* Stroz confirmed that it had imaged or otherwise collected data from devices listed in 225 of the 538 records. *Id.*

On January 14, 2019, counsel for the NSCA confirmed to Stroz that 225 devices had been provided to Stroz and that an additional 17 devices had "[p]ossibly" been provided to Stroz. *Id.* at 12; *see also* ECF No. 319-3. Counsel for the NSCA was "[u]nable to determine" whether devices in 240 of the listed records had been provided to Stroz. Final Rep. at 12; *see also* ECF No. 319-3.

/ / /

---

[1] At the October 22, 2019 hearing, it became clear that these asset inventory logs were actually produced in the State Court Action, *National Strength and Conditioning Association v. Glassman et al.*, No. 37-2016-00014339-CU-DF-CTL (Cal. Super. filed May 2, 2016), and were only produced to CrossFit—and provided to Stroz—in the final months before the completion of Stroz's forensic evaluation. *See* Tr. at 20:6–19, 45:6–46:3, 48:7–24, 60:7–25.

On August 1, 2019, counsel to the NSCA submitted an updated asset inventory in support of its Opposition that claims to have located over 150 of the devices the NSCA previously had been unable to locate. *See* Decl. of Genevieve M. Ruch in Support of the Opp'n ("Ruch Decl.," ECF No. 353-2) ¶ 3; *see also* Ruch Decl. Ex. 1, ECF No. 353-4.

## III. Review and Production of Documents

### A. Documents from the NSCA

After running the Parties' search terms on the 12 Terabytes of data harvested from the NSCA,[2] Stroz ported to a Relativity document review workspace 1,245,070 presumptively relevant documents, consisting of 853,699 direct search term hits plus family members.[3] Final Rep. at 14; *see also* Final Rep. App. F. The NSCA began its review of these documents on November 6, 2018. Final Rep. at 15.

Between November 20, 2018, and January 2, 2019, Stroz produced 218,949 documents to CrossFit. *See id.* After January 2, 2019 and prior to the filing of its Final Report on April 4, 2019, Stroz produced an additional 60,605 documents to CrossFit. *See id.* All told, 279,554 documents were produced to CrossFit as a result of the neutral forensic evaluation prior to the filing of Stroz's Final Report. *Id.* The NSCA also provided privilege and non-responsive logs to CrossFit containing 43,448 and 932,422 entries, respectively. Ruch Decl. ¶ 10.

---

[2] Although the Parties initially agreed to a protocol that provided for collection of data from a list of relevant custodians, *see* Final Rep. at 4, the "NSCA was unable to determine actual relevant custodians and instead identified an extensive list of 'potential' custodians." *Id.* at 8. "In addition, NSCA asset inventory records were inaccurate or incomplete." *Id.* "As such, Stroz recommended, and the Parties agreed to, broadened the collection strategy under the Protocol to collect *every* NSCA-owned computer, mobile device, server, and external storage device, regardless of its primary user." *Id.*

[3] Because the "NSCA was unable to verify that the listed keywords [in Appendix B of the September 2017 Protocol], or even which keywords, were used to produce responsive documents in the proceedings . . . , on April 27, 2018, Stroz and the Parties came to decide on a process for the Parties to propose a reach agreement on a set of keywords to be applied against the differential data set." Final Rep. at 14; *see also* Final Rep. App. D; Tr. at 41:14–21 ("The reason [Stroz] ended up collecting everything wasn't the generosity of a party. It was because of poor record-keeping[ and] . . . inability to give [Stroz] what [it] needed to feel confident that what [it] w[as] collecting was actually the universe.").

Since April 4, 2019, the NSCA has produced an additional 153 documents in response to CrossFit's challenges to the NSCA's non-responsive and privilege logs, 81 documents related to a newly agreed-upon search for documents, and one additional document that had previously been produced. *Id.* ¶ 11. CrossFit has continued to challenge the NSCA's claims of non-responsiveness, privilege, and confidentiality. *Id.* ¶ 15.

### B. Documents from the Editorial Manager System

On January 7, 2019, Stroz received data from the Editorial Manager System, which holds the NSCA's publications and historical data associated with those publications, from the owner of the software, Areis Systems. *See* Final Rep. at 8–9. The data harvested from the Editorial Manager System yielded 93,627 presumptively relevant documents, consisting of 93,586 direct search term hits plus Manuscript Group members. *Id.* at 14; *see also* Final Rep. App. G. Stroz made these documents available for the NSCA to review in Relativity on March 14, 2019. Final Rep. at 14. The NSCA produced 8,645 documents from Editorial Manager following the filing of Stroz's Final Report. Ruch Decl. ¶ 11.

## IV. Stroz's Final and Supplemental Reports

On April 4, 2019, CrossFit filed Stroz's Final Report, *see* ECF No. 319, which was provided to the Parties on April 3, 2019. *See* ECF No. 319-4. In addition to relaying many of the above developments, Stroz relayed its conclusions from its forensic analysis. *See* Final Rep. at 12–13.

Specifically, "Stroz performed forensic analysis to identify devices that may reflect evidence of spoliation through unreasonable wiping or deletion across all collected devices and repositories."[4] *Id.* at 12. Although "Stroz identified no evidence of data wiping on

---

[4] At the hearing, in response to arguments from the NSCA that "Stroz did not describe an in-depth forensic analysis," *see* Tr. at 32:14–15, Stroz clarified that it "conducted [an] in-depth forensic analysis . . . using forensic industry standard tools." Tr. at 40:18–19; *see also id.* at 41:23–24 ("[Stroz] did in-depth forensics on a number of items of media."), 43:4–7 (noting that Stroz conducted "deep forensics . . . on a number of items of media that resulted in the identification of a hundred-and-some-odd documents that are presumptively relevant based on the parties' agreement."). Stroz also clarified that "when [a forensic evaluator] look[s] for evidence of wiping, [it is] looking for the installation of a tool or an application or a technology that [a spoliator] can use to render data unrecoverable," *id.* at 75:21–23, whereas "mass

---

5

any of the collected devices" and "no evidence of deletion of the Exhibit A Documents,"[5] *id.* at 12–13, "Potentially Relevant Documents and mass deletions were identified across some devices."[6]  *Id.* at 13; *see also* Final Rep. App. E.

"Based on the deletion findings, Stroz performed more in-depth analysis of each of the devices to determine potential context for deletions or other related user activity."  Final Rep. at 13.  "While deletion evidence may be related to moving documents to another device or volume, the fact that recoverable and processed data was excluded from [Stroz's] analysis negates this possibility."  *Id.*; *see also* Tr. at 40:25–41:3.

Stroz identified several mass deletion events occurring throughout the pendency of this litigation.  *See* Final Rep. at 13; *see also* Final Rep. App. E.  Overall, Stroz found evidence of 9,107 documents destroyed in seven separate mass deletion events.  *See* Final Rep. at 13; *see also* Final Rep. App. E.  These mass deletion events also resulted in the destruction of 50 presumptively relevant documents.  *Id.*  Another 67 presumptively relevant documents were destroyed in non-mass deletions.  *Id.*

---

deletion is . . . when [an evaluator] look[s] forensically at a drive, sometimes [it] see[s] spikes in activity that [it] can further investigate using forensic techniques to try to figure out what caused that spike, whether it was intentional or not."  *Id.* at 75:24–76:3.

[5] Exhibit A to CrossFit's original motion for sanctions was a "[s]preadhseet drafted by Torrey Smith[, the NSCA's certification director,] containing his notes on documents responsive to CrossFit's discovery requests."  *See* ECF No. 150-2.  Mr. Smith noted that "'CrossFit' Appeared in the **2012** Job Analysis Survey for the CSCS and the NSCA-CPT certifications in a list of credentials under the question 'Which certifications and/or licenses do you current[ly] maintain?  THIS IS THE JOB ANALYSIS REPORT INFORMATION THAT THE NSCA CERTIFICATIONS ARE BUILT FROM (CORE BUSINESS) AND IS CONFIDENTIAL AND PROPRI[E]T[A]RY INFORMATION THAT IS CRITICAL TO THE SUCCESS OF OUR CERTIFICATION PROGRAM – THIS REPORT AND FULL INFORMATION SHOULD NOT BE SHARED WITH ANYONE."  ECF No. 150-3 Ex. A (emphasis in original).  In its May 26, 2017 Order, the Court ordered CrossFit to provide "a copy of this Order to the neutral forensic analyst so that she may search for other instances of the document referenced in Exhibit A—or its deletion—and any surrounding context."  ECF No. 176 at 11.

[6] Although Stroz was able to recover the filenames of the documents appearing in Appendix E to Stroz's Final Report, it was unable to recover the contents of those documents.  *See* Final Rep. at 13 n.9.  Accordingly, a document was considered presumptively relevant if the filename contained one of the key terms to which the Parties agreed.  *See id.*

Following the filing of Stroz's Final Report, CrossFit renewed its request for terminating sanctions on June 20, 2019. *See generally* ECF No. 326. On August 29, 2019, after the close of briefing on the instant Motion, CrossFit filed Stroz's Supplemental Report, *see* ECF No. 379, which was provided to the Parties on August 28, 2019. *See* ECF No. 379-3. The Supplemental Report was meant "to help clarify several points raised by the parties regarding [Stroz's] work performed to date." Supp. Rep. at 1.

In its Supplemental Report, Stroz emphasized that, "[w]hile Stroz did not identify evidence of deletion of the documents referenced in Exhibit A of Plaintiff's Sanction Motion or of the use/installation of wiping utilities, Stroz did identify evidence of mass deletions and deletion of files whose names were responsive to agreed-upon keywords across numerous NSCA devices." *Id.* (citing Final Rep. at 12–13; Final Rep. App. E). Stroz clarified that "the Protocol did not require Stroz to conduct an in-depth deletion analysis of the data harvested from NSCA devices and processed into Relativity. Rather, Stroz agreed to make available to the Parties (in accordance with agreed upon production protocols) all available data, including recoverable deleted files, for the Parties' own review and analysis." *Id.* at 2. "In providing this data, Stroz utilized industry standard and forensically sound processes to extract user documents from forensic images of devices and repositories collected from NSCA." *Id.* "Specifically, [Stroz's] process included recovering available deleted files and maintaining available metadata for each file (including its original location, often referred to [as] a 'Full Path', and timestamps)." *Id.* "Once processed into Relativity, the parties were provided this metadata information for each produced file in specific fields that had been agreed upon by the Parties." *Id.*

Stroz further noted that it "collected approximately 279 NSCA devices and repositories for analysis pursuant to the Protocol," *id.* at 1, upon agreement of the Parties "to broaden the collection strategy under the Protocol to collect every NSCA-owned computer, mobile device, server, and external storage device, regardless of its primary user." *Id.* at 2. This was because the "NSCA was unable to determine actual relevant custodians and instead identified an extensive list of 'potential' custodians" and because

"NSCA asset inventory records were inaccurate or incomplete." *Id.* It was this "expanded collection of devices [that] resulted in an increase in the volume of data that had to be processed, de-duplicated against previously produced documents, searched, and reviewed by the Parties." *Id.* Accordingly, "[t]he costs associated with [Stroz's] work under the protocol is largely due to the NSCA's inability at the outset to help identify the custodians, computer systems and repositories containing potentially relevant information, as required by the Protocol." *Id.*

## LEGAL STANDARD

"Federal Rule of Civil Procedure 37 authorizes the district court, in its discretion, to impose a wide range of sanctions when a party fails to comply with the rules of discovery or with court orders enforcing those rules." *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983). Additionally, district courts have inherent power to "impose sanctions including, where appropriate, default or dismissal." *Thompson v. Hous. Auth. of City of L.A.*, 782 F.2d 829, 831 (9th Cir. 1986) (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626 (1961)). Because dismissal is such a severe remedy, however, it should be imposed only in extreme circumstances, and "only where the violation is 'due to willfulness, bad faith, or fault of the party.'" *In re Exxon Valdez*, 102 F.3d 429, 432 (9th Cir. 1996). To guide its discretion, "a district court should consider a five-part test, with three subparts to the fifth part, to determine whether a case-dispositive sanction" is appropriate. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007). These factors are:

> (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. The sub-parts of the fifth factor are whether the court has considered lesser sanctions, whether it tried them, and whether it warned the recalcitrant party about the possibility of case-dispositive sanctions.

*Id.* (footnotes removed).

14-CV-1191 JLS (KSC)

But "[t]his 'test' is not mechanical. It provides the district court with a way to think about what to do, not a set of conditions precedent for sanctions or a script that the district court must follow." *Id.*

## ANALYSIS

### I. Evidentiary Objections

Each Party has objected to evidence introduced by the other. *See* ECF No. 353-1 ("Def.'s Objs."); ECF No. 376 ("Pl.'s Objs."); ECF No. 385 ("Def.'s Reply Objs."). To the extent possible, the Court has endeavored to rely only on the Final Report submitted by the Court-ordered neutral forensic evaluator and, to the extent necessary, on additional evidence to which neither Party has objected. To the extent the Court has relied on evidence to which objections have been made, those objections are **OVERRULED**; the Court **OVERRULES AS MOOT** the Parties' remaining evidentiary objections.

### II. Terminating Sanctions

CrossFit seeks terminating sanctions on four independent grounds: (1) pursuant to Rule 37(e) for the NSCA's loss of electronically stored information ("ESI")[7]; (2) pursuant to Rule 37(c) for the NSCA's failure to identify all potential witnesses and sources of relevant documents in its initial Rule 26(a) disclosures or to supplement those disclosures

---

[7] This action was filed in May 2014, while the prior version of Rule 37(e) was in effect. *See generally* ECF No. 1. On April 29, 2015, the Supreme Court ordered that the 2015 Amendments to the Federal Rules of Civil Procedure would "take effect on December 1, 2015, and . . . govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending." *See* April 29, 2015 Order re Rules of Civil Procedure, *available at* https://www.supremecourt.gov/orders/courtorders/frcv15(update)_1823.pdf. Further, by statute, "[t]he Supreme Court may fix the extent to which [a proposed] rule [of procedure] shall apply to proceedings then pending, except that the Supreme Court shall not require the application of such rule to further proceedings then pending to the extent that, in the opinion of the court in which such proceedings are pending, the application of such rule in such proceedings would not be feasible or would work injustice, in which event the former rule applies." 28 U.S.C. § 2074(a). Because the Court concludes that application of the current version of Rule 37(e) is feasible and would not result in inequity to either Party, the Court will consider CrossFit's Motion pursuant to the current version of Rule 37(e). *See, e.g.*, *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 496 (S.D.N.Y. 2016); *Epicor Software Corp. v. Alternative Tech. Sols., Inc.*, No. SACV1300448CJCJCGX, 2015 WL 12734011, at *1 (C.D. Cal. Dec. 17, 2015) ("Finding no reason why applying the newly propagated Rule 37(e) would not be 'just and practicable' in the instant case, the Court will apply it here.").

subsequently; (3) pursuant to Rule 37(b) for failure to comply with (a) Magistrate Judge Karen S. Crawford's July 15, 2015 Order re Joint Motion for Determination of Discovery Dispute re Electronic Discovery (ECF No. 59), (b) this Court's May 26, 2017 Order Granting in Part and Denying in Part Motion for Sanctions (ECF No. 176), and (c) this Court's October 19, 2018 Order Setting Scheduling Order (ECF No. 302); and (4) pursuant to the Court's inherent powers. *See generally* ECF No. 337 ("Pl.'s Mem.") at 3, 18–39, 50.

### A.  *Termination Pursuant to Rule 37(e)*

Under Rule 37(e)(2)(C), "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court[,] . . . only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation[,] may . . . dismiss the action or enter a default judgment."

### 1.  *The NSCA Lost ESI*

The first question is whether the NSCA did in fact lose ESI.  *See* Fed. R. Civ. P. 37(e)(2)(C).  ESI is only lost if "it cannot be restored or replaced through additional discovery."  *Id.*  CrossFit contends that the NSCA "irrecoverably lost at least **200 devices** and **196 responsive documents**," *see* Pl.'s Mem. at 19 (emphasis in original); *see also id.* at 19–22.  The NSCA maintains that CrossFit has failed to establish that any information of significance to the remaining issues in this case has been lost because "[t]here is no basis to conclude that the 196 documents are relevant and important to the remaining issues in the case" and CrossFit performed no "analysis whether the [200] devices were duplicate devices, devices where the information was transferred to a new device and preserved, or devices that are outside the relevant time frame and scope but were listed anyway for full transparency and disclosure."  Opp'n at 35.  Further, "many devices that CrossFit claims were lost or destroyed were produced to, and imaged by, Stroz."  *Id.*

/ / /

Although the NSCA attempts to minimize the scope of the ESI losses here, "**[t]he NSCA does not dispute that over 100 presumptively-responsive documents are lost**" or "**that over 100 entire devices are lost**." Reply at 11 (emphasis in original). It is evident that presumptively relevant ESI that cannot be replaced through additional discovery was destroyed, *see, e.g.*, Tr. at 42:2–7, 45:1–2, 46:7–21, and that those losses are egregious.

Lost Devices: The NSCA produced several asset inventories to CrossFit, which list 538 devices. *See* Final Rep. at 11. "Stroz confirmed that [it] has forensically imaged or otherwise collected data from devices named in 225 of those records." *Id.* In January 2019, nineteen months after the Court ordered a forensic evaluation and only three months before Stroz was to submit its Final Report, the NSCA indicated to the Court-appointed, neutral forensic evaluator that it was "[u]nable to determine" whether 240 devices had been provided to Stroz. *See* Final Rep. at 12. The NSCA also indicated that seventeen devices had "possibly" been provided to Stroz; "however, Stroz [wa]s unable to validate this based on the available identifying information for these devices." *Id.* at 12 & n.7.

In its Opposition, filed nearly four months after Stroz submitted its Final Report, the NSCA contends that "many devices that CrossFit claims were lost or destroyed were produced to, and imaged by, Stroz." Opp'n at 35 (citing Decl. of Michael Massik in Support of Opp'n, ECF No. 353-94, ¶¶ 3–8; Decl. of David Newcomb in Support of Opp'n ("Newcomb Decl.," ECF No. 353-97) ¶¶ 6, 8, 12–13, 17–18, 20–22; Decl. of Derrick Guerrero in Support of Opp'n ("Guerrero Decl.," ECF No. 353-89) ¶ 5; Decl. of Virginia Meier in Support of Opp'n, ECF No. 353-95 ¶¶ 6–7; Decl. of Keith Cinea in Support of Opp'n ("Cinea Decl.," ECF No. 353-85) ¶ 7; Decl. of Robert Eggleton in Support of Opp'n, ECF No. 353-88, ¶ 6; Decl. of Shelby Williamson in Support of Opp'n, ECF No. 353-105, ¶ 5; Decl. of Wendy Silva in Support of Opp'n, ECF No. 353-103, ¶¶ 6–8; Decl. of Teresa Schauer in Support of Opp'n, ECF No. 353-102, ¶ 8; Decl. of Lee Madden ("Madden Decl.," ECF No. 353-93) ¶ 5; Decl. of Michael Hobson in Support of Opp'n, ECF No. 353-92, ¶¶ 5, 7; Decl. of Tom Hessek in Support of Opp'n, ECF No. 353-91, ¶ 5; Decl. of Carissa Gump in Support of Opp'n, ECF No. 353-90, ¶ 5; Decl. of Mary-Clare Brennan in

Support of Opp'n, ECF No. 353-81, ¶ 5); *see also* Ruch Decl. Ex. 1.  CrossFit faults "[t]he NSCA's alleged recent discovery of over 150 previously-missing devices identified on its 'updated' asset inventory," noting that "[t]his simple task should have been completed years ago—<u>before</u> the 2017 Sanctions Order, <u>before</u> the completion of the forensic evaluation, and certainly <u>before</u> CrossFit's Renewed Motion."  Reply at 16 (emphasis in original).  CrossFit further notes that the NSCA's identification of these devices has been inconsistent.  *Id.* at 8.  For example, CrossFit notes, *see id.*, two separate declarants each claimed to have been assigned computer BK4CPW1, with one claiming it had been collected by Stroz and the other claiming that it had not been used for normal work and therefore had not been provided to Stroz.  *Compare* Guerrero Decl. ¶ 5 (declaring that BK4CPW1 was collected by Stroz in April 2018 as Nos. ES0120a and ES0120b),[8] *with* Newcomb Decl. ¶ 7 (declaring that BK4CPW1 "was not used for normal work" and "was not collected by Stroz").  Further, CrossFit argues, "[e]ven if this new information were not wholly based upon contradictory declarations by witnesses who have already perjured themselves, the NSCA has given the Court, CrossFit, and the public no reason to trust this belated and self-serving 'evidence.'"  Reply at 9.

The Court must agree.  The Court ordered the forensic evaluation in May 2017.  *See generally* ECF No. 176.  Because the "NSCA was unable to determine actual relevant custodians and . . . NSCA asset inventory records were inaccurate or incomplete," Stroz shifted to a device-based collection strategy in April 2018.  Final Rep. at 8.  Pursuant to the new collection protocol, the NSCA agreed that Stroz would "collect *every* NSCA-owned computer, mobile device, server, and external storage device, regardless of its primary user."  *Id.*  This resulted in the collection of over two hundred devices listed in Appendix B to the Final Report.  *See id.*; *see also* Final Rep. App. B.

/ / /

---

[8] CrossFit further notes that "the asset inventory log that the NSCA previously provided to Stroz . . . shows that ES0120a and ES0120b refer to a device with a completely different serial number: GDVQDH2." Reply at 8–9 (citing ECF No. 319-3 at 3).

Based on this device-based collection strategy, Stroz believed it had collected all potentially relevant devices. *See* Tr. at 48:10–19. At the eleventh hour, however, CrossFit and Stroz learned through asset inventories produced in the State Court Action that there were literally hundreds of additional devices that may not have been imaged despite Stroz's prior collection efforts. *See* Final Rep. at 11; *see also* Tr. at 45:6–19, 48:7–24. Although Stroz provided the NSCA the opportunity to comment, the NSCA was unable to account for at least 240 additional devices before Stroz submitted its Final Report in April 2019.[9] *See* Final Rep. at 12; *see also* ECF No. 319-3; Tr. at 45:20–46:3. The end result is that Stroz was unable to verify that all relevant devices and ESI had been collected. *See* Final Rep. at 12 & n.7; Tr. at 45:6–3, 48:7–24.

Even if the Court could trust the NSCA's belated identification of over 150 of those devices—which, for the reasons discussed above, is difficult—it is too little, too late. The multi-year forensic investigation has closed and, in any event, dozens of devices are still missing. There can simply be no question that the NSCA lost ESI stored on these dozens of unaccounted-for devices. Because entire devices are missing—including devices from the Kraemers, *see* Final Rep. at 9–11; Tr. at 48:25–49:9—it is reasonable to conclude that at least some of this highly relevant ESI cannot be replaced from additional discovery. *See, e.g.*, *HP Tuners, LLC v. Sykes-Bonnett*, No. 3:17-CV-05760-BHS, 2019 WL 5069088, at *4 (W.D. Wash. Sept. 16) (concluding that ESI had been "lost" where the defendant destroyed a flash drive and "there is no way of knowing the extent of the evidence contained on the flash drive and there is nothing in the record to indicate that the information is recoverable"), *report & recommendation adopted as modified*, 2019 WL 5064762 (Oct. 9, 2019); *see also* Pl.'s Mem. at 20 ("[T]hese key custodians stored unique

///

---

[9] Despite these hundreds of missing devices, the NSCA maintained at the October 22, 2019 hearing that, following the association of Noonan Lance Boyer & Banach LLP in August 2017, *see* ECF Nos. 206–08, "the focus was to be full disclosure, full transparency," and "that's why [the NSCA] agreed to all devices, not just the 39 custodians. Over, over a hundred people. Secretaries turned in their phones. Custodians. Everybody turned in their devices. Everybody did." Tr. at 37:13–19.

14-CV-1191 JLS (KSC)

data locally on their devices—data that is not located through another device or source."); Reply at 16–17 (regarding the importance of discovery from the Kraemers).

<u>Lost Documents</u>: Stroz also identified 196 documents that were permanently deleted but whose file names hit upon one or more of the search terms upon which the Parties had agreed. *See* Final Rep. at 12–13; *see also* Final Rep. App. E; Nahama Decl. Ex. 4. The NSCA first contests that any of these documents were "irrecoverably destroyed." Opp'n at 20. Stroz opined, however, that "[w]hile deletion evidence may be related to moving documents to another device or volume, the fact that recoverable and processed data was excluded from [its] analysis negates this possibility." Final Rep. at 13; *see also* Tr. at 40:25–41:3. The NSCA's quibbling over CrossFit's counsel's use of the phrase "irrecoverably destroyed" is therefore a non-starter: Stroz has indicated definitively that the files listed in Appendix E were deleted and not otherwise recoverable. *See* Tr. at 46:7–21 (noting that "the items in the chart on page 13 of [Stroz's] report" are "presumptively . . . relevant" and cannot "be replaced or reconstructed through some means"); *see also* Final Rep. at 12 ("Excluded from this analysis are files, whether deleted or not, whose content was recovered during the harvesting process and made available for review.").

The NSCA further contends that "[t]he fact that a document had a search term 'hit' does not mean that such document is relevant to the litigation," Opp'n at 19, and "[t]here is no basis to conclude that the 196 documents are relevant and important to the remaining issues in the case." *Id.* at 35. For example, the NSCA explains, "[t]here are 20 documents containing the name 'Russell' . . . in the file name on a device belonging to Kathryn Russell," but "[t]hose documents are not related to Russell Berger or Russell Greene, the individuals that the 'russ*' search term was designed to capture." *Id.* at 19. The NSCA contends that many of the other "hits" are "publicly available," may have been produced to CrossFit, or may fall outside "the relevant scope of time (beginning January 1, 2008)." *Id.* at 20.

It is true that some of the 196 presumptively relevant documents listed in Appendix E ultimately may not have proven relevant, but it is also true that some of those documents

may have. *See Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) ("[B]ecause 'the relevance of . . . [destroyed] documents cannot be clearly ascertained because the documents no longer exist,' a party 'can hardly assert any presumption of irrelevance as to the destroyed documents.'") (quoting *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1205 (8th Cir. 1982)) (alterations in original). For example, Stroz identified 853,699 direct search term hits (plus 391,371 family members) from the 11 million documents harvested from the NSCA during the collection process. *See* Final Rep. at 14; *see also* Final Rep. App. F. Following review for relevance and privilege, 279,554 of those documents were produced to CrossFit. *See* Final Rep. at 15. Nearly a quarter of the hits or their family members were therefore produced; it is fair to assume that a similar proportion of the Appendix E hits also may have proven relevant to this litigation. Consequently, there also can be no question that the NSCA lost ESI that could not be replaced with additional discovery in the form of the 196 documents hitting upon the agreed-upon search terms listed in Appendix E. *See* Final Rep. at 12–13 (indicating that 196 presumptively relevant documents had been deleted and were not otherwise recoverable); Tr. at 46:7–21 (same).

The Court therefore concludes that CrossFit has demonstrated that the NSCA lost relevant ESI that cannot be recovered or replaced with additional discovery.

### 2. *The NSCA Did Not Take Reasonable Steps to Preserve ESI*

Next, the Court must determine whether the NSCA took reasonable steps to preserve the lost ESI. *See* Fed. R. Civ. P. 37(e)(2)(C). CrossFit urges that the NSCA failed to take reasonable steps to preserve this lost ESI because "[t]he NSCA did not institute *any* written litigation hold until March 2018—<u>four years after inception of this lawsuit</u>, and not until years after *many* additional preservation triggers, including . . . the Court's 2017 Sanctions Order." Pl.'s Mem. at 22–23 (emphasis in original) (footnotes omitted). The NSCA protests that it did institute reasonable steps to preserve relevant ESI, citing to deposition testimony from Mr. Cinea that the NSCA verbally informed employees not to delete emails or documents related to this lawsuit on May 15, 2014, days after this lawsuit was filed. Opp'n at 32–33 (citing Ruch Decl. Ex. 14 at 274:11–19; Ruch Decl. Ex. 15 at 724:20–

725:1, 725:7–25, 726:5–727:4).  CrossFit notes that the NSCA does not dispute "that it failed to modify its Microsoft Exchange default settings and failed to institute a written litigation hold until **March 2018**."  Reply at 13 (emphasis in original).

The Court concludes that the NSCA did not take reasonable steps to preserve relevant ESI.  Although this action was filed on May 12, 2014, *see generally* ECF No. 1, there is no evidence in the record that the NSCA issued a written litigation hold to its employees until March 2, 2018.[10]  *See* ECF No. 311-26 at 462:15–17.  Instead, the NSCA relies on the testimony of Mr. Cinea about an all staff meeting allegedly held on May 15, 2014, at which the NSCA claims to have verbally instructed employees not to delete "anything relating to the lawsuit."  *See* Opp'n at 32–33 (citing Ruch Decl. Ex. 14 at 274:11–19; Ruch Decl. Ex. 15 at 724:20–725:1, 725:7–25, 726:5–727:4)).  Not only is such a verbal instruction insufficient to meet the NSCA's preservation obligations, *see Mfg. Automation & Software Sys., Inc. v. Hughes*, No. CV 16-8962-CAS (KSX), 2018 WL 5914238, at *7 (C.D. Cal. Aug. 20, 2018) (concluding that spoliator failed to take reasonable steps to preserve relevant documents where it "never issued any written litigation hold directive to [the plaintiff] group employees, but simply told them verbally to save documents"), but the Court views Mr. Cinea's testimony with some skepticism.

On June 30, 2017, in response to the Court's May 27, 2017 Order, Mr. Cinea signed a declaration under penalty of perjury that he "ha[d] not destroyed any servers, information on servers, or documents regarding Crossfit or that [he] underst[oo]d to be relevant to this action."  ECF No. 189-3 ¶ 4.  Between December 2 and 8, 2016, however, prior to signing his declaration of June 30, 2017, Mr. Cinea deleted six presumptively relevant documents whose file names hit on terms such as interval training, high intensity, and power training. *See* Final Rep. App. E; *see also* Nahama Decl. Ex. 4.  On September 5, 2017, only a couple

---

[10] There are vague references in the NSCA's briefing and at oral argument to other litigation holds.  *See, e.g.*, Opp'n at 33 ("[T]here were other litigation hold letters."); Tr. at 29:5–30:3.  But "other possible communications that could count as a legal hold [are] not in the record and [are] insufficient."  Tr. at 54:13–19.

of months after signing his declaration, Mr. Cinea also deleted a pdf entitled "CrossFit_ The Good Fight – YouTube." *Id.*  Because Mr. Cinea himself destroyed presumptively relevant documents—including after the Court's May 27, 2017 Order sanctioning the NSCA and after filing his declaration on June 30, 2017—the Court has little confidence that Mr. Cinea did instruct, or was capable of instructing, NSCA staff on their duty to preserve documents relevant to this litigation.

The NSCA also claims that "[t]he immense volume of data retrieved, including the number of devices that were imaged and the time period covered by the documents preserved, confirm that the preservation efforts were not only reasonable but that they worked."  Opp'n at 33.  But this ignores the massive losses of ESI identified by Stroz, *see* Final Rep. at 11–13; *see also* Final Rep. App. E, and discussed above, *see supra* Section II.A.1, which bolster the conclusion that the NSCA's long-standing failures to implement a formal litigation hold or modify its document retention policies were unreasonable.

Accordingly, the Court concludes that CrossFit has demonstrated that the NSCA failed to take reasonable steps to preserve ESI.  *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 998 (N.D. Cal. 2012) ("By failing to do as little as issue a litigation hold notice to any employees for eight months after its preservation duty arose, and by further delaying issuance of litigation hold notices to several key custodians, the Court finds that [the plaintiff] acted with not just simple negligence but rather conscious disregard of its duty to preserve.").

### 3. *The NSCA Acted with the Requisite Intent*

Finally, the Court must determine whether the NSCA "acted with the intent to deprive [CrossFit] of the information's use in th[is] litigation."  *See* Fed. R. Civ. P. 37(e)(2)(C).  CrossFit argues that it is clear that the NSCA acted with the requisite intent because "over **33,000 responsive documents were moved to deleted items folders during the pendency of this lawsuit**."  Pl.'s Mem. at 24 (emphasis in original) (citing Decl. of Chris G. Haley in Support of Mot. ("Haley Decl.," ECF No. 328) ¶ 24); *see also* / / /

Reply at 13.[11]  The NSCA counters that CrossFit has not proven by clear and convincing evidence that the NSCA acted with the intent to deprive CrossFit of using the lost ESI, while the NSCA's voluntary agreement to expand the scope of the Stroz collection and "[t]he fact that the NSCA actually preserved and produced all relevant data over a 10-year time period dating back to January 1, 2008, is strong evidence that the NSCA did not act with the intent to deprive CrossFit of any relevant information."  Opp'n at 37.  CrossFit responds that, "[t]ellingly, of the 23 new declarations submitted by the NSCA[,] **not a single NSCA employee declared that he or she never attempted to destroy responsive documents**."  Reply at 14 (emphasis in original).

As a preliminary matter, the NSCA contends that CrossFit must prove its intent by clear and convincing evidence, *see* Opp'n at 36–37 (citing *Lokai Holdings LLC v. Twin Tiger USA LLC*, No. 15cv9363 (ALC) (DF), 2018 WL 1512055 (S.D.N.Y. Mar. 12, 2018); *CAT3, LLC*, 164 F. Supp. 3d at 499), whereas CrossFit disputes it must meet such a standard.  *See* Reply at 14 n.61 (citing *Hugler v. Sw. Fuel Mgmt., Inc.*, No. 16 CV 4547-FMO (AGRx), 2017 WL 8941163, at *10 (C.D. Cal. May 2, 2017).  Prior to the 2015 Amendment to Rule 37(e), it appears that this District applied a preponderance-of-the-evidence standard.  *See Gen. Atomic Co. v. Exxon Nuclear Co.*, 90 F.R.D. 290, 296 (S.D. Cal. 1981).  The NSCA relies on non-published and non-binding authorities to support its proposition that, "after the 2015 Amendment to Rule 37(e), several courts have held that intent to deprive another of using information must be proved by clear and convincing evidence."  Opp'n at 36 (citing *Lokai Holdings LLC*, 2018 WL 1512055; *CAT3, LLC*, 164 F. Supp. 3d at 499).  But at least one district court within the Ninth Circuit applying the amended version of Rule 37(e) has indicated that "[t]he applicable standard of proof

---

[11] This deletion analysis was undertaken by Chris G. Haley, the Director of Legal Technology at Troutman Sanders eMerge LLC.  *See generally* Haley Decl.  Not surprisingly, the NSCA objects strenuously to his analysis.  *See, e.g.*, Opp'n at 15–18; ECF No. 353-1 at 20–47.  Although the Court would be inclined to conclude that the Haley Declaration—which undoubtedly bolsters a finding of the NSCA's intent to deprive CrossFit of the lost ESI—is admissible, the Court ultimately concludes that the Haley Declaration is not necessary to support its conclusion.

for spoliation motions in the Ninth Circuit is the preponderance of evidence." *OmniGen Research v. Yongqiang Wang*, 321 F.R.D. 367, 372 (D. Or.) (citing *Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1052–53 (S.D. Cal. 2015); *LaJocies v. City of N. Las Vegas*, No. 2:08-CV-00606-GMN, 2011 WL 1630331, at *1 (D. Nev. Apr. 28, 2011)), *appeal dismissed*, No. 17-35519, 2017 WL 6507124 (9th Cir. Oct. 5, 2017). The Court therefore concludes that the preponderance-of-the-evidence standard continues to apply.

Whatever the applicable standard, however, it is clear that CrossFit has met it here: CrossFit adequately has demonstrated that the NSCA acted with intent to deprive CrossFit of the lost ESI. "A party's destruction of evidence can be considered willful or in bad faith when the party had notice that the evidence was potentially relevant to litigation before it was destroyed." *HP Tuners, LLC*, 2019 WL 5069088, at *4 (citing *Leon*, 464 F.3d at 959). A review of the NSCA's discovery misconduct reveals that this is such a case.

Here, CrossFit filed its initial complaint on May 12, 2014, *see generally* ECF No. 1, and its initial requests for production in June 2014. *See* ECF No. 32-4 Ex. 1. Among other things, CrossFit requested "[a]ll documents and communications referring or relating to CrossFit," *id.* at 8, and "[a]ll documents and communications concerning the Devor Study." *Id.* at 9. On August 27, 2014, acting on a joint motion filed by the Parties, *see* ECF No. 13, Magistrate Judge Crawford ordered that "[t]he relevant time period for collection and production of documents is January 1, 2008[,] through the date the Complaint was filed" and that the "Parties shall preserve data from as early as January 1, 2008[,] to the extent such data still exists on an active data source and subject to the exception" for privileged data.[12] ECF No. 17 ¶ 22. Magistrate Judge Crawford also ordered that "[p]reservation of potentially relevant ESI shall be reasonable and proportionate" and that "[t]he Producing Party shall take reasonable steps to collect and process documents using methods that avoid

---

[12] The relevant time period established by Magistrate Judge Crawford further undermines the NSCA's argument that some of the unaccounted-for devices are not relevant because they "dat[e] back to 2010." *See* Tr. at 33:12–13.

spoliation of data." *Id.* ¶ 23. Finally, Magistrate Judge Crawford ordered that "[t]he parties will endeavor to produce documents in a reasonably timely manner." *Id.* ¶ 45.

But as of December 2014, the NSCA had produced only approximately 300 documents in response to CrossFit's initial requests for production. *See* ECF No. 32 at 3. Because the NSCA "had not adequately addressed the apparent gaps in the documents that were produced," ECF No. 59 at 8, Magistrate Judge Crawford granted CrossFit's "request for an order compelling 'transparency' in the discovery process." *Id.* at 2. As a result, she ordered the NSCA to, among other things, "provide plaintiff with declarations by defense counsel and defendant's representative(s) stating under penalty of perjury that all documents responsive to plaintiff's document requests have been produced 'to the best of the person's knowledge, information and belief formed after a reasonable inquiry.'" *Id.* at 10 (quoting Fed. R. Civ. P. 26(g)).

As of May 26, 2017, however, the NSCA had produced only 439 documents. Nahama Decl. ¶ 12.[13] After CrossFit discovered that the NSCA had withheld relevant and responsive documents, the Court imposed various sanctions and ordered the NSCA to pay for a neutral forensic evaluation of its servers. *See generally* ECF No. 176. The Court-appointed neutral forensic evaluator ran the keywords to which the Parties agreed on twelve Terabytes of data harvested from the NSCA, yielding 1,245,070 presumptively relevant documents, comprised of 853,699 direct hits on the search terms plus family members. *See* Final Rep. at 14. Among these were 66,614 direct hits for the terms "crossfit," "cross fit," "xfit," and "x fit," and 5,621 direct hits for "Devor Article" and "Devor Study." *See* Final Rep. App. F. As of the conclusion of the Court-ordered neutral forensic evaluation, the NSCA had produced an additional 279,554 documents. *See* Final Rep. at 15. Further,

/ / /

---

[13] When the Court asked the NSCA's counsel at the October 22, 2019 hearing whether it "concede[d] that NSCA produced less than 450 documents as of May, 2017," counsel responded that he "was not involved in the case" at that time and therefore "d[id]n't have personal knowledge." *See* Tr. at 3315–22. The Court therefore accepts as true Mr. Namaha's testimony, to which the NSCA did not object.

there remain questions as to the completeness of this production. *See, e.g.*, Tr. at 14:2–8, 14:23–25, 17:4–6, 20:3–5, 45:6–46:3, 48:7–49:9, 72:21–24.

Not only is it clear that the NSCA knowingly and repeatedly resisted producing documents that were irrefutably relevant to this litigation, but the forensic evaluation also uncovered evidence that the NSCA *destroyed* presumptively relevant documents and engaged in mass deletions across numerous devices during the pendency of this litigation. *See* Final Rep. at 13. In fact, Stroz was unable to recover over 100 documents whose filenames hit on the Parties' agreed-upon search terms. *See id.*; *see also* Final Rep. App. E; Nahama Decl. Ex. 4. Among these were pdfs titled "CrossFit_ The Good Fight – YouTube" and "Cambio, Todd M. Crossfit." Final Rep. App. E; Nahama Decl. Ex. 4. Stroz also noted several mass deletion events *during the pendency of this litigation—* including *after the May 26, 2017 Order imposing sanctions*—some of which resulted in the deletion of presumptively relevant documents. *See* Final Rep. at 13; *id.* App. E.

In short, the NSCA has been on notice since 2014 that documents pertaining to CrossFit and the Devor Study are relevant to this litigation; nonetheless, there is no evidence that the NSCA implemented a formal litigation hold until March 2, 2018. *See* ECF No. 311-26 at 462:15–17. In the meantime, the NSCA long withheld clearly responsive documents and—during CrossFit's interminable battle to obtain those documents—the NSCA's employees continuously deleted presumptively relevant documents, including some that contained the term "CrossFit" *in the filename*. Under such circumstances, "[the NSCA]'s resistance to preserving [presumptively relevant ESI] supports the reasonable inference that Defendant[] acted with the *intent* to deprive [CrossFit] of the use of the [ESI]." *See Hugler*, 2017 WL 8941163, at *10 (emphasis in original); *see also HP Tuners, LLC*, 2019 WL 5069088, at *4 (defendant intentionally spoliated flash drive where he "was aware[] that the information on the flash drive was relevant, that he was obligated to preserve the evidence and that he was required to produce the flash drive" and, "[d]espite being aware of these facts, [the defendant] intentionally destroyed the flash drive"); *OmniGen Research*, 321 F.R.D. at 372 (defendants

intentionally spoliated ESI when one of its employees "intentionally deleted over 200 files from his Lenovo laptop, at least 44 of which were not recoverable," and at least some of the documents had filenames "that are most certainly relevant to this litigation"); Tr. at 56:1–4 ("It takes an intentional effort . . . to move items to deleted items folders.").

### 4. *CrossFit Has Been Prejudiced*

The NSCA intimates that terminating sanctions are inappropriate because CrossFit cannot establish that it has been prejudiced. *See* Opp'n at 18–23. But CrossFit need not establish prejudice where, as here, the Court has concluded that the NSCA acted with intent to deprive CrossFit of the lost ESI, *see supra* Section II.A.3:

> Subdivision (e)(2) does not include a requirement that the court find prejudice to the party deprived of the information. This is because the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position. Subdivision (e)(2) does not require any further finding of prejudice.

Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment.

In any event, the Court concludes that CrossFit has demonstrated that it has been prejudiced by the loss of ESI here. As but one example, CrossFit notes that "ESI from the Kraemers' NSCA-owned devices"—ESI that "is central to CrossFit's ability to prove the NSCA's liability . . . , and its request for damages"—"were 'factory reset' and/or withheld from the forensic evaluation." Pl.'s Mem. at 25–26; *see also* Reply at 17 ("CrossFit's inability to review ESI from the primary devices of [the Kraemers] directly prejudices its ability to prove the scope of the . . . damages to CrossFit."); Tr. at 48:25–49:9. Of course the loss of the Kraemers' ESI is prejudicial to CrossFit,[14] and—to reiterate—this is but one example of the abundance of potentially relevant ESI that was lost here.

---

[14] The importance of the Kraemers' devices is underscored by the fact that the NSCA disclosed only two witnesses in its Rule 26(a) disclosures: Dr. Kraemer and Mr. Cinea. *See* Tr. at 18:15–20.

Because CrossFit has established that the NSCA intended to and did deprive CrossFit of ESI relevant to this litigation and because the five factors the Ninth Circuit has articulated for considering imposing terminating sanctions weigh in favor of termination, *see infra* Section II.D, the Court concludes that termination is appropriate and therefore **GRANTS** CrossFit's Motion to the extent it seeks termination pursuant to Rule 37(e)(2). *See, e.g.*, *OmniGen Research*, 321 F.R.D. at 377.

### B. *Termination Pursuant to Rule 37(c)*

Pursuant to Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Further, "the court, on motion and after giving an opportunity to be heard . . . may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)–(vi)." Fed. R. Civ. P. 37(c)(1)(C).

CrossFit contends that termination pursuant to Rule 37(c) is appropriate because the NSCA failed "to (i) identify all potential witnesses and sources of relevant documents in its initial Rule 26(a) disclosures, and (ii) supplement its initial disclosures with additional potential witnesses and documents." Pl.'s Mem. at 28 (footnote omitted) (citing Fed. R. Civ. P. 37(c)(1)(C)). The NSCA counters that it "did not fail to provide information or identify a witness as required by FRCP Rule 26(a) or (e)," Opp'n at 38, because "the NSCA was only required to identify those witnesses and documents that it might use to defend itself," *id.* (citing Fed. R. Civ. P. 26(a)(1)(A)(i)), and "[t]he NSCA met this burden." *Id.* The NSCA adds that "the additional witnesses and documents [identified by Stroz] are not witnesses or documents that the NSCA intends to use on the remaining issues at trial." *Id.* at 39.

The NSCA is correct that Rule 26(a) required it to disclose only those "individual[s] likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i). Given the NSCA's admission that it does not intend to use any witnesses

14-CV-1191 JLS (KSC)

not listed in its initial disclosure, *see* Opp'n at 39, the Court determines that the NSCA did not violate either Rule 26(a) or Rule 26(e). Accordingly, the Court **DENIES** CrossFit's Motion to the extent it seeks sanctions pursuant to Rule 37(c). *See, e.g.*, *Myers ex rel. Myers v. United States*, No. 02CV1349-BEN(AJB), 2004 WL 7323087, at *3 (S.D. Cal. Nov. 22, 2004) (denying sanctions where party conceded in opposition that it had no intent to use witnesses not disclosed under Rule 26(a)(1)(A)(i) in support of its defenses at trial because that party "was not obligated to . . . identify [two witnesses] under Fed. R. Civ. P. 26(a)(1)").

## C.    *Termination Pursuant to Rule 37(b)*

Under Rule 37(b)(2)(A), "[i]f a party . . . fails to obey an order to provide or permit discovery . . . , the court where the action is pending may issue further just orders." Such orders "may include . . . striking pleadings in whole or in part; . . . dismissing the action[;] or . . . rendering default judgment against the disobedient party." Fed. R. Civ. P. 37(b)(2)(A)(iii), (v)–(vi). "[W]here the drastic sanctions of dismissal or default are imposed, . . . the losing party's noncompliance must be due to willfulness, fault, or bad faith." *Computer Task Grp., Inc. v. Brotby*, 364 F.3d 1112, 1115 (9th Cir. 2004) (quoting *Payne v. Exxon Corp.*, 121 F.3d 503, 507 (9th Cir. 1997)) (internal quotation marks omitted). "The willfulness standard is met by disobedient conduct that is within the offending party's control." *Fab Films, LLC v. JP Morgan Chase Bank, N.A.*, No. CV 16-1722 PSG (SSX), 2017 WL 1287675, at *2–3 (C.D. Cal. Feb. 28) (citing *Stars' Desert Inn Hotel & Country Club, Inc. v. Hwang*, 105 F.3d 521, 525 (9th Cir. 1997); *In re Visioneering Const.*, 661 F.2d 119, 121 (9th Cir. 1981)), *report and recommendation adopted*, 2017 WL 1276945 (Apr. 4, 2017).

CrossFit asks the Court to enter default judgment against the NSCA for its "fail[ure] to comply with multiple discovery orders throughout this matter, including (i) the Court's 2015 Discovery Order, ordering the NSCA's full and complete document production; (ii) the Court's 2017 Sanctions Order, requiring the NSCA to file declarations of

/ / /

24

compliance; and (iii) the Court's October 2018 Scheduling Order, requiring the NSCA to complete production of documents by January 2, 2019." Pl.'s Mem. at 29–30.

### 1. The 2015 Discovery Order

On July 15, 2015, Magistrate Judge Crawford ordered the NSCA to provide CrossFit with declarations (1) identifying "[t]he process of processes used by defendant to locate documents and information responsive to plaintiff's document requests, including but not limited to the search terms and/or date ranges used," ECF No. 59 at 9; (2) "explain[ing] . . . why defendant believe[d] the processes used . . . were reasonable under the circumstances," *id.*; (3) outlining "[t]he document retention policies and/or practices being applied by the key custodians and entities," *id.*; (4) "explain[ing] . . . any apparent gaps in the documents and information produced," *id.*; and (5) "stating under penalty of perjury that all documents responsive to plaintiff's document requests have been produced 'to the best of the person's knowledge, information and belief formed after a reasonable inquiry.'" *Id.* at 10 (quoting Fed. R. Civ. P. 26(g)). CrossFit contends that "[t]he NSCA failed to comply with this order" as evidenced by the NSCA's production of only 439 documents prior to the Court's imposition of sanctions on May 26, 2017, *see* Pl.'s Mem. at 30 (citing Haley Decl. ¶ 29; Nahama Decl. ¶ 12), compared to the identification of over 1.3 million presumptively relevant documents during the course of the forensic evaluation, including over 37,900 de-deduplicated documents containing variations of the terms "CrossFit" and "Devor." *Id.* (citing Final Rep. at 15; Haley Decl. ¶ 19).

The NSCA counters that it has "substantially complied" with Magistrate Judge Crawford's July 15, 2015 Order because "[t]he Stroz Forensic evaluation encompassed each item the Court ordered the NSCA to address." Opp'n at 42–43. CrossFit responds that "the NSCA cannot shift its Court-ordered discovery obligations onto Stroz" and adds that "[t]he NSCA remains in violation of the 2015 Discovery Order" because "the Forensic Evaluation did not include the requisite sworn declaration by NSCA custodians 'as to why defendant believes the processes used to locate and product documents and information in

/ / /

response to plaintiff's document requests were reasonable under the circumstances.'" Reply at 18 (quoting ECF No. 59 at 9).

The Court-ordered forensic evaluation revealed the true extent of the NSCA's failure to abide by Magistrate Judge Crawford's July 15, 2015 Order. Essentially, Magistrate Judge Crawford's Order "compell[ed] 'transparency' in the discovery process . . . to ensure disclosure of all documents and information responsive to [CrossFit's] documents requests." ECF No. 59 at 2. Unfortunately, that Court-ordered transparency remains elusive—to CrossFit, to the Court, and even to the NSCA itself.

For example, Magistrate Judge Crawford ordered the NSCA to provide a declaration containing "the search terms . . . used to locate documents." *Id.* at 9. Time and again, the NSCA has purported to provide such a list and, with each iteration, it has become more doubtful that such a list ever existed. In its overview of the NSCA's search and collection efforts, Stroz noted that the NSCA's Senior Director of Technology, Wayde Rivinius, "ha[d] not provided the search queries" used for the NSCA's searches of the Office 365 platform and had been "unable to provide" the queries used to search Jira and Confluence. Final Rep. at 5. Mr. Rivinius informed Stroz that the NSCA's IT department had developed scripts "to search the desktops, servers, and archive backups," but "Mr. Rivinius was unable to provide these scripts." *Id.* Additionally, "[c]urrent NSCA employees developed an XML file containing search criteria extracted from the various Requests for Production," but "log files recorded by the scripts . . . were not provided to Stroz." *Id.* at 6. Mr. Rivinius also noted an initial collection process at the behest of Mr. Cinea "for individuals to perform specific searches across their files," although "Mr. Rivinius [wa]s unsure if any direct instructions or protocols were provided to those individuals advising them how to perform those searches" and "[n]o system-wide searches involving IT staff occurred at that time." *Id.* at 6–7. Stroz requested that the NSCA provide a list of search terms that the NSCA had used in both this and the State Court Action, but the "NSCA was unable to verify that the listed keywords, or even which keywords, were used to produce responsive documents in the proceedings." *Id.* at 14; *see also* Final Rep. App. B. Consequently,

14-CV-1191 JLS (KSC)

"Stroz and the Parties came to decide on a process for the Parties to propose and reach agreement on a set of keywords to be applied." Final Rep. at 14; *see also* Final Rep. App. D.

The NSCA's actions with regard to its purported search terms have been the antithesis of transparency. Rather than candidly concede that it could not confirm its search terms in August 2015 (when the NSCA presumably provided the declarations ordered by Magistrate Judge Crawford), or in late 2017 (when purporting to provide search terms to Stroz as part of the protocol for the forensic evaluation), the NSCA has led CrossFit and the Court through four years of obfuscation and, perhaps, perjury. The Court therefore concludes that the NSCA has repeatedly and willfully failed to comply with Magistrate Judge Crawford's July 15, 2015 Order.

### 2. *The 2017 Sanctions Order*

In its May 26, 2017 Order, the Court ordered the NSCA, "under penalty of perjury, [to] acquire declarations from all relevant NSCA personnel either (a) assuring or reaffirming that no documents relevant to this litigation have been destroyed or (b) admitting to any destruction." ECF No. 176 at 10. CrossFit argues that "[n]ot only did the NSCA omit multiple 'relevant NSCA personnel,' [but] the forensic evaluation discovered that the NSCA compliance declarants who swore they had <u>not</u> deleted anything[] in fact deleted **7,900 documents—<u>1,500</u>** of which contained either 'CrossFit' or 'Devor.'" Pl.'s Mem. at 31 (emphasis in original) (citing Haley Decl. ¶ 25). CrossFit therefore urges that "**[t]he NSCA's perjurious compliance declarations are independently sufficient grounds to terminate this case**." *Id.* at 32 (emphasis in original) (citing *Lee v. Max Int'l, LLC*, 638 F.3d 1318, 1322 (10th Cir. 2011)).

The NSCA responds that it did not violate the Court's May 26, 2017 Order because "[t]he forensic analysis is completed, including a forensic analysis well beyond what was set forth in the Sanctions Order," "[t]he NSCA paid the costs of that forensic analysis," and "[t]he NSCA submitted the required employee declarations that made the required statements." Opp'n at 41 (citing ECF Nos. 178–178-8, 189–189-13).

27

It matters naught that the NSCA's employees "made the required statements"—under penalty of perjury—in the Court-ordered compliance declarations if those employees then spoliated the very documents they had assured CrossFit and the Court had not been destroyed. CrossFit's evidence, which the NSCA fails adequately to negate, is appalling. For example, CrossFit argues that Appendix E to Stroz's Final Report "shows that 50 'Potentially Relevant Documents' were destroyed by three compliance declarants." Reply at 18. Appendix E reveals that Carwyn Sharp deleted thirty-nine presumptively relevant documents between November 2015 and October 2017, both before and after filing his compliance declarations on June 9 and 30, 2017, *see* ECF Nos. 178-7, 189-12; Mr. Cinea deleted six presumptively relevant documents in December 2016, and—most troubling—a pdf entitled CrossFit_ The Good Fight – YouTube on September 5, 2017, shortly after filing his compliance declaration on June 30, 2017, *see* ECF No. 189-3; and Mr. Madden deleted three presumptively relevant documents on November 2, 2017, after filing his compliance declarations on June 9 and 30, 2017.[15] *See* ECF Nos. 178-3, 189-6. Other presumptively relevant documents from Appendix E were from the NSCA's local files or external drives, rendering it impossible for CrossFit or the Court to determine whether any of the compliance declarants were responsible for their deletion.[16] *See generally* Final Rep.

---

[15] The NSCA argues that the majority of the presumptively relevant documents listed in Appendix E to Stroz's Final Report are non-responsive, publicly available, or not relevant to the issues remaining in this case. *See* Opp'n at 18–21. The documents deleted by Dr. Sharp, for example, largely appear to be pdfs of journal articles. *See* Final Rep. App. E; *see also* Nahama Decl. Ex. 4. As CrossFit notes, however, it is impossible to say with any certainty that these files—which the NSCA has destroyed—do not contain relevant information, such as handwritten notes. *See* Reply at 13. This is why the documents are *presumptively* relevant: the documents hit upon the keywords to which the Parties agreed and, because "'the relevance of . . . [destroyed] documents cannot be clearly ascertained because the documents no longer exist,' a party 'can hardly assert any presumption of irrelevance as to the destroyed documents.'" *Leon*, 464 F.3d at 959 (quoting *Alexander*, 687 F.2d at 1205). Further, because the Court concluded that the NSCA destroyed the documents with intent to deprive CrossFit of them, *see supra* Section II.A.3, the relevance of those documents is presumed. *See supra* Section II.A.4.

[16] To be clear, the deletion of the documents in Appendix E is troubling whether or not committed by a compliance declarant; their deletion by compliance declarants is rendered exponentially more consequential by virtue of the declarants' assurances—under penalty of perjury—that they had not knowingly destroyed any relevant documents.

App. E; *see also* Nahama Decl. Ex. 4.  And, of course, Appendix E contains only those files that were destroyed but whose filenames Stroz succeeded in recovering; consequently, it is entirely possible that those documents represent only the tip of the spoliation iceberg. Although Mr. Cinea and Mr. Madden each signed a declaration in support of the NSCA's Opposition, neither addresses the deletion of the presumptively relevant documents identified in Appendix E to Stroz's Final Report.  *See generally* Cinea Decl.; Madden Decl. The NSCA did not even file a declaration from Dr. Sharp.  *See generally* ECF No. 353.

CrossFit also notes that "752 . . . documents were destroyed by compliance declarant Lee Madden in a 'Mass Deletion Event' on November 2, 2017—months <u>after</u> the 2017 Sanctions Order and <u>during</u> the Forensic Evaluation."[17]  Reply at 18 (emphasis in original) (citing Final Rep. at 13).  Although Mr. Madden filed a declaration in support of the NSCA's Opposition, he fails to address the mass deletion event identified by Stroz.  *See generally* Madden Decl.

The Court therefore concludes that CrossFit has introduced evidence that the NSCA has repeatedly and willfully failed to comply with the Court's May 26, 2017 Order by filing multiple declarations falsely affirming that no documents relevant to this litigation had been destroyed and by continuing to destroy presumptively relevant documents following the filing of those declarations.

### 3.  The October 2018 Scheduling Order

Finally, CrossFit contends that "the NSCA has repeatedly failed to comply with multiple scheduling orders—most recently, the Court's October 19, 2018 Order."  Pl.'s Mem. at 32.  Specifically, on October 19, 2018, the Court ordered the "NSCA to complete document review, serve privilege logs, and turn documents over to CrossFit" by January 2, 2019.  ECF No. 302 at 26.  CrossFit contends that, "[b]etween January 2, 2019, and

---

[17] Unidentified individuals deleted nearly 6800 documents from an NSCA external drive on January 21, and March 2, 2016.  *See* Final Rep. at 13.  Again, the Court cannot rule out that these deletions were also committed by or at the behest of any of the compliance declarants, although the Court reiterates that their deletion is troublesome in either event.

[June 20, 2019], the NSCA has belatedly produced over 69,400 documents; 19,500 privilege log entries; and 260,400 'non-responsive log' entries." Pl.'s Mem. at 32 (citing Nahama Decl. ¶ 80; Haley Decl. ¶ 34).

The NSCA contends that it did not violate the Court's October 19, 2018 Order because "the vast majority of the documents (58,275 of the over 69,400 documents produced after January 2, 2019) were duplicative email threads." Opp'n at 41. Although "CrossFit did not agree that the NSCA could use email threading to filter out and not produce the duplicative emails contained within the complete email threads," *id.* at 42, the NSCA produced the approximately 242,000 duplicative documents on January 28, 2019. *Id.* (citing Ruch Decl. ¶ 17). CrossFit responds that, although the content of the belatedly produced documents themselves may not have been new, "[e]ach email that the NSCA produced after January 2, 2019, contains unique metadata—the very type of metadata that evidences the NSCA's attempt to destroy over 33,000 documents." Reply at 18 (citing Haley Reply Decl. ¶ 15). Consequently, "[t]he NSCA's attempt to withhold valuable metadata on approximately 242,000 documents through email threading violates the Forensic Protocol and multiple discovery orders, including the 2018 Scheduling Order." *Id.*

The Court ordered the NSCA to "complete its review of the documents" and "turn [the] documents over to CrossFit" on or before January 2, 2019. *See* ECF No. 302 at 26, 27. The Court did not carve out an exception for "duplicative" documents, *see generally id.*, nor—as the NSCA itself concedes, *see* Opp'n at 42—did CrossFit agree to the NSCA's use of "email threading." Instead, the NSCA produced those documents several weeks later, on January 28, 2019, *see* Ruch Decl. ¶ 17, eating into CrossFit's narrow review window.[18] *See* ECF No. 302 at 26.

/ / /

---

[18] To be clear, the Court does not fault the NSCA for its failure to produce the Editorial Manager System documents until after January 2, 2019, given that Stroz was unable to make those documents available to the NSCA for review until March 14, 2019. *See* Final Rep. at 14.

14-CV-1191 JLS (KSC)

Although the NSCA's failure to abide by the Court's October 19, 2018 Scheduling Order may not itself merit terminating sanctions, it further bolsters an already extensive record of the NSCA's repeated and willful failure to comply with the other discovery Orders and deadlines detailed above. *See supra* Sections II.C.1–2. Viewing this evidence cumulatively, the Court concludes that CrossFit has demonstrated the NSCA's repeated and willful failure to comply with its Court-ordered discovery obligations. Accordingly, the Court **GRANTS** CrossFit's request for termination pursuant to Federal Rule of Civil Procedure 37(b). *See, e.g.*, *Wyle*, 709 F.2d at 590 (affirming district court's issuance of terminating sanctions where "[s]ufficient evidence support[ed] the district court's finding that [the plaintiff], through [its counsel], willfully failed to comply with discovery orders"); *see also Reddy v. Gilbert Med. Transcription Serv., Inc.*, 467 F. App'x 622, 624 (9th Cir. 2012) ("The district court did not abuse its discretion by imposing terminating sanctions under Fed. R. Civ. P. 37(b)(2) based on [the plaintiff]'s willful and repeated violations of the court's discovery orders after the court had imposed monetary sanctions and warned [the plaintiff] of the possibility of terminating sanctions.").

## D. Termination Pursuant to the Court's Inherent Powers

The Court also may issue terminating sanctions pursuant to its inherent powers. *See Thompson*, 782 F.2d at 831. As discussed above, *see supra* at pages 7–8, and in the Court's May 26, 2017 Order, *see* ECF No. 176 at 6, the Ninth Circuit has laid out a five-part test for courts to consider in determining whether case-dispositive sanctions are appropriate:

> (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. The sub-parts of the fifth factor are whether the court has considered lesser sanctions, whether it tried them, and whether it warned the recalcitrant party about the possibility of case-dispositive sanctions.

*Conn. Gen. Life Ins. Co.*, 482 F.3d at 1096 (footnotes removed).

/ / /

In its May 26, 2017 Order, the Court found that the first four factors weighed in favor of terminating sanctions, *see* ECF No. 176 at 8–9, but that the fifth factor—the availability of less drastic sanctions—"weigh[ed] slightly against termination sanctions, but only because all of Defendant's misconduct was discovered in one moment." *Id.* at 9–10. The Court therefore "conclude[d] that it [wa]s well within its discretion to award terminating sanctions" but "decline[d] to do so at th[at]s time." *Id.* at 10. The Court warned, however, that, "[i]f at the conclusion of the neutral forensic evaluation it appears that documents have been destroyed, or that the discovery misconduct is substantially greater than the scope of which Plaintiff is currently aware, Plaintiff [would be] granted leave to renew its Motion for Terminating Sanctions and present the newly discovered evidence." *Id.* at 11 (emphasis omitted).

CrossFit now renews its prior motion, arguing "there is no question that all five factors weigh heavily in favor of termination." Pl.'s Mem. at 34. The NSCA appears to contest only the third and fifth factors, *see generally* Opp'n at 43–44; Reply at 5, as well as the Court's authority to issue terminating sanctions. *See generally* Opp'n at 43.

### 1. The Court's Authority to Terminate Pursuant to Its Inherent Powers

As an initial matter, the NSCA contends that "the Court cannot impose terminating sanctions based on its inherent authority" based on a party's loss of discoverable ESI. Opp'n at 43 (citing Fed. R. Civ. P. Adv. Comm. Notes (2015); *Newberry v. Cnty. of San Bernadino*, 750 Fed. App'x 534, 537 (9th Cir. 2018); *Small v. Univ. Med. Ctr.*, No. 2:13-cv-0298-APG-PAL, 2018 WL 3795238, at *66 (D. Nev. Aug. 9, 2018)). On reply, CrossFit rejoins that "Rule 37(e) applies *only* to termination based on lost ESI," meaning "the Court may still exercise its inherent authority to assess whether termination is warranted due to the NSCA's other misconduct," including "concealment, perjury, attempted evidence destruction, and discovery order violations." Reply at 4 (emphasis in original).

The Court agrees with CrossFit that it may terminate this action under its inherent powers for discovery misconduct unrelated to the loss of ESI. *Cf. Hugler*, 2017 WL

8941163, at *8 (disagreeing that the 2015 Amendments to Rule 37(e) foreclose reliance on inherent authority because "[i]t is an irrefutable principle of law that the Supreme Court's authority cannot be limited by a body such as the Advisory Committee" and "it would be poor public policy to require the courts to rely solely upon the Rules to address improper conduct such as spoliation of evidence by the parties appearing before them," but noting that "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power") (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991)) (citing *CAT3, LLC*, 164 F. Supp. 3d at 497–98).

### 2. Prejudice to CrossFit

The NSCA next argues that CrossFit cannot establish that it has been prejudiced because "there is no showing that CrossFit cannot present its damages theory to the jury" and "lesser drastic sanctions exist to cure the claimed prejudice." Opp'n at 44. CrossFit responds that it will be prejudiced by having to re-do years of discovery, motion practice, and trial preparation. Reply at 9–10.

The Court concludes that CrossFit has established prejudice as a result of the NSCA's discovery misconduct. *See also supra* Section II.A.4. CrossFit filed this action in May 2014, *see generally* ECF No. 1, over five years ago. On the eve of the March 23, 2017 final pretrial conference, *see* ECF No. 129, CrossFit discovered that the NSCA had failed to produce relevant documents and filed its prior motion for terminating sanctions. *See generally* ECF Nos. 150, 153. As of the Court's May 26, 2017 Order, the NSCA had produced only 439 documents. Nahama Decl. ¶ 12. As a result of the Court-ordered neutral forensic evaluation, the NSCA has produced an additional 279,554 documents. Final Rep. at 15. But, as the Ninth Circuit has long cautioned, "[l]ast-minute tender of documents does not cure the prejudice to opponents nor does it restore to other litigants on a crowded docket the opportunity to use the courts." *N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986) (citing *G-K Props. v. Redev. Agency*, 577 F.2d 645, 647–48 (9th Cir. 1978)).

Further, the Court finds compelling CrossFit's arguments that the NSCA's conduct will "require CrossFit—*over five years into this case and after already incurring exorbitant costs*—to depose or re-depose NSCA representatives (many of whom are no longer with the company and have limited memory of events occurring in 2013 and 2014), re-file dispositive motions, re-conduct expert discovery, and re-prepare for trial." Reply at 10 (emphasis in original) (footnote omitted). Not only does CrossFit still not have all relevant documents, but its prior depositions and expert testimony will have to be revisited, if not entirely redone. Further, "[t]he NSCA's tactical delays have successfully resulted in the loss of evidence that CrossFit could have more accurately collected five years ago." *Id.* at 10 n.41. Specifically, the Court finds persuasive CrossFit's arguments that certain witnesses and their memories are no longer readily available. CrossFit contends, for example, that key witnesses, such as Dr. Sharp, have left the NSCA during the pendency of this litigation, meaning that "CrossFit will now have to subpoena non-parties who would have been readily available to CrossFit but for the NSCA's misconduct." *Id.* CrossFit also introduces evidence to support its fears that "witnesses' memories [are now] significantly impaired," such as Dr. Kraemer's increased inability to recall details between his July 15, 2015, and December 11, 2018 depositions. *Id.* Such destruction of non-ESI evidence as a result of the repeated discovery misconduct and delay can, indeed, suffice to establish prejudice. *See, e.g.*, *Horn v. California*, No. CIV 05-814 MCE KJM, 2008 WL 4500187, at *1 (E.D. Cal. Oct. 6) ("[D]elay itself generally is prejudicial—witness memories fade and evidence becomes stale or undiscoverable."), *report & recommendation adopted*, 2008 WL 5142959 (Dec. 8, 2008).

The NSCA attempts to sidestep these issues, contending that "the only [issue] left after the application of [the Court's May 26, 2017] issue sanctions is damages," which means CrossFit would "not [be] starting from scratch." *See* Tr. at 24:19–22; *see also id.* at 63:2–13, 65:11–66:2. The NSCA also claims that "there is no evidence whatsoever . . . that there was a loss of data that goes to [CrossFit's corrective advertising] damages model." *Id.* at 67:14–16; *see also id.* at 66:8–68:11. But CrossFit contests the NSCA's

analysis, noting that "there'[re] still issues relating to liability" that were not addressed by the Court's May 26, 2017 issue sanctions, *see id.* at 71:24–72:1, and that CrossFit's "theory on damages is [not] limited to corrective advertising," *id.* at 72:6–7, which "is only one component" among such others as lost revenue. *Id.* at 72:18–19. In its moving papers, CrossFit identified additional discovery based on the documents produced through the forensic evaluation that it considers necessary to establish its damages. *See* Pl.'s Mem. at 43–44.

The Court also shares CrossFit's concerns that, "[g]iven the extensive perjury to date, the evidence supplied by the NSCA will also be inherently untrustworthy." Reply at 10. As the Court previously noted, "[t]here is no point to a lawsuit . . . if it merely applies law to lies." ECF No. 176 at 9 (quoting *Valley Eng'rs Inc.*, 158 F.3d at 1051). Neither CrossFit nor the Court nor the public can trust the veracity of further discovery collected from the NSCA. The Court therefore concludes that CrossFit has established that it will suffer prejudice absent termination.

### 3. *Availability of Less Drastic Sanctions*

Finally, the NSCA maintains that "lesser drastic sanctions exist . . . , such as CrossFit being able to designate additional experts so that CrossFit can present its damages theory to the jury." Opp'n at 44. CrossFit responds that lesser sanctions have proven ineffective given escalations in the NSCA's misconduct following the Court's prior issuance of sanctions. *See* Reply at 8–9.

The Court imposed a harsh and wide variety of sanctions in its prior Order. *See generally* ECF No. 176 at 10–14. The Court has therefore both considered and tried lesser sanctions. *See Conn. Gen. Life Ins. Co.*, 482 F.3d at 1096. Further, the Court made abundantly clear its belief that "it [wa]s well within its discretion to award terminating sanctions" on the record as it existed in May 2017, ECF No. 176 at 10; nonetheless, the Court "decline[d] to do so at th[at] time," in part because there was then "no indication that the NSCA ha[d] actually destroyed evidence." *Id.* The Court therefore denied CrossFit's motion for terminating sanctions without prejudice, *id.* at 14, and explicitly granted

CrossFit leave to renew its request for terminating sanctions "[i]f at the conclusion of the neutral forensic evaluation it appear[ed] that documents ha[d] been destroyed, or that the discovery misconduct [wa]s substantially greater than the scope of which Plaintiff [wa]s currently aware." *Id.* at 11. Consequently, the NSCA has long been on notice "about the possibility of case-dispositive sanctions." *See Conn. Gen. Life Ins. Co.*, 482 F.3d at 1096.

But those lesser sanctions and warnings have proven ineffective. Whether out of spite or incompetence, the NSCA repeatedly obstructed Stroz's forensic evaluation, unable or unwilling to identify custodians, search terms, and devices. *See* Final Rep. at 5–12. Stroz discovered mass deletions and deletions of presumptively relevant documents occurring even after the Court imposed lesser sanctions in May 2017. *See id.* at 12–13. Meanwhile, the NSCA refuses to take accountability, instead misrepresenting Stroz's findings and blaming its prior counsel.[19]

---

[19] For example, the NSCA claims throughout its Opposition that "Stroz found 'no evidence of data wiping on any of the collected devices' and 'no evidence of deletion of the Exhibit A Documents.'" *See, e.g.*, Opp'n at 1 (quoting Final Rep. at 12–13); *see also* Tr. at 63:20–64:2. But the NSCA selectively omits that "Potentially Relevant Documents and mass deletions were identified across some devices." Final Rep. at 13.

The NSCA also claims that "prior counsel[] fail[ed] to properly advise the NSCA about collecting and producing the responsive documents that existed." Opp'n at 33; *see also id.* at 49 ("As a result of its prior counsel's substantial and meaningful failures, the NSCA initially did not comply with some of its discovery obligations and this Court awarded CrossFit meaningful issue and adverse inference sanctions."). The NSCA notes that it "took the Sanctions Order very seriously" and "hired new counsel." *Id.* at 11. But CrossFit is correct that "[t]he NSCA cannot avoid responsibility for its misconduct by blaming its first defense counsel." Reply at 9 n.38 (citing *In re Fitzsimmons*, 920 F.2d 1468, 1472 n.3 (9th Cir. 1990)). Moreover, prior counsel "cannot be blamed for the perjury, destruction, and attempted destruction by key NSCA witnesses," and the NSCA has engaged in a pattern of concealment and destruction of evidence across several lawsuits. *See id.; see also Nat'l Strength & Conditioning Ass'n v. Glassman*, No. 37-2016-00014339-CU-DF-CTL (Cal. Super. filed May 2, 2016); *Potterf v. Nat'l Strength & Conditioning Ass'n*, No. 14CV3293 (Ohio C.P. Franklin Cnty. filed Mar. 26, 2014).

In any event, the record belies the claim that "the big difference, the line of demarcation in this case is when the Noonan Lance law firm got involved and . . . from that point in time, the focus was to be full disclosure, full transparency." Tr. at 37:12–15. Noonan Lance formally appeared in this action in August 2017. *See* ECF Nos. 206–08. Nonetheless, mass deletions and deletions of potentially relevant documents continued to occur after that date. *See* Final Rep. at 13; Final Rep. App. E. And despite Noonan Lance's assertion that "[e]verybody turned in their devices. Everybody did," *see* Tr. at 37:18–19, Stroz emphasized that "there was a lot of lack of clarity about what was out there and what wasn't," *id.* at 45:19–

---

The Ninth Circuit has long recognized that "[d]ismissal is appropriate where a 'pattern of deception and discovery abuse made it impossible' for the district court to conduct a trial 'with any reasonable assurance that the truth would be available.'" *Valley Eng'rs Inc.*, 158 F.3d at 1057–58 (quoting *Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 352 (9th Cir. 1995)). Although the Court had hoped that lesser sanctions would provide reasonable assurance that this action could be resolved fairly on the merits, the NSCA's continued "discovery violations [have] ma[d]e it impossible for [the C]ourt to be confident that the parties will ever have access to the true facts." *See id.* at 1058. Because there can no longer be assurance of proceeding on the true facts, termination is appropriate. *See, e.g.*, *id.* The Court therefore **GRANTS** CrossFit's Motion to the extent it seeks terminating sanctions pursuant to the Court's inherent powers.

## III. Evidentiary Sanctions

Because "[t]he NSCA's concealment and spoliation prevents CrossFit from fairly proving its damages without additional experts . . . , CrossFit requests that the Court issue evidentiary sanctions against the NSCA by permitting CrossFit to submit its damages evidence, including new and additional expert reports, through unopposed briefing in lieu of an evidentiary hearing." Pl.'s Mem. at 39. Specifically, CrossFit requests that the Court order the following evidentiary sanctions: "1. NSCA may not contest the admissibility, authenticity, foundation, or relevance of any documents produced to CrossFit by Stroz, including CrossFit's expert's analysis of the same" and "2. Based upon the NSCA's withholding of documents and information related to its marketing efforts, CrossFit is not

---

20, culminating in the discovery only months before Stroz filed its Final Report that there were "potentially other sources of media . . . out there that [Stroz] didn't have access to," *see id.* at 45:15–18, and that Stroz "[ha]d never seen." *See id.* at 48:19–21. Stroz also indicated to the Court that, although the NSCA may have been "cooperat[ive]," it "got a lot of misinformation both while [it] w[as] onsite and characterization of information since." *See id.* at 44:18–22.

To be clear, the Court does not attribute these shortcomings to Noonan Lance; as CrossFit aptly notes, it is "[t]he NSCA—not its numerous law firms—[that] is the common denominator and the true bad actor." *See* Reply at 9 n.38. The point is that the record does not support that the NSCA is a "litigant that got the message" following the Court's May 26, 2017 Order. *See* Tr. at 38:6.

14-CV-1191 JLS (KSC)

required to separate the causal effects of the NSCA's lawful marketing efforts from those of the NSCA's unlawful marketing efforts." Decl. of Justin Nahama in Support of Reply ("Nahama Reply Decl.") Ex. 129, ECF No. 370-23

The NSCA protests that CrossFit's "damages must be established by CrossFit in an evidentiary proceeding in which the NSCA has the opportunity to contest the amount." Opp'n at 46 (citing *Greyhound Exhibitgrp., Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992)). CrossFit responds that "[w]hile defaulting parties are *generally* entitled to participate in a damages hearing, the NSCA is much worse than a defaulting party who simply failed to show up; it is an affirmative wrongdoer that engaged in a five-year marathon of malfeasance." Reply at 11.

CrossFit cites a single, nonpublished, out-of-circuit decision, *O'Connor v. Powell*, No. 99 C 6582, 2000 WL 1230459 (N.D. Ill. Aug. 23, 2000), to support its contention that the Court may prohibit the NSCA from introducing evidence disputing the amount of damages to which CrossFit is entitled. *See* Pl.'s Mem. at 39–40. Although the Court may be well within its discretion to grant the relief CrossFit seeks, the Court ultimately concludes that the weight of authority supports allowing the NSCA the opportunity to contest CrossFit's damages evidence. *See, e.g.*, *Rubicon Glob. Ventures, Inc. v. Chongqing Zongshen Grp. Imp./Exp. Corp.*, 226 F. Supp. 3d 1141, 1147 (D. Or. 2016) ("Even though there is disagreement regarding a defaulting party's right to notice of a damages hearing, courts generally agree that a defaulting party has 'the right to participate in such a hearing.' . . . This does not mean the defaulting party may present evidence going solely to liability, but she 'may cross-examine the opposing witnesses and introduce evidence on [her] own behalf in *mitigation of the damages*.'") (second alteration and emphasis in original) (quoting B. Finberg, *Defaulting Defendant's Right to Notice and Hearing as to Determination of Amount of Damages*, 15 A.L.R.3d 586 (1967)) (citing *Henry v. Sneiders*, 490 F.2d 315, 318 (9th Cir. 1974); *Oire Or. C, LLC v. Yaldo*, No. CV 08-724-ST, 2008 WL 5071709, at *1 (D. Or. Nov. 25, 2008)). The Court therefore **DENIES** CrossFit's request for evidentiary sanctions.

## IV. Issue Sanctions

CrossFit maintains that, "if the NSCA is not prohibited from opposing CrossFit's damages evidence, CrossFit maintains that specific issue and evidentiary sanctions related to damages are necessary." Reply at 11 (citing Nahama Reply Decl. Ex. 129). CrossFit requests eight specific issue sanctions related to damages. *See* Nahama Reply Decl. Ex. 129. Although the NSCA did not respond directly to the requested issue sanctions at the October 22, 2019 hearing, counsel did indicate its belief that the May 26, 2017 sanctions sufficed. *See, e.g.*, Tr. at 36:11–24.

In light of its above analysis, *see supra* Section III, the Court concludes that additional issue sanctions concerning CrossFit's damages are warranted here. The Court therefore **AWARDS** the following issue sanctions:

1. It is taken as established that the NSCA's unfair competition and false advertising—including its false statements in the Devor Article, Erratum, Hak Study, various TSAC Report articles about CrossFit, content promoted at NSCA events referencing CrossFit-related injuries, and republication of these false statements—have deceived and continue to deceive the public and consumers regarding the safety and effectiveness of CrossFit training;

2. It is taken as established that the NSCA's unfair competition and false advertising—including its false statements in the Devor Article, Erratum, Hak Study, various TSAC Report articles about CrossFit, content promoted at NSCA events referencing CrossFit-related injuries, and republication of these false statements—caused a decline in CrossFit's seminar revenue in the military, United States, and international fitness markets;

3. It is taken as established that the NSCA's unfair competition and false advertising—including its false statements in the Devor Article, Erratum, Hak Study, various TSAC Report articles about CrossFit, content promoted at NSCA events referencing CrossFit-related injuries, and republication of these false statements—were willful and malicious;

4. It is taken as established that the NSCA's unfair competition and false advertising—including its false statements in the Devor Article, Erratum, Hak Study, various TSAC Report articles about CrossFit, any content promoted at NSCA events referencing CrossFit-related injuries, and republication of these false statements—have increased NSCA revenue, growth, and goodwill, while injuring CrossFit's revenue, growth, and goodwill;

5. It is taken as established that the NSCA's unfair competition and false advertising were a material cause of CrossFit's damages; and

6. It is taken as established that CrossFit's efforts to combat, correct for, and mitigate the misinformation spread through the NSCA's false advertising, including references to the false injury data, were reasonable, appropriate, and not a material cause of CrossFit's damages.

## V. Monetary Sanctions

Finally, CrossFit contends that "[t]he NSCA's misconduct warrants monetary sanctions under three independent grounds." Pl.'s Mem. at 44. "First, under Rule 37(b)(2)(C), the Court 'must order the disobedient party . . . to pay the reasonable expenses, including attorney's fees, cause by the failure [to obey an order to provide or permit discovery]'" and "[u]nder Rule 37(c)(1)(A) the Court 'may order payment of the reasonable expenses, including attorney's fees, caused by the failure [to provide full and complete disclosures pursuant to Rule 26(a) or (e) or to supplement those disclosures.'" Pl.'s Mem. at 44 (alterations in original) (emphasis in original) (quoting Fed. R. Civ. P. 37(b)(2)(C), (c)(1)(A)). "Second, Rule 26(g)(3) requires the Court to issue an 'appropriate sanction' that 'may include an order to pay the reasonable expenses, including attorney's fees.'" Pl.'s Mem. at 44 (emphasis in original) (quoting Fed. R. Civ. P. 26(g)(3) (citing *Rodman v. Safeway*, No. 11-CV-03003-JST, 2016 WL 5791210, at *3–4 (N.D. Cal. Oct. 4, 2016)). "Third, beyond these specific Rule-based sanctions, the Court has the inherent power to issue monetary sanctions for expenses and fees to redress abusive litigation and

///

40

other bad-faith practices." *Id.* (emphasis in original) (citing *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997)).

Specifically, CrossFit seeks $3,997,868.66 plus any additional fees incurred after August 22, 2019,[20] as monetary sanctions for the following: $485,846.03 incurred in bringing two affirmative motions for summary judgment (ECF Nos. 38, 74); $325,359.16 incurred for bringing various joint motions to compel (*see, e.g.*, ECF Nos. 25, 30, 57, 70); $129,651.58 incurred to oppose the NSCA's motion for summary judgment (ECF No. 102); $106,290.50 incurred to oppose the NSCA's motion to reopen expert discovery (ECF No. 215); $603,859.11 incurred in depositions of the NSCA's witnesses conducted prior to the Court's May 26, 2017 Order imposing sanctions; $219,685.52 expended to obtain the opinions and depositions of CrossFit's experts prior to the Court's May 26, 2017 Order imposing sanctions; $79,539.51 expended to obtain the opinions and depositions of the NSCA's experts prior to the Court's May 26, 2017 Order imposing sanctions; $486,956.66 incurred for trial preparation before the Court's May 26, 2017 Order; $99,346.25 incurred to oppose the NSCA's motion for reconsideration of the Court's May 26, 2017 Order (ECF No. 186); $203,060.68 expended on the Court-ordered forensic evaluation; $211,885.87 expended on depositions of NSCA witnesses concerning evidence preservation, collection, and production; $67,666.37 incurred to challenge the NSCA's improper and overly broad confidentiality designations; and $441,609.65 incurred as of May 31, 2019, and $537,111.77 incurred as of August 22, 2019, for work performed in connection with the instant Motion. *See* Pl.'s Mem. at 45–50; Reply at 19.

The NSCA concedes that CrossFit is entitled to attorneys' fees "incurred solely because of the misconduct," *i.e.*, fees that CrossFit "would not have incurred but for the bad faith." Opp'n at 47 (quoting *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. ___, 137 S. Ct. 1178, 1183–84 (2017)). The NSCA contends, however, that at least some

---

[20] $3,460,756.89 as of the filing of CrossFit's Motion, *see* Pl.'s Mem. at 50, plus an additional $537,111.77 as of the filing of its Reply. *See* Reply at 19.

14-CV-1191 JLS (KSC)

portion of CrossFit's requested fees are not recoverable because "either they would have been incurred even in the absence of the NSCA's deficient document production or are excessive." *Id.* (citing *Goodyear*, 137 S. Ct. at 1183–84). Specifically, the NSCA claims that $2,946,646.09 expended on CrossFit's motions for summary judgment, CrossFit's motions to compel and confidentiality challenges, the NSCA's motion for summary judgment, the NSCA's motion to reopen expert discovery, pre-sanctions depositions of the NSCA's witnesses, pre-sanctions discovery concerning CrossFit's and the NSCA's experts, pre-sanctions trial preparation, and the instant Motion. *Id.* at 48–49. The NSCA also challenges an additional $254,255.43 related to billing entries that contain nonrecoverable tasks or insufficient detail to determine whether the claimed cost is recoverable, fail to note the time allocated to a recoverable item, or reflect general litigation work that would have been preformed in any event. *See id.* at 49.

CrossFit responds that it would not "have engaged in [any of the] work [for which fees are requested] *if it had known* that the NSCA was withholding over 279,000 documents" and argues that the NSCA "ignores that [it]'s misconduct and misrepresentations about its spoliation have 'vastly increase[d] the cost of litigation by drawing out deadlines and necessitating motion practice.'" Reply at 20 (emphasis in original) (quoting *Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 631 (2d Cir. 2018)). CrossFit adds that, "[i]f the Court is inclined to reduce block-billed entries, it should appropriately reduce **only those specific entries**." *Id.* (emphasis in original).

It is clear that additional monetary sanctions are warranted; the question is in what amount. At the hearing, *see* Tr. at 17:12–19, the Court noted that the Supreme Court has recognized that, "[i]n exceptional cases, the but-for standard even permits a trial court to shift all of a party's fees, from either the start or some midpoint of a suit, in one fell swoop," such as where "the district court could reasonably conclude that all legal expenses in the suit 'were caused . . . solely by [the sanctioned party's] fraudulent and brazenly unethical efforts.'" *Goodyear*, 137 S. Ct. at 1187–88 (quoting *Chambers*, 501 U.S. at 58). The Court asked each Party whether this is such a case. *See* Tr. at 17:19–30, 36:25–37:8.

Not surprisingly, CrossFit advocated that it is, *see id.* at 17:21–19:5, 57:8–61:21, while the NSCA disagreed. *See id.* at 37:9–38:19. Specifically, CrossFit argued that "every step of this case was poisoned by the NSCA's decisions from inception." *See id.* at 18:11–12. For example, "in response [to CrossFit's discovery requests], the NSCA withheld evidence, withheld documents, [and] didn't give accurate or correct answers." *Id.* at 58:3–5. "In fact, the NSCA concealed the existence of an entire marketing department." *Id.* at 58:8–9. Consequently, CrossFit proceeded to take depositions with a limited knowledge of relevant witnesses and on a record of only 439 documents, meaning CrossFit "didn't depose the right people" and "didn't ask the right questions." *See id.* at 58:5–13. The NSCA's withholding of relevant documents, in turn, led "CrossFit [to] spend[] a ton of money trying to compel and []force the NSCA to meet its discovery obligations, all to no avail." *Id.* at 58:15–17. Then "CrossFit ha[d] to twice move for summary judgment on falsity . . . because the tons of documents that [it] would have relief on were not produced," thereby rendering "it immeasurably more expensive, immeasurable more difficult." *Id.* at 58:20–59:1. CrossFit "also had to defend against the NSCA's motion for summary judgment," a "motion [that] would have never been filed and [CrossFit] would never have had to oppose . . . had [withheld] documents [listing CrossFit as the NSCA's number-one competitor] been produced." *Id.* at 59:2–9. Then came "expert discovery," but CrossFit could not "even realize how far [it] ha[d] been damaged because [it] didn't receive the spreadsheet showing the spread of the Devor article and what [the NSCA] w[as] tracking and how [it] w[as] leveraging it until this year." *Id.* at 59:10–16. CrossFit then prepared for the mandatory settlement conference before Magistrate Judge Crawford and trial "on a record of 439 documents, perjury, and incomplete deposition testimony." *See id.* at 59:17–60:1. It was only at that point that the NSCA's prior discovery misconduct was revealed, *see id.* at 59:18–24, which resulted in the Court-ordered forensic evaluation, "during [which the NSCA's] misconduct not only continue[d]; it escalate[d]." *See id.* at 60:2–3. Specifically, "[t]he NSCA [did]n't know what its search terms were. It [did]n't know who its custodians were. It [did]n't know where its documents are. It [did]n't even

14-CV-1191 JLS (KSC)

know which devices it has." *Id.* at 60:3–6. CrossFit also engaged in "another round of expert discovery," during which additional discovery misconduct came to light, including the NSCA "using documents the[ NSCA] withheld from [CrossFit] but provided to [its] own expert," thereby prompting additional discovery disputes before Magistrate Judge Crawford. *See id.* at 60:1–6. In short, according to CrossFit, "[e]very single stage of this litigation has been infected by the NSCA's seeming unwillingness to stop being a recalcitrant litigant and to litigate this case on a fair record," as a result of which "[t]here is no aspect of this case that has not been corrupted by the[ NSCA's] misconduct." *See id.* at 60:12–17.

The NSCA, on the other hand, contends that it cooperated fully once its prior counsel, Noonan Lance, substituted in:

> the big difference, the line of demarcation in this case is when the Noonan Lance law firm got involved and . . . , from that point in time, the focus was to be full disclosure, full transparency. That's why the[ NSCA] agreed to all devices, not just the 39 custodians. Over, over a hundred people. Secretaries turned in their phones. Custodians. Everybody turned in their devices. Everybody did.

*Id.* at 37:12–19. As a result, "[t]his has been a full-disclosure case where everything was turned over. That's why so much was preserved. That's why [Stroz collected] the [12] Terabytes." *Id.* at 37:25–3. The NSCA therefore urges that it "got the message" and that this litigation got on the right track:

> here's a litigant that got the message, hired new counsel, turned over every available device that they had from every employee at the place, turned over [12] Terabytes of information, and what's the message that they still get terminat[ing] sanctions . . . ? How is that message to the public and the judiciary? The question becomes, what could they have done? Yes, they should have done a lot better before Noonan Lance got involved. Absolutely. But Noonan Lance took your sanctions Order seriously, turned over all that data and everybody's devices. What else could they have done?

*Id.* at 38:6–16.

For the reasons discussed above, *see, e.g.*, *supra* Sections II.A, II.C–D, the Court concludes that the only message that can be conveyed on this record is that this is the sort of "exceptional case[]" that was defended "in complete bad faith, so that every cost of [litigating it once the obstructionism began] is attributable to sanctioned behavior." *See Goodyear*, 137 S. Ct. at 1187–88. Accordingly, "all legal expenses . . . [CrossFit seeks] 'were caused . . . solely by [the NSCA's] fraudulent and brazenly unethical efforts.'" *See id.* at 1187–88 (quoting *Chambers*, 501 U.S. at 58). The Court therefore concludes that it is appropriate to grant CrossFit the fees it seeks "in one fell swoop," *see id.* at 1187, with due consideration of the NSCA's challenges to the reasonableness of the requested fees and the block-billed entries. *See* Opp'n at 49.

The Court has carefully reviewed the declarations and timesheets submitted by counsel for CrossFit—Troutman Sanders LLP, *see* ECF Nos. 331, 346-1–2, 364, 374, and Troutman Sanders eMerge, *see* ECF Nos. 334, 346-3–4, 367, 375; Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, *see* ECF Nos. 332, 346-5–6, 365; and Latham & Watkins LLP, *see* ECF Nos. 333, 346-7–8, 366—and finds the requested fees to be reasonable and reasonably incurred under the circumstances. The NSCA does not challenge any of the hourly rates charged, *see* ECF No. 353-1 at 72–104, which were below the billers' standard hourly rates, and "declarations of plaintiff's counsel can be sufficient to establish the reasonable market rate where the defendant does not oppose or challenge the asserted rates." *De La Riva Const., Inc. v. Marcon Eng'g, Inc.*, No. 11-CV-52-MMA DHB, 2014 WL 794807, at *5 (S.D. Cal. Feb. 27, 2014); *see also United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990) ("Affidavits of the [fee-seeking party's] attorney and other attorneys regarding prevailing fees in the community . . . are satisfactory evidence of the prevailing market rate.") (citing *Chalmers v. City of L.A.*, 796 F.2d 1205, 1214 (9th Cir. 1986)). Further, the hourly rates charged are consistent with the Court's experience regarding the rates charged in the San Diego community and those found reasonable for other national, high-caliber law firms practicing complex civil litigation in this District. *See, e.g.*, *LG Corp. v. Huang Xiaowen*, No. 16-CV-1162 JLS

(NLS), 2017 WL 3877741, at *2–3 (S.D. Cal. Sept. 5, 2017) (finding reasonable hourly rates between $140 to $890 for work by "international . . . firm with numerous accolades" in patent matter); *Lobaton v. City of San Diego*, No. 3:15-CV-1416-GPC-DHB, 2017 WL 3622248, at *3 (S.D. Cal. Aug. 22, 2017) (finding reasonable hourly rate of $825 for highly experienced attorneys) (collecting cases); *Zest IP Holdings, LLC v. Implant Direct Mfg., LLC*, No. 10-CV-0541-GPC WVG, 2014 WL 6851612, at *5–6 (S.D. Cal. Dec. 3, 2014) (finding reasonable hourly rates between $170 and $895 for work by "multi-state/national law firm" in patent matter).

The Court also contends that, given the circumstances, the hours expended here were reasonable. The NSCA contends, for example, that the amounts CrossFit seeks for preparing the instant Motion is "excessive, unreasonable, and must be substantially reduced based on FRCP 37(b)(2)(C) and (c)(1)(A)." Opp'n at 49. Based on the Court's calculation, it appears that 2904 hours were billed in fully briefing the instant Motion. *See* ECF No. 364-1 at 65 (731 hours); ECF No. 367-1 at 35 (752.5 hours); ECF No. 374-1 at 5, 15, 19, 23, 30, 35 (1070.6 hours); ECF No. 375-1 at 2, 4–5, 8–9,11 (349.9 hours). Although a staggering number of hours, review of the billing entries corroborates the scope of this undertaking, which culminated in the filing of—literally—thousands of pages of legal memoranda, declarations, and exhibits. *See* ECF Nos. 326–37, 359–67, 369–77. Indeed, in addition to researching and writing the instant Motion, CrossFit's counsel had to comb through the nearly 300,000 documents the NSCA had only recently produced. Given the Herculean task of preparing the instant Motion, the Court finds that the number of hours expended—shocking as it is—is reasonable given the circumstances. The same is true for the other tasks for which CrossFit seeks to recover its fees through the instant Motion.

Finally, the NSCA challenges certain entries for work that is block-billed, not recoverable or would have been performed anyway, or provides insufficient detail. *See* Ruch Decl. Ex. 27–29. Given the Court's conclusion that every cost CrossFit seeks to recover through the instant Motion is attributable to the NSCA's bad faith, the Court determines that the NSCA's challenges to recoverability and block billing are without

merit. Further, CrossFit has provided the Court with unredacted billing statements that provide sufficient detail for the Court to conclude that the costs incurred were, in fact, reasonable. Accordingly, the Court **AWARDS** CrossFit monetary sanctions in the form of attorneys' fees in the amount of $3,997,868.66.

## CONCLUSION

As indicated at the October 22, 2019 hearing, in twenty-five years on the bench, "[t]his is the first case that [the Court] ha[s] ever had that has gotten to this point." *See* Tr. at 77:16–19. This is a "serious, momentous issue" that the Court does not take lightly. *See id.* at 78:4, 79:15–18. Having carefully considered the record, "[t]he severity and frequency of defendant['s] bad faith misconduct is as egregious as anything this [C]ourt has ever seen or read in any of the cases." *See Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, No. CV126972FMOJEMX, 2015 WL 12732433, at *46 (C.D. Cal. Dec. 14, 2015). Because the NSCA's pervasive "discovery violations 'threaten to interfere with the rightful decision of the case,'" *Valley Eng'rs Inc.*, 158 F.3d at 1057 (quoting *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 (9th Cir. 1990)), the Court **GRANTS IN PART** and **DENIES IN PART** CrossFit's Motion (ECF Nos. 326, 359). Specifically, the Court:

1.  **GRANTS** CrossFit's request for terminating sanctions under Federal Rule of Civil Procedure 37(b);

2.  **DENIES** CrossFit's request for terminating sanctions pursuant to Federal Rule of Civil Procedure 37(c);

3.  **GRANTS** CrossFit's request for terminating sanctions under Federal Rule of Civil Procedure 37(e);

4.  **GRANTS** CrossFit's request for terminating sanctions under the Court's inherent powers;

5.  **DENIES** CrossFit's request for evidentiary sanctions related to damages;

6.  **GRANTS** CrossFit's request for the following additional issue sanctions related to damages:

/ / /

47

a.     It is taken as established that the NSCA's unfair competition and false advertising—including its false statements in the Devor Article, Erratum, Hak Study, various TSAC Report articles about CrossFit, content promoted at NSCA events referencing CrossFit-related injuries, and republication of these false statements—have deceived and continue to deceive the public and consumers regarding the safety and effectiveness of CrossFit training;

b.     It is taken as established that the NSCA's unfair competition and false advertising—including its false statements in the Devor Article, Erratum, Hak Study, various TSAC Report articles about CrossFit, content promoted at NSCA events referencing CrossFit-related injuries, and republication of these false statements—caused a decline in CrossFit's seminar revenue in the military, United States, and international fitness markets;

c.     It is taken as established that the NSCA's unfair competition and false advertising—including its false statements in the Devor Article, Erratum, Hak Study, various TSAC Report articles about CrossFit, content promoted at NSCA events referencing CrossFit-related injuries, and republication of these false statements—were willful and malicious;

d.     It is taken as established that the NSCA's unfair competition and false advertising—including its false statements in the Devor Article, Erratum, Hak Study, various TSAC Report articles about CrossFit, any content promoted at NSCA events referencing CrossFit-related injuries, and republication of these false statements—have increased NSCA revenue, growth, and goodwill, while injuring CrossFit's revenue, growth, and goodwill;

e.     It is taken as established that the NSCA's unfair competition and false advertising were a material cause of CrossFit's damages; and

f.     It is taken as established that CrossFit's efforts to combat, correct for, and mitigate the misinformation spread through the NSCA's false advertising,

///

including references to the false injury data, were reasonable, appropriate, and not a material cause of CrossFit's damages; and

7.  **GRANTS** CrossFit's request for monetary sanctions in the amount of $3,997,868.66.

Accordingly, the Court **STRIKES** the NSCA's Answers (ECF Nos. 9, 88, 191, 192) to CrossFit's Complaints and **ORDERS** the Clerk of Court to enter default against the NSCA in favor of CrossFit. To resolve the amount of damages to which CrossFit is entitled and the terms for the NSCA's payment of the ordered monetary sanctions to CrossFit, the Court **ORDERS** the Parties to meet and confer on or before December 31, 2019, and to file a Joint Status Report on or before January 14, 2020. Should the Parties fail to reach agreement concerning the amount of damages to which CrossFit is entitled, the Court **ORDERS** CrossFit to file a motion for default judgment addressing the damages CrossFit seeks on or before April 13, 2020.

**IT IS SO ORDERED.**

Dated: December 4, 2019

Hon. Janis L. Sammartino
United States District Judge